Robert G. Shepherd, Esq. (RGS-5946)
Brooks R. Bruneau, Esq. (BRB-5523)
MATHEWS, SHEPHERD, McKAY & BRUNEAU, P.A.
29 Thanet Road, Suite 201
Princeton, NJ 08540
Tel: (609) 924-8555

Of Counsel:
Philip Colicchio, Esq.
Taylor, Colicchio & Silverman, LLP
502 Carnegie Center, Suite 103
Princeton, NJ 08540
Tel: (609) 987-0022
Attorneys for Defendant

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| AEDES DE VENUSTAS, INC., | : | Civil Action No.: 1:07-04530 (LTS) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| VENUSTAS INTERNATIONAL, LLC, | : | |
| | : | |
| Defendant. | : | Honorable Laura Taylor Swain |
| | | Magistrate Judge Theodore Katz |

Document Electronically Filed

## VENUSTAS INTERNATIONAL LLC'S POST TRIAL BRIEF

# TABLE OF CONTENTS

Table of Cases                                                                ii

Statement of Facts                                                          1

Argument                                                                       7

    1.    Proximity of the Products                               7
    2.    Strength of the Mark                                    10
    3.    Degree of Similarity Between the Two Marks              11
    4.    Bridging the Gap                                        12
    5.    Instances of Actual Confusion                           14
    6.    Junior User's Good Faith In Adopting
          Its Own Mark                                        16
    7.    Quality of Defendant's Goods or Services                17
    8.    Sophistication of the Buyers                            18
Conclusion                                                                     19

## TABLE OF CASES CITED

Page(s)

*Brown v. Quiniou,* 744 F.Supp.
463 at 468 (S.D.N.Y. 1990)                                          15

*Edison Bros. Stores, Inc. v. Cosmair, Inc.,*
651 F.Supp. 1547, 1560 (S.D.N.Y. 1987)                             17

*E.S. Originals, Inc. v. Stride-Rite Corp.,*
656 F.Supp. 484, 490 (S.D.N.Y. 1987)                               17

*Horn's, Inc. v. Sanofi Beaute, Inc.,*
93 F.Supp. 318 at 325  (S.D.N.Y. 1997)                            14,17

*Lang v. Retirement Living Publishing Co., Inc.,*
 949 F.2d. 576 at 582 (2d. Cir. 1991)                            12,14

*Mejia and Associates, Inc. v. IBM Corp.,*
920 F.Supp. 540 at 549  (F.D.N.Y. 1996)                            14

*Trustees of Columbia University v.*
*Columbia HCA Healthcare Corp.,*
964 F.Supp. 733 at 742 (S.D.N.Y. 1997)                             11

*Windsor Inc. v. Intravco Travel Centers, Inc.,*
 799 F.Supp. 1513 at 1524                                        15,18

## STATEMENT OF FACTS

Aedes de Venustas was started by Carl Bradl and Robert Gerstner approximately 13 years ago in 1994 on Christopher Street in Manhattan.  May 29, 2007 Declaration of  Robert Gerstner  (hereinafter "Gerstner I") ¶2.  The principals run a store from that location that sells hard to find fragrances, related "beauty products" and products for the home such as candles. Gerstner I, ¶3.   It is their only location.  They also maintain a web site under the domain name Aedes.com on which they have been selling the same products they sell in their store. Declaration of Robert G. Shepherd (hereinafter "Shepherd Declaration") Exhibit A, Page 34; Gerstner Deposition Line 10-12 and Exhibit C.  In addition, they circulate a catalog in which the same products are offered for sale. Shepherd Declaration Exhibit A, Page 36, Line 9-14. Plaintiff owns U.S. Trademark Registration 3,082,887 for the mark "AEDES DE VENUSTAS" for retail store services, catalog and on line retail services in the fields of fragranced products, bath products, cosmetics, skin care products and scented candles.  Gerstner I, ¶5.  Their total revenues for 2006 were 1.4 million dollars.

While they do no traditional advertising for their retail services, the store and Mr. Bradl and Mr. Gerstner have been the subject of numerous articles in various publications which circulate in New York City and elsewhere.  Gerstner I, ¶6.  Some of these articles appear in Plaintiff's web site. Shepherd Declaration Exhibit B.  The web site also makes reference to a "Aedes gift card", the "Aedes Perfume News" and the "Aedes Magazine. Shepherd Declaration Exhibit B.   Likewise, the telephone number for catalog sales is 888-AEDES15. Id.  Their gift box and gift bag display the word "AEDES" in large lettering over the logo in which the entire

mark "Aedes de Venustas" appears in very small lettering. Defendant's Trial Exhibit A, Shepherd Declaration Exhibit 3.

Plaintiff's principal, Robert Gerstner, also testified that the company has also provided certain services to customers that they refer to generally as "consulting services". Shepherd Declaration Exhibit A, Page 17, Line 4-Page 18, Line 8. These services include creating corporate gifting programs for the holidays, scenting events such as fashion shows and art shows and product development which consists of assisting others in creating products and fragrances. Id. While the Plaintiff's reply brief states that 25% of the Plaintiff's revenues for 2006 come from product development, this claim was acknowledged as untrue by Mr. Gerstner in his trial testimony. Plaintiff's Reply Brief at P. 3 citing Gerstner Deposition Transcript P. 16-17; Trial transcript (hereinafter "T.T.") P. 41 Line 2-23. In fact, the Plaintiff has never been paid any money for any product development services it may have rendered to others. Id.

The one instance of what the Plaintiff characterizes as "product development" that occurred prior to the Defendant going into its business involved Mr. Bradl assisting the principals of an entity called "ThreeasFour in the development of a fragrance for Collette, a boutique in France. T.T. Page 57 Line 8. Contrary to the deposition and trial testimony of Mr. Gerstner wherein he claimed that Mr. Bradl had been involved in the design of the packaging, T.T. Page 31, Line 5-10, Mr. Bradl's involvement was limited to participating in the development of the fragrance in cooperation with Angela Donhauser of ThreeAsFour and Symrise, 'a big company that was hired from Collette to create the scent". T.T. Page 57, Line 17-25; Page 58, Line 1-3 and page 62, Line 13-16. Plaintiff was not paid for this service nor was there any contract between the parties defining Mr. Bradl's duties. T.T. page 41, Line 18-23; T.T. Page 58, Line 23-page 59 Line 3; T.T. Page 653, Line 19-20. As a token of appreciation,

2

however, ThreeAsFour let Aedes de Venustas sell between 50 and 100 of the 200 bottles of the product that they were given by Collette. T.T. page 61 Line 18-21. The product quickly sold out and because it is a limited edition, no more has been made.  T.T. Page 62, Line 3-18.

To date, this is the only commercially available fragrance Plaintiff has ever participated in the design of and the participation was limited to consulting on the fragrance.    Plaintiff does not even have a proprietary "signature fragrance" for sale under the Aedes de Venustas mark. Shepherd Declaration Exhibit A Page 39, Line 18-20.

Plaintiff also testified to having three other product development projects that it has been negotiating, since 2006.    T.T. page 46, Line 16-25.  These projects have several common characteristics.  First, there is no contract, written or oral, in existence for any of them even though Plaintiff claims to have been in discussions regarding all of these projects since 2006. Second, the Plaintiff does not even know how or how much it will be charging for its services. Third, the quantities of the product to be produced are unknown.  Fourth, none of the projects are for clients which are remotely related to the Defendant's target clients.  T.T. P. 14-18; P. 34-37.

Plaintiff did, however, reveal at trial that it has interacted with Defendant's target companies.  According to Plaintiff, Victoria's Secret, Abercrombie and Fitch, The Limited, Calvin Klein and Ann Taylor all do competitive shopping at Plaintiff's store. TT P. 10 L 20-22 In addition, in February of 2006, Plaintiff testified that it had a meeting with representatives of The Limited who are interested in us developing products for them, us consulting for them and also, on top of it, them eventually investing into our company". T.T. 23 12-16.  Nothing has transpired since that time.  There is also no claim or testimony that there has been any actual confusion among any of these entities arising from the Women's World Daily article.

Plaintiff did not offer this testimony about its consulting services to suggest that the Plaintiff and the Defendant were in the same business.  This much was admitted by Plaintiff's counsel when he stated during the trial that "we have not said that we're in the same business as Mr. Ghusson's company". T.T. P. 70, Line 18-19. "In fact, the arguments that were made in my brief were that we are able to bridge the gap in the future". T.T. P.70, Line 19-10.  Yet, when Plaintiff's counsel asked Mr. Gerstner whether he has set any kind of timetable for developing that consulting work, Mr. Gerstner replied "Nothing in particular." T.T. P. 21, Lie 20-22. "We just want to start getting this off the ground over the next couple of years, four or five years." T.T. P. 21, Line 22-24. There is no testimony from Plaintiff that describes any real business plan on how it plans to move from a retailer consulting with companies to develop fragrances to becoming a company that produces and delivers millions of dollars of product to companies with billion dollar revenue streams.  There is no testimony as to how it will finance projects of the size Venustas International is engaged in at this time.  Plaintiff has also admitted that it does not advertise any of its consulting services including its product development services. T.T. P. 43, Line 3-8.  Nor is any mention of them made in the articles attached to the declaration of Robert Gerstner.  Prospective purchasers learn about Plaintiff's consulting services only by word of mouth. Shepherd Declaration Exhibit A; Page 40, Line 15-22.

Venustas International is a creative development company that conceptualizes, develops and manufactures product lines in the "beauty" category including fragrances, on a contract basis for branded vertical specialty retailers with sales of $1 billion that are committed to creating and supporting a line of beauty products within their stores.  Declaration of Sam Ghusson (herein "Ghusson Declaration") ¶1 and 2.  As a result, the universe of prospective purchasers of Defendant's services is small, consisting of companies such as The Gap Stores and its

4

subsidiaries such as Banana Republic, Ann Taylor and Abercrombie and Fitch.    Ghusson Declaration ¶2 and 3.

Both of the company's principals, Sam Ghusson and Robin Burns-McNeill, have a great deal of experience in the beauty industry working for or with the same branded vertical specialty retailers they now seek as clients.    Ghusson Declaration ¶8.    Sam Ghusson has 30 years of experience in the operations side of the business and Robin Burns has 25 years in the creative side of the business developing such fragrances as Obsession, Eternity, Pleasure and Dream Angels and won more than 10 FiFi awards, the equivalent of an Oscar for beauty industry Ghusson Declaration ¶9, 10, 11 and 13.    Mr. Ghusson and Ms. Burns-McNeill worked together at both Calvin Klein and Victoria Secret Beauty. Ghusson Declaration ¶11.

Venustas International is not a consulting company.  T.T. P. 96, Line 17-19; T.T. P. 100, Line 1-16.  With the exception of payments they may receive for development costs such as tooling, they finance the development and manufacture of the product line for their customer and get paid only when they deliver product to the customer.  T. T. 79, Line 7-24. They work with customer forecasts to manufacture and deliver the right amount of product at the right time.  T.T. P. 100, Line 1-16.  Product deliveries for a single client are typically many millions of dollars in a single quarter. For example, see T.T.  P. 73, L. 17-22; T.T. P. 94, Line 11-13.

Venustas International does not advertise.  Its name does not appear on any of the product it produces.  T.T. P. 94, Line 16-19.  The company gets its business through existing contacts among its prospective purchasing population and personal introductions.  It gets the business based on the credentials and reputation of Robin Burns-McNeill in the industry. Ghusson Declaration ¶14.

The company was operating in virtual anonymity until March of 2007 when Ann Taylor issued a press release that was carried by Women's Wear Daily announcing "Ann Taylor taps Robin Burns to develop Collection." Gerstner I, ¶8. The article went on to say that Robin Burns and her company Venustas International had been hired to redesign and supply a beauty product line for all Ann Taylor stores. Gerstner I, ¶8. Immediately after the article ran, Aedes de Venustas began to receive calls from people asking to speak with people from Venustas International including Sam Ghusson. Gerstner I, ¶10. They also received calls from people in the fashion and beauty field congratulating Plaintiff and asking about the new contract with Ann Taylor. Gerstner l, ¶10. None of the callers were identified by the Plaintiff as its customers or the prospective customers of Venustas International. By the time Defendant took the deposition of Robert Gerstner, the calls had stopped. Aedes de Venustas received its last call for Venustas International in mid May, three weeks before Mr. Gerstner's deposition. Shepherd Declaration Exhibit A; P. 105, line 7-13.

Aedes de Venustas also received two misdirected invoices for services preformed for Venustas International, Gerstner I, ¶11. Robin Burns received an e-mail from a bottle manufacturer with whom she had done business in the past, congratulating her on becoming a part of Aedes de Venustas. Second Declaration of Robert Gerstner dated June 20, 2007 Exhibit "C".

At the time the article ran, Venustas International's phone number was not listed with directory assistance nor did it have an operating web site. Ghusson Declaration ¶35. When Mr. Ghusson called directory assistance after the law suit was filed but before the phone number of Venustas International was listed, and asked for Venustas International, he was told by the operator that there was no listing for Venustas International but that they had a number of Aedes

de Venustas which was offered.    Ghusson Declaration ¶26.    At this point, the Venustas International phone number is listed with directory assistance and the web site is up and running. T.T. P. 75, Line 6-7; Line 18-20. Since that time, Venustas International has not received any phone calls or electronic mail intended for the Plaintiff.  T.T. P. 75, Line 23 through P. 76, Line 1.

## ARGUMENT

As it was when we wrote our initial brief in opposition to Plaintiff's Motion for a Preliminary Injunction, we believe that the case is most properly analyzed in terms of the eight factors of the *Polaroid* case.   Accordingly, we review the eight factors in the same order of presentation as our original brief.

1.    **Proximity of the Products**.

Nothing has changed with regard to this point from our initial brief.   Plaintiff is selling products to retail purchasers under the name Aedes de Venustas.   The sales are made from its store on Christopher Street in Manhattan, and from its catalogue, and from its website, Aedes.com.   Plaintiff sells primarily the products of others and wraps them in a gift box emblazoned with the word "AEDES" and the Aedes de Venustas logo and then places them in its own personalized shopping bag which also features the word "AEDES" and the Aedes de Venustas logo. As for products it has created for its own line of goods it has thus far produced a candle which is sold in the Aedes de Venustas store.   There is no fragrance product being sold under the "AEDES DE VENUSTAS" mark.

The Plaintiff also provides consulting services which consist of the creating of gifting programs for its corporate clients, and the scenting of events such as fashion shows and art shows.

Plaintiff has also asserted that it is offering consulting services in the field of product development. Mr. Gerstner testified at his deposition that its product development services were responsible for 25% of the income of Aedes de Venustas. At trial, however, Mr. Gerstner testified that it has not been any paid money for any of the product consulting services that it had performed, and that it took its compensation for its services the opportunity to have an exclusive right to sell a product or product line. For example, in the only example of product development in which the Plaintiff engaged before the Defendant began to do business, they were given somewhere between 50-100 bottles of the fragrance ThreeasFour. This right to sell, however, was not a negotiated part of the arrangement between the Plaintiff and ThreeasFour, but merely a token of ThreeasFour's appreciation for Aedes de Venustas' participation in the project.

Plaintiff also identified three other projects in which it was doing consulting services for a third party. Two projects involve the development of a fragrance, and one project involved the development of a candle and room sprays. All three projects have been "in discussion" since 2006. None of the projects are under contract. There has not even been an determination at this point as to what the Plaintiff intends to charge for the quantities of product that will be manufactured. All three projects at this point are not even projects, but are merely generalized ideas in which no one is obligated to do or pay for anything. It is noteworthy in this regard that the only piece of paper relating to any of these projects confirms a meeting to discuss terms.

Aedes de Venustas does no traditional advertising for any of the goods or services it offers for sale. Its store and internet retail site, however, are promoted by the principals of Aedes de Venustas by having stories appear in local and national magazines, by running its website and sending catalogs to its existing customers. It does not, however, do **any** advertising of its

consulting services. The reason given for this lack of advertising is that they are not equipped to handle what they perceive would be a flood of business to take advantage of the consulting services that they offer including product development. This lack of interest in growth, however, begs the question of how they can claim that they can "bridge the gap' and begin to offer the same services being offered by Venustas International.

Venustas International, in contrast, has no retail presence. Their customers are a relatively few billion dollar corporate entities operating in the branded vertical specialty retailer industry. As has been noted throughout all of the briefs and at trial, Defendant's customers are entities such as the Gap stores and its subsidiaries such as Banana Republic, Ann Taylor and Abercrombie & Fitch. It is with these latter two entities, that the Defendant already has contracts.

Venustas International is not a consulting company nor does it provide consulting services. It develops and delivers products in the beauty category to its customers and it is paid for product, not for services. They make their money on the manufacturing profit margin. When the product is delivered to the customer, the name Venustas International does not appear anywhere on the product. Venustas International is the anonymous source of origin of these goods. With the exception of the press release issued by Ann Taylor when the agreement between Ann Taylor and Venustas International was struck, the only time one would see the Venustas International name is on its business cards or on its website, on its letterhead or on any materials prepared for presentation.

Venustas International does no advertising. It get its clients through pre-existing personal relationships that the principals have with their prospective clients and introductions by others in the beauty industry. For that reason, the only people who would likely come in contact with the

Venustas International name are decision makers and those who might be doing the introductions.

Comparing the two, Aedes de Venustas and Venustas International service entirely different purchasing populations and operate in entirely different channels of trade. Aedes de Venustas operates in the retail field and on a very limited basis provides some consulting services to corporations and small entities in the beauty industry. In contrast, Venustas International serves the decision makers from a very small group of billion dollar companies in the beauty industry. That Plaintiff and Defendant operate in different segments of the beauty industry was conceded by Plaintiff's counsel when during the trial he stated "We have not said that we are in the same business as Mr. Ghusson's company. In fact, the argument made in my brief were that we were able to bridge the gap in the future." Accordingly, unless Plaintiff is able to bridge the gap, there is no possibility of confusion between the two entities because they serve different client bases and their goods and services travel through entirely different channels of trade. For this reason, this factor weighs in Defendant's favor.

### 2.    **Strength of the Mark.**

Plaintiff's mark, "AEDES DE VENUSTAS," is the subject of a federal registration for both Plaintiff's retail store services and its internet services in the beauty field. In addition, Plaintiff's store and Plaintiff's principals have been the subject of numerous articles in newspapers and magazines that would likely be read by the Plaintiff's prospective purchasers. In view of the foregoing, Defendant concedes that Plaintiff's mark, "AEDES DE VENUSTAS," is a strong mark when used in connection with retail store services and retail internet services because the mark is registered and because the mark has received significant exposure from the articles appearing the public media.

The same cannot be said for use of the mark "AEDES DE VENUSTAS" in connection with Plaintiff's various consulting services. The presumption of an exclusive right to use a registered mark extends only to the goods and services noted in the registration certificate. *Trustees of Columbia University v. Columbia HCA Healthcare Corp.*, 964 F.Supp. 733 at 742 (S.D.N.Y. 1997). Two factors illuminates the "strength" inquiry: (1) the placement of the mark in the spectrum of marks; and (2) the marketplace recognition value of the mark. *Brown v. Quiniou*, 744 F.Supp. 463 at 468 (S.D.N.Y. 1990). The first factor identifies the inherent potential of the mark at the time of its first use. Id. The second describes its actual consumer recognition value at the time registration is sought and at the time it is asserted in litigation to prevent another's use. (citations omitted). Id. With regard to consulting services, we have already pointed out that the term "VENUSTAS" means "beauty." In addition, we note that Plaintiff, by its own admission, has not done any advertising with regard to its consulting services. Accordingly, because the term "VENUSTAS" has descriptive value and there has been no advertising in connection with the services, the mark as used in connection with consulting services is weak. This factor, therefore, is either a draw or is in Defendant's favor.

3.    **Degree of Similarity Between Two Marks**.

Little has changed in terms of our analysis of the comparison between the two marks. As noted in our initial brief, the Plaintiff has emphasized the "Aedes" portion of the mark on its signature gift box and its gift bag, as well as on its website, Aedes.com. On the website, it identifies two publications "Aedes Magazine" and "The Aedes Perfume News" as well as the "Aedes Gift Card" and in various locations throughout the text the business is referred to as "Aedes" as opposed to "Aedes de Venustas." Defendant points this out not so much as to suggest that the Plaintiff does not have rights in the mark "AEDES DE VENUSTAS," but to

11

point out that the "Aedes" portion of the mark is important, and has been emphasized to customers. Therefore, existing customers and perspective purchasers will focus on this portion of the mark as well as the "Venustas" portion and the Plaintiff does not have the right to dissect the mark when making this comparison.    Likewise, the Plaintiff's mark "VENUSTAS INTERNATIONAL" has the additional word "International" which distinguishes it from the Plaintiff's mark.  Because the marks share only one term, "VENUSTAS," and are otherwise easily distinguishable, this factor weighs in favor of Defendant.

4.    **Bridging the Gap**.

As noted earlier, Plaintiff's counsel has conceded that Plaintiff is not in the same business as Venustas International.  Instead, they are arguing that they are able to bridge the gap in the future.  As noted  in Defendant's Pre-Trial Brief, in order for Plaintiff to succeed in a claim that it will bridge the gap, it must first have plans to enter the market, and second, perspective purchasers, by virtue of Plaintiff's advertising, must be aware of Plaintiff's intention.  *Lang v. Retirement Living Publishing Co., Inc.,* 949 F.2d. 576 at 582 (2d. Cir. 1991).  As in the *Lang* case, however, the expansion claims of Aedes de Venustas are wholly speculative.  Furthermore, because the only way prospective purchasers can learn about Plaintiff's consulting services is by word of mouth, prospective purchasers have no reason to believe that Plaintiff will enter Defendant's  business of designing **and then manufacturing** lines of beauty products for branded specialty retailers.  Indeed, it is not even these services that are being "advertised" by word of mouth, rather, it is simply fragrance consulting services that Plaintiff passes on by word of mouth which clearly are different from what the Defendant does.

From the testimony at trial, it is clear that Plaintiff fails to appreciate the sophisticated nature of the Defendant's business. Defendant is only able to run a business like this because its

12

principals have spent a combined 55 years in the beauty industry working in house for the same clients Venustas International is now seeking to work for. It is because of its track record and their ability to get access to the decision makers though prior relationships with people who are influential in the industry, that the business can get the opportunity to offer its services to the decision makers it seeks to work with. Furthermore, in order to make the business work, the Defendant must finance the production of the line of beauty products, getting paid only 30 days after the products are delivered. Furthermore, the very magnitude of the business dwarfs the annual revenues of the Plaintiff. As testified by Mr. Ghusson, they will be delivering millions of dollars worth of product to their existing clients at the end of this quarter.

Finally, Plaintiff does not appreciate the time sensitive nature of the business. As noted above, they are still in early negotiations regarding certain consulting assignments they are pursuing, whereas the Defendant has, since March of this year, created an entire line of beauty products for two companies and are having them manufactured for delivery at the end of the third quarter. When Plaintiff's counsel asked Mr. Gerstner whether he had set any time table for development of the consulting work for the same customers serviced by the Defendant, Mr. Gerstner replied "nothing in particular," "we just want to start getting this off the ground over the next couple of years, four or five years." There is no testimony from Plaintiff that this drives any real business plans on how it plans to move from being a retailer to consulting with companies to develop fragrances to becoming a company that produces and delivers millions of dollars in product to companies with billion dollar revenue streams. There is also no testimony as to how it will finance projects of the size Venustas International is engaged in at this time.

Even if that is not enough to show that Plaintiff's plans to bridge the gap are clearly speculative, the Plaintiff has admitted that it does not advertise its consulting services including

13

its product development services.  Nor is there any mention of the consulting services in any of the articles attached to the first Declaration of Mr. Gerstner. Prospective purchasers learn about Plaintiff's consulting services (which are not the same as Defendant's services) only by word of mouth.  Accordingly, Plaintiff has not shown that it can bridge the gap. Its plans are purely speculative, and its customers and prospective customers have no inkling that Aedes de Venustas has any intention to move the company in this direction because it has done no  advertising.  See *Horn's, Inc. v. Sanofi Beaute, Inc.*, 93 F.Supp. 318 at 325  (S.D.N.Y. 1997) and *Mejia and Associates, Inc. v. IBM Corp.*, 920 F.Supp. 540 at 549  (F.D.N.Y. 1996).

5.    **Instances of Actual Confusion**.

Very little additional information was learned about the misdirected telephone calls received by the Plaintiff at the time of the Women's Wear Daily press release.  As we explained in our initial brief, the confusion created by the article that appeared in Women's Wear Daily is not relevant to the issue before the Court because it is not the type of confusion against which the Lanham Act was designed to protect.  The relevant confusion is that which affects "the purchasing and selling of the goods or services in question." *Lang v. Retirement Living Publishing Co., Inc.*, 949 F.2d 576 at 582 (2d.Cir. 1991).  Trademark infringement protects only against mistaken purchasing decisions and not against confusion generally. (Citations omitted) Id.  In this case, as in *Lang*, there is no evidence that links the confusion evinced by the calls to any potential or actual affect on consumer's purchasing decisions.  Id.  In this case, there is argument in Plaintiff's brief that referrals come from people in the beauty industry, however, that is not supported by the facts in the case.  There is no testimony that any of Plaintiff's consulting work has come from suppliers or people who are generally in the beauty industry.  Instead, the testimony of Angela Dornhauser from ThreeasFour shows a common theme wherein existing

14

customers of the store ask for assistance in connection with a project. Accordingly, the telephone calls that arose as a result of the Women's Wear Daily article should not be considered to be instances of actual confusion in this case.

In addition, the Plaintiff points to the misdirected letters from one of Defendant's suppliers and an email exchange between Robin Burns McNeill and a bottle designer as being additional instances of actual confusion. Again, these events should not be treated as instances of actual confusion "because the Lanham Act is concerned with confusion among consumers, and Plaintiff must prove that an appreciable number of reasonable consumers rather than suppliers or retailers would be confused as to the source of origin of Defendant's services. (citations omitted). *Windsor Inc. v. Intravco Travel Centers, Inc.,* 799 F.Supp. 1513 at 1524. See also *Brown v. Quiniou,* 744 F.Supp.463 at 472 (S.D.N.Y. 1990) wherein the Court found one incident of confusion by a fashion professional who confused a fashion design house with a jewelry company operating under the same name to be "of little probative value" "because …[she] is not an ordinarily prudent purchaser whose impressions are significant in the likelihood of confusion calculus." (citation omitted). Id. "She is a fashion professional with a substantial background in that industry and her impression cannot reasonably be said to reflect that of an average consumers." Id. Furthermore, as noted above, Plaintiff has not offered any evidence to support its claim that referrals for the Plaintiff's consulting services or its retail store services come from suppliers rather than existing customers of the Plaintiff's Aedes de Venustas retail operation. Accordingly, Plaintiffs have demonstrated no probative instances of actual confusion.

On the other hand, we note that the last misdirected telephone call received by Plaintiff was in mid-May and that since the Defendant launched its website and had its telephone number listed with directory assistance it has received no emails or telephone calls that should have gone

to the Plaintiff. In addition, at trial, Plaintiff testified that some of the corporations Defendant has identified as prospective clients for its services do competitive shopping at Plaintiff's store. We note, however, that none of these individuals were identified as having been confused as to the source of origin of the Defendant's services. Obviously, this suggests that differences between the marks, the goods and services offered by the parties and the sophistication of these competitive shoppers has avoided any confusion. Even if they were confused, however, the people doing competitive shopping are not the decision makers of the companies with which the Defendant does business and it is unlikely that they would have actually be exposed to the Defendant's trade name other than through the article. In view of the foregoing, namely the lack of probative instances of actual confusion as well as the fact that others who are employed by Defendant's prospective purchasers have not been confused, this factor weights heavily in favor of the Defendants as well.

6. **Junior User's Good Faith in Adopting Its Own Mark**.

The only fact added to the case regarding Defendant's good or bad faith in adopting its mark is the fact that Defendant's logo incorporates butterflies which were also present on Defendant's website until recently. From this, the Plaintiff asked the Court to conclude that Defendant's adoption and use of the "VENUSTAS INTERNATIONAL" trade name was in bad faith and that Defendant knew of Plaintiff's mark at the time it adopted its mark. As we noted in our initial brief, Plaintiff's adopted the mark based upon advice of counsel and the word within Defendant's trade name that it is the source of Plaintiff's complaint is the word "VENUSTAS" which means "beauty" in Latin.

As noted in our Pre-Trial Brief, the selection of a name that reflects an industry term or characteristic, a request for a trademark search and reliance on the advice of counsel are all

16

factors that support a finding of good faith. *E.S. Originals, Inc. v. Stride-Rite Corp.,* 656 F.Supp. 484, 490 (S.D.N.Y. 1987). Furthermore, "prior knowledge of a senior user's trademark does not necessarily give rise to an inference of bad faith and may be consistent with good faith. (citations omitted). *Horn's, Inc. v. Sanofi Beaute, Inc.,* 963 F.Supp. 318, 326 (S.D.N.Y. 1997). The real issue here is whether the Defendant adopted its mark with the intention of capitalizing on Plaintiff's reputation and good will, and any confusion between his and the senior user's product. *Lang,* 949 F.2d. at 583 (quoting *Edison Bros. Stores, Inc. v. Cosmair, Inc.,* 651 F.Supp. 1547, 1560 (S.D.N.Y. 1987); *Horn's, Inc.,* 967 F.Supp. at 326. Here, it must be plainly evident that Defendant did not choose its t name to capitalize Plaintiff's good will, Defendant's good will comes from the reputation and experience of the two principals, Sam Ghusson and Robin Burns McNeill. It is their combined 55 years of experience in the beauty industry and their familiarity with their prospective purchasers that drive the company. That is why the press release from Ann Taylor focused upon Robin Burns McNeill and mentioned Venustas International only in passing. Clearly, Defendant acted in good faith when choosing this mark and this factor weighs in favor of Defendant as well.

7.    **Quality of Defendant's Goods or Services**.

No additional testimony was taken on this issue at the trial because Plaintiff, in its Reply Brief, stated that "It seems likely the quality of Defendant's products will be approximately the same as those of Plaintiff." The Plaintiff goes on, however, to suggest that the similarity of product would lead to a greater likelihood of confusion. This may be true in cases such as the cases in the *Savin* case cited by the Plaintiff, where both parties sell product marked with their respective trademarks to the same purchasing population but here, that is not the case. Plaintiff's goods are sold at retail with the "AEDES DE VENUSTAS" trademark appearing thereon.

17

Defendant's goods are sold at retail under the trademark of their customer. The Defendant's trade name does not appear anywhere on the goods and is used only on Plaintiff's letterhead, business cards, website and presentation materials.  The use of the trade name in this fashion by the Defendants  is only in connection with a separate purchasing population  which is not likely to know of or see Plaintiff's trademark or service mark.  Accordingly, since there is no opportunity for the same purchasers to see the respective marks in a context where there could be confusion, this factor weighs in Defendant's favor.

8.    **Sophistication of the Buyers**.

Again, there was no testimony taken on this particular issue at trial.  Again, this is because the Plaintiff and Defendant agree on the issue of sophistication. As stated by the Plaintiff in its Reply Brief: "In general, consumers in the beauty and fragrance industry are sophisticated." The Plaintiff goes on, however, to argue that sophistication is not a factor here because the instances of actual confusion noted by the Plaintiff show that regardless of sophistication there is going to be confusion.  We have pointed out, however, that the confusion created by the publication of the Women's Wear Daily article is not probative of a likelihood of confusion because it did not involve perspective purchasers and that there is no evidence offered by the Plaintiff that supported its assertion that these misdirected telephone calls came from people who would provide consulting work to the Plaintiffs.  Accordingly, because high levels of consumer sophistication militate against the likelihood of confusion in the marketplace, *Windsor, Inc. v. Intravco Travel Centers, Inc.,* 799 F.Supp. 1513 at 1526, confusion in this case is less likely. Furthermore, because the higher the price of an article the more careful the typical consumer can be expected to be (citations omitted) Id., the fact that Defendant's customers are decision making executives of billion dollar corporations and the contracts between Defendant's and these

18

companies will result in production and sale of millions of dollars worth of products in the beauty category to be sold by these clients in their stores, the issue weighs heavily in favor of the Defendants.

## CONCLUSION

Reviewing the eight factors, the Plaintiff's goods and services and the Defendant's services are different that the Plaintiff's goods and services directed to different purchasing populations. Accordingly, the proximity of the goods and services weighs in favor of the Defendants.

With regard to strength of the Plaintiff's mark, because it is registered and publicized, the Plaintiff's mark as used in connection with the retail services is strong, however, because the mark is not registered for Defendant's consulting services and those services are not advertised, the mark is weak with regard to Defendant's services. As a result, this factor weighs either slight in favor of Defendant or it is a draw.

As for the next factor, similarity of the marks, Plaintiff's mark and Defendant's trade name share only the common word "VENUSTAS" which is the Latin term for "beauty." Plaintiff's mark begins with the word "AEDES" which is emphasized by the Plaintiff on its website and its packaging. Defendant's trade name includes the additional word "INTERNATIONAL." The differences, therefore, outweigh the similarities and this factor thereby weighs in favor of Defendants.

As for bridging the gap, Plaintiff has admitted that it does not provide the same services as Defendant and any plans that it does have to bridge the gap are speculative and the Plaintiff has not advertised these services. Accordingly, this factor weighs in favor of the Defendants.

As for actual confusion, while there is confusion, it is not probative of a likelihood of confusion in this case because the confusion has not occurred among perspective purchasers, but only others in the beauty industry. Because Plaintiff has not introduced any evidence supporting its claim that its referrals come from others in the beauty industry, any confusion among suppliers and others in the industry is not probative of a likelihood of confusion. Accordingly, this factor weighs in Defendant's favor.

As for Defendant's good or bad faith, Defendant requested a trademark search and the mark was cleared by Defendant's counsel. There is nothing to suggest bad faith on the part of the Plaintiff and, for that reason, this factor again weighs in Defendant's favor.

With regard to the remaining two factors: quality of Defendant's services and sophistication of consumers, the parties are in agreement that the products are of the same catagory and that the consumers are sophisticated. For that reason, both those factors also weigh in Defendant's favor.

Accordingly, with at least 7 out of 8 factors weighing in Defendant's favor, there is no possibility, let alone likelihood, of confusion between Plaintiff's mark "AEDES DE VENUSTAS" and Defendant's trade name "VENUSTAS INTERNATIONAL" and Plaintiff's motion for an injunction against Defendant's use of the trade name "VENUSTAS INTERNATIONAL" should be denied and the case dismissed.

Respectfully submitted:

Dated: August 7, 2007          BY: s/ Robert G. Shepherd
                               Robert G. Shepherd, Esq.
                               MATHEWS, SHEPHERD, McKAY & BRUNEAU
                               29 Thanet Road, Suite 201
                               Princeton, New Jersey 08540-3661
                               Email: shep@mathewslaw.com