# EXHIBIT 1

18

1  Q.  What did you do next in terms of the
2 naming the company?
3  A.  We asked our lawyer to clear the
4 name.
5  Q.  What do you mean by clear the name?
6  A.  Let me know if I could have it.
7 That's --
8  Q.  And do you have any understanding of
9 what's involved in that process of clearing a name?
10  A.  Yes.
11  Q.  Can you explain that to me.
12  A.  Clear, make sure that no one has the
13 name as their companies and that it's clear from a
14 trademark.
15  Q.  Do you remember the name of the
16 lawyer that you asked to do that?
17  A.  Yes.
18  Q.  What was that?
19  A.  Allen Silk. It's A-L-L-E-N, Allen,
20 Silk, S-I-L-K.
21  Q.  Which firm is he with?
22  A.  Stark and Stark.
23  Q.  Had you used Mr. Silk previously to
24 this request as an attorney?
25  A.  Yes.

19

1  Q.  Okay. And was it personally or in
2 connection with business?
3  A.  Business.
4  Q.  Okay. How many -- how long had you
5 been using Mr. Silk as an attorney?
6  A.  I believe we'd retained him as of
7 November or -- November maybe or October of 2005.
8  Q.  Does Mr. Silk have any particular
9 area of the law that he focuses on?
10  A.  Not familiar with that.
11  Q.  Okay. And is the firm Stark and
12 Stark a reputable firm in your mind?
13  A.  Absolutely.
14  Q.  Mr. Silk a competent attorney in your
15 mind?
16  A.  Absolutely. I use the firm for my
17 personal --
18  Q.  So you have -- you have a great deal
19 of trust in the firm?
20  A.  Absolutely.
21  Q.  Okay.
22  A.  He -- I just want to add one thing.
23  Q.  Sure.
24  A.  He basically did not clear the name
25 Pulse for us, The Pulse.

20

1  Q.  He did not clear the name The Pulse?
2  A.  He did not. He said, that can be a
3 problem. You might have issues with that and
4 basically we said, we don't want any issues. We
5 walk away from it and we went to the second choice,
6 Venustas.
7  Q.  So, Pulse was the first choice?
8  A.  My partner's first choice, and I
9 relinquish to her, she's the creative mind.
10  Q.  What was the nature of the problem,
11 did he elaborate?
12  A.  Just he said that other people -- The
13 Pulse could be -- could create problem for you. I
14 said, I'm not interested if it creates problem.
15  Q.  You didn't ask him what kind of
16 problem there was?
17  A.  No.
18  Q.  And do you remember the time frame in
19 which this happened with Mr. Silk, the clearing the
20 name?
21  A.  Early Spring of 2006 I believe,
22 somewhere around there.
23  Q.  Okay. So let me make sure I
24 understand the chronology. You asked Mr. Silk to
25 clear the name The Pulse, correct?

21

1  A.  Correct.
2  Q.  He came back and said there could be
3 a problem and you said forget it, correct?
4  A.  Correct.
5  Q.  Then you asked him to clear the name
6 Venustas International?
7  A.  You got it.
8  Q.  Okay. Let's mark this as Plaintiff's
9 Exhibit number two.
10   (Document received and marked P-2 for
11 identification.)
12  Q.  Mr. Ghusson, I'm handing you a
13 document that we've had marked as Plaintiff's
14 Exhibit number two. Can you identify this document
15 for us?
16  A.  Yeah. This is an invoice from Stark
17 and Stark in association with the formation of the
18 LLC and clearing the corporate and trademark name
19 for my company.
20  Q.  It doesn't identify the name of the
21 company on the invoice, but do you recall what the
22 name of the company was that was involved?
23  A.  Venustas International.
24  Q.  Okay. And the document bears the
25 bates VEN120; is that correct?

6 (Pages 18 to 21)

22

1    A.    Excuse me?
2    Q.    For the record, I'll just say --
3    A.    VEN120, yes.
4    Q.    That's the bates number?
5    A.    Correct.
6    Q.    Is that the number that --
7          MR. HEPPT: Can we stipulate that
8 that's the number that the Defendant has affixed to
9 its document production?
10         MR. SHEPHERD: Yeah.
11         MR. HEPPT: Okay.
12   Q.    Now, can you describe for me the
13 business -- the nature of the business of Venustas
14 International, LLC?
15   A.    Yes.
16   Q.    Sure.
17   A.    We are a development company.
18   Q.    Uh-huh.
19   A.    Development creative company. We
20 develop beauty, personal care, home care and edible
21 product to specialty retailers to sell under their
22 own trademark and in their own stores to their own
23 customers.
24   Q.    When you say develop these various
25 products, what exactly do you mean by that?