# Ex A to Decl of McCallion

```
                                                                    1
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
 2                DOCKET NO. 07 CIV 4530 (LTS) (THK)

 3

 4   AEDES DE VENUSTAS, INC.,

 5          Plaintiff,                          CONFIDENTIAL
                                                DEPOSITION OF:
 6      vs.
                                                SAM GHUSSON
 7
     VENUSTAS INTERNATIONAL, LLC,
 8
            Defendants.
 9   ---------------------------------

10

11

12

13

14        T R A N S C R I P T  of the stenographic notes of

15   the proceedings, taken in the above-entitled matter, by and

16   before SHAUNNA H. MORAN, a Certified Shorthand Reporter,

17   License No. X1002 3700, Registered Professional Reporter,

18   and Notary Public of the State of New Jersey, held at the

19   offices of MATHEWS, SHEPHERD, McKAY & BRUNEAU, P.A., 29

20   Thanet Road, Princeton, New Jersey, on Tuesday, June 12,

21   2007, commencing at 10:10 a.m.

22

23

24

25
```

*Condensed Copy* (watermark)

Page 6

```
 1  understand that?
 2      A.   Yes.
 3      Q.   Okay. If at any time you don't
 4  understand the question that I ask you just let me
 5  know, I'll be happy to rephrase it.
 6      A.   No problem.
 7      Q.   Okay. And if you need to take a
 8  break at any time, again, let me know, I'd be happy
 9  to accommodate. As long as there's no question
10  pending at the time.
11      A.   No problem.
12      Q.   Okay. By whom are you employed?
13      A.   By myself.
14      Q.   Okay. And are you affiliated with
15  the defendant in this case in any way?
16      A.   I'm the president and CEO.
17      Q.   Okay. Of the Venustas International,
18  LLC?
19      A.   Correct.
20      Q.   And is Venustas International, LLC
21  engaged in the business -- I'm sorry, the beauty
22  industry?
23      A.   Yes, we are.
24      Q.   Okay. How long have you personally
25  been engaged in the beauty industry?
```

Page 7

```
 1      A.   Since 1976.
 2      Q.   And what was the first company that
 3  you worked for in the beauty industry?
 4      A.   Estee Lauder.
 5      Q.   Okay. If you could just, you know,
 6  briefly summarize for me the -- your employment
 7  history. And I'm only interested in employment
 8  relating to the beauty industry.
 9      A.   No problem. I was at Estee Lauder.
10  After Estee Lauder I went to the Mennen Company.
11  After the Mennen Company I was employed by Calvin
12  Klein Cosmetics, Elizabeth Arden Cosmetics, company
13  called the Griffin Development and Victoria Secret
14  Beauty.
15      Q.   The company that you mentioned,
16  Griffin, what -- what type of company was that?
17      A.   Griffin was a development company,
18  beauty, personal care product development company
19  that developed products for Victoria Secret, Bath
20  and Body Works and other retailers.
21      Q.   Okay. Would it be fair to say that
22  you held an executive position at each one of those
23  companies that you just mentioned?
24      A.   No.
25      Q.   Okay. Which companies did you hold
```

Page 8

```
 1  an executive position?
 2      A.   At Calvin Klein, Elizabeth Arden,
 3  Griffin and Victoria Secret Beauty, the last four.
 4      Q.   Okay. Was Griffin a privately held
 5  or publicly held company?
 6      A.   It was owned by the Limited.
 7      Q.   Okay. During your career in the
 8  beauty industry did you have occasion to deal with
 9  trademark issues?
10      A.   Yes.
11      Q.   Okay. Would it be fair to say that
12  trademark issues are a big part of the beauty
13  industry?
14      A.   I would say it is part of it.
15      Q.   It's an important -- it's an
16  important issue, especially in product development;
17  isn't that true?
18      A.   In product name, correct.
19      Q.   And have you had occasion personally
20  to -- to deal with any trademark issues during the
21  course of your career in the beauty industry?
22      A.   Not personally, but my team did.
23      Q.   Okay. And have you worked with
24  attorneys, outside counsel or inside counsel, on
25  trademark issues from time to time?
```

Page 9

```
 1      A.   Yes.
 2      Q.   Okay. Are you familiar with a
 3  publication called Women's Wear Daily?
 4      A.   Yes.
 5      Q.   Do you read that publication?
 6      A.   Yes.
 7      Q.   Do you read it with any -- any sort
 8  of regularity?
 9      A.   Yes.
10      Q.   Okay. Would it be fair to say that
11  you read it on a daily basis?
12      A.   Yes.
13      Q.   Okay. When you read Women's Wear
14  Daily do you read the entire issue cover to cover?
15      A.   No.
16      Q.   Okay. Can you explain. Do you have
17  a practice of how you read that publication?
18      A.   Yes, I do. I receive it on line, I
19  click on the retail end to see what interesting
20  retail is going on. Then I click on the beauty
21  section and see if anything interesting in the
22  beauty.
23      Q.   Okay. What would -- what would, in
24  your mind, constitute an interesting article in the
25  beauty section?
```

Page 10

1  A.    Somebody launching a new fragrance or
2  a new cosmetic line.
3  Q.    Okay. And the same question with
4  regard to retail, what would be an interesting
5  article in your mind?
6  A.    Any retailers that I associate with
7  that I want to read about.
8  Q.    Okay. Have you ever heard of the
9  Phee Phee Awards?
10 A.    Oh, yes.
11 Q.    Okay. And what are they?
12 A.    They are fragrance award given to
13 different categories in the fragrance industry.
14 Q.    And is there a particular industry
15 group that, you know, gives out those awards?
16 A.    The beauty industry.
17 Q.    Okay. Have you ever participated in
18 nominating a product for a Phee Phee Award?
19 A.    No.
20 Q.    Have you ever been nominated for a
21 Phee Phee Award yourself?
22 A.    When you say yourself, me or my
23 company?
24 Q.    Either one. Let's start with
25 yourself first.

Page 11

1  A.    Myself, no.
2  Q.    And your company?
3  A.    Yes.
4  Q.    Which company was that?
5  A.    Calvin Klein, Elizabeth Arden and
6  Victoria Secret Beauty.
7  Q.    And did any of those nominations
8  result in an actual award?
9  A.    Absolutely.
10 Q.    Which ones?
11 A.    All of them.
12 Q.    All of them. And what years -- can
13 you just tell me which years those awards were?
14 A.    Oh, God. You know, I -- I work for
15 Calvin Klein in 19 -- I'm sorry. I work for Calvin
16 Klein in 1984 to -- to 2004, Arden in 2005 and
17 Victoria Secret from 1998 'till 2004, roughly. So
18 during those periods multiple nomination, multiple
19 wins at Calvin Klein and Victoria Secret.
20 Q.    You just -- maybe I wrote this down.
21 You said you worked at Calvin Klein from 1984, was
22 that to 2004 or was that '94?
23 A.    Oh, no. No, '94. My mistake, '84 to
24 '94. Ten years for Calvin Klein, one year for
25 Elizabeth Arden.

Page 12

1  Q.    And about six years for Victoria
2  Secret?
3  A.    Victoria Secret, give and take a few
4  months, you know.
5  Q.    Now, I think you said you're the
6  president and chief executive officer of Venustas
7  International, LLC, correct?
8  A.    Yes.
9  Q.    Who's the chairman?
10 A.    Robin Burns McNeill.
11 Q.    Have you and Ms. McNeill worked
12 together previously?
13 A.    Yes, sir.
14 Q.    And can you explain when and where.
15 A.    Robin was my president at Calvin
16 Klein Beauty Cosmetics and she was the president at
17 Victoria Secret Beauty. So I worked for Robin in
18 both companies.
19 Q.    Okay. When -- when was the company
20 Venustas International formed?
21 A.    I don't know the exact date.
22 Q.    Can you give me an approximate date,
23 a year?
24 A.    It was in zero -- I'm not sure if it
25 was late '05 or early '06. I am not sure.

Page 13

1  Q.    Okay.
2  A.    I would have to look back for the
3  information date. My guess would be it could be
4  late in 2005 or early 2006 somewhere.
5  Q.    Okay. Let's mark this as Plaintiff's
6  Exhibit 1.
7       (Document received and marked P-1 for
8  identification.)
9  Q.    Mr. Ghusson, I've just handed you a
10 document that has been marked as Plaintiff's Exhibit
11 1.
12      MR. HEPPT: And for the record, the
13 document is a multi page document bearing bates
14 numbers VEN2 through VEN6. The first page appears
15 to be a certificate for the State of Delaware dated
16 January 25, 2007.
17 Q.    Mr. Ghusson, does this document
18 refresh your recollection as to when the company was
19 formed?
20 A.    I need to read it for a second.
21 Q.    Sure.
22 A.    Yes, this says July 2006.
23 Q.    Okay.
24 A.    As a Delaware corporation.
25 Q.    Okay.

Page 14

1  A.   Uh-huh.
2  Q.   Were you involved in the formation or
3 the decision to form the defendant corporation?
4  A.   Yes.
5  Q.   Okay. And who did you work with in
6 that regard?
7  A.   My partner and I are the founders of
8 Venustas International.
9  Q.   And by your partner who are you
10 referring to?
11  A.   Robin Burns.
12  Q.   Okay. Can you explain to me how the
13 name Venustas International, LLC was selected?
14  A.   Yes.
15  Q.   And would you please do that.
16  A.   I asked my assistant at Victoria
17 Secret Beauty prior to departing Victoria Secret
18 Beauty to have some ideas -- if she has some ideas
19 with a name for a company and I told her what our
20 business was going to be, developing beauty product
21 for retailers. And she came out -- back to me with
22 a list of names all has the meaning of beauty in
23 different languages.
24  Q.   What was this -- I'm sorry, I didn't
25 mean to interrupt you.

Page 15

1  A.   Please.
2  Q.   What was the assistant's name?
3  A.   Mina, M-I-N-A, Coccia, C-O-C-C-I-A.
4  Q.   Is she still working at Victoria
5 Secret Beauty, to your knowledge?
6  A.   Yes, sir. Let me just -- she might
7 be working another division, but owned by the same
8 parent company.
9  Q.   Okay.
10  A.   She still have her job.
11  Q.   And Victoria Secret is owned?
12  A.   By the Limited.
13  Q.   Now, you said that she came back to
14 you with a list of names, all of which had the word
15 beauty in various languages.
16  A.   Correct.
17  Q.   How many names were on that list?
18  A.   I'm going to say, just roughly
19 estimating, probably eight names.
20  Q.   Do you remember what those names
21 were?
22  A.   No.
23  Q.   Do you have a copy of that list
24 anywhere?
25  A.   No.

Page 16

1  Q.   And so, after she gave you the list
2 what did you do next?
3  A.   I circled the Venustas name and I
4 liked it. In Latin -- it's beauty in Latin. I sent
5 the list to -- I send the name, as well as other --
6 like Bella, which I believe it's in Italian, and
7 Amore, and I send the names to my business partner,
8 to Robin, and she asked me to give her an
9 explanation of the names. I forwarded the
10 explanation of the name Venustas to mean beauty,
11 elegance, loveliness as was defined by Mina from her
12 dictionary, wherever she found it, and Robin waited
13 for a while and wanted to entertain additional names
14 in addition to this. We -- and then we decided
15 finally to go for it.
16  Q.   Okay. When did this all take place?
17  A.   I'm going to say before we formed the
18 company. It's got to be either some time in early
19 Spring of 2006.
20  Q.   Okay.
21  A.   That's my guess. I'm not sure of the
22 exact timing.
23  Q.   And correct me if I heard you wrong,
24 but I thought you told me a minute ago that Robin
25 had asked to come up with additional names in

Page 17

1 addition to the eight that were on the list?
2  A.   Yes.
3  Q.   And do you remember whether there
4 were additional names that were proposed?
5  A.   Yes.
6  Q.   And how many additional names were
7 proposed?
8  A.   A few. I can't recall the number.
9  Q.   Who proposed them?
10  A.   She proposed some and I proposed
11 some.
12  Q.   Okay. Do you remember what those
13 additional names were?
14  A.   One was -- The Pulse was proposed by
15 her, and I believe I proposed Opus.
16  Q.   O-P-U-S?
17  A.   Yeah.
18  Q.   Off the record.
19      (Discussion held off the record.)
20  Q.   Back on the record. Eventually
21 Venustas International obviously was selected?
22  A.   Correct.
23  Q.   And it was a joint decision between
24 yourself and Ms. McNeill?
25  A.   Correct.

## Page 18

1  Q.  What did you do next in terms of the
2 naming the company?
3  A.  We asked our lawyer to clear the
4 name.
5  Q.  What do you mean by clear the name?
6  A.  Let me know if I could have it.
7 That's --
8  Q.  And do you have any understanding of
9 what's involved in that process of clearing a name?
10  A.  Yes.
11  Q.  Can you explain that to me.
12  A.  Clear, make sure that no one has the
13 name as their companies and that it's clear from a
14 trademark.
15  Q.  Do you remember the name of the
16 lawyer that you asked to do that?
17  A.  Yes.
18  Q.  What was that?
19  A.  Allen Silk. It's A-L-L-E-N, Allen,
20 Silk, S-I-L-K.
21  Q.  Which firm is he with?
22  A.  Stark and Stark.
23  Q.  Had you used Mr. Silk previously to
24 this request as an attorney?
25  A.  Yes.

## Page 19

1  Q.  Okay. And was it personally or in
2 connection with business?
3  A.  Business.
4  Q.  Okay. How many -- how long had you
5 been using Mr. Silk as an attorney?
6  A.  I believe we'd retained him as of
7 November or -- November maybe or October of 2005.
8  Q.  Does Mr. Silk have any particular
9 area of the law that he focuses on?
10  A.  Not familiar with that.
11  Q.  Okay. And is the firm Stark and
12 Stark a reputable firm in your mind?
13  A.  Absolutely.
14  Q.  Mr. Silk a competent attorney in your
15 mind?
16  A.  Absolutely. I use the firm for my
17 personal --
18  Q.  So you have -- you have a great deal
19 of trust in the firm?
20  A.  Absolutely.
21  Q.  Okay.
22  A.  He -- I just want to add one thing.
23  Q.  Sure.
24  A.  He basically did not clear the name
25 Pulse for us, The Pulse.

## Page 20

1  Q.  He did not clear the name The Pulse?
2  A.  He did not. He said, that can be a
3 problem. You might have issues with that and
4 basically we said, we don't want any issues. We
5 walk away from it and we went to the second choice,
6 Venustas.
7  Q.  So, Pulse was the first choice?
8  A.  My partner's first choice, and I
9 relinquish to her, she's the creative mind.
10  Q.  What was the nature of the problem,
11 did he elaborate?
12  A.  Just he said that other people -- The
13 Pulse could be -- could create problem for you. I
14 said, I'm not interested if it creates problem.
15  Q.  You didn't ask him what kind of
16 problem there was?
17  A.  No.
18  Q.  And do you remember the time frame in
19 which this happened with Mr. Silk, the clearing the
20 name?
21  A.  Early Spring of 2006 I believe,
22 somewhere around there.
23  Q.  Okay. So let me make sure I
24 understand the chronology. You asked Mr. Silk to
25 clear the name The Pulse, correct?

## Page 21

1  A.  Correct.
2  Q.  He came back and said there could be
3 a problem and you said forget it, correct?
4  A.  Correct.
5  Q.  Then you asked him to clear the name
6 Venustas International?
7  A.  You got it.
8  Q.  Okay. Let's mark this as Plaintiff's
9 Exhibit number two.
10   (Document received and marked P-2 for
11 identification.)
12  Q.  Mr. Ghusson, I'm handing you a
13 document that we've had marked as Plaintiff's
14 Exhibit number two. Can you identify this document
15 for us?
16  A.  Yeah. This is an invoice from Stark
17 and Stark in association with the formation of the
18 LLC and clearing the corporate and trademark name
19 for my company.
20  Q.  It doesn't identify the name of the
21 company on the invoice, but do you recall what the
22 name of the company was that was involved?
23  A.  Venustas International.
24  Q.  Okay. And the document bears the
25 bates VEN120; is that correct?

Page 22

```
1   A.   Excuse me?
2   Q.   For the record, I'll just say --
3   A.   VEN120, yes.
4   Q.   That's the bates number?
5   A.   Correct.
6   Q.   Is that the number that --
7        MR. HEPPT: Can we stipulate that
8   that's the number that the Defendant has affixed to
9   its document production?
10       MR. SHEPHERD: Yeah.
11       MR. HEPPT: Okay.
12  Q.   Now, can you describe for me the
13  business -- the nature of the business of Venustas
14  International, LLC?
15  A.   Yes.
16  Q.   Sure.
17  A.   We are a development company.
18  Q.   Uh-huh.
19  A.   Development creative company. We
20  develop beauty, personal care, home care and edible
21  product to specialty retailers to sell under their
22  own trademark and in their own stores to their own
23  customers.
24  Q.   When you say develop these various
25  products, what exactly do you mean by that?
```

Page 23

```
1   A.   We come up with the assortment, the
2   naming, we select the fragrance, we select the
3   formulation of the product, we source the
4   componentry, we retain designers to design the
5   package, we procure the componentry, we manufacture
6   it and we ship it to our customers in their own
7   trademark with their own name.
8   Q.   Okay. So the product that you
9   develop is under the trademark that the client owns?
10  A.   Correct.
11  Q.   Okay. Now, selecting the fragrance,
12  do you have people that are employed by your company
13  who are trained in fragrance development or
14  perfumers, for example?
15  A.   Fragrance evaluation.
16  Q.   What is involved within fragrance
17  evaluation?
18  A.   They basically give a profile to a
19  fragrance house of what we're looking for, what kind
20  of fragrance we're looking for. Fragrance house
21  comes back with submissions. Our people will smell
22  them and they'll give feedback to the fragrance
23  houses if there is any modifications need to be
24  done, top note, middle note, bottom note, I'm not a
25  perfumist and that's not my specialty.
```

Page 24

```
1   Q.   When you say they give a profile to
2   the fragrance house, what do you mean by the
3   profile?
4   A.   It's what we're trying to accomplish.
5   This is, you know, sophisticated customer. You
6   know, you describe the fragrance. What are you
7   trying to -- you know, the positioning. The
8   positioning of the fragrance.
9   Q.   The target, the person who the
10  fragrance will be targeted at?
11  A.   It's the customer that you'll be
12  targeted at, yes.
13  Q.   And do they describe the types of
14  scents that will be involved in the fragrance?
15  A.   I don't know.
16  Q.   Okay. What do you mean by edible
17  products? You mentioned edible products.
18  A.   We make mints.
19  Q.   Okay. Are they scented mints?
20  A.   No, flavored mints.
21  Q.   Would you consider the mints to be a
22  beauty product?
23  A.   It's an accessory to the beauty.
24  Q.   Okay. Not a beauty product itself?
25  A.   No.
```

Page 25

```
1   Q.   Let's have this document marked as
2   Plaintiff's Exhibit Three.
3        (Document received and marked P-3 for
4   identification.)
5   Q.   Mr. Ghusson, I've handed you what's
6   been marked as Plaintiff's Exhibit Three. Can you
7   identify -- it's -- first of all, for the record
8   it's a three page document bearing the bates numbers
9   VEN11 through VEN13. And can you describe to me
10  what those documents are?
11  A.   This is a website for Venustas
12  International, LLC in development of -- have not yet
13  been published. Have not yet been approved yet by
14  my business partner --
15  Q.   Okay.
16  A.   -- Robin Burns.
17  Q.   The first page would be the home
18  page; is that correct?
19  A.   Yes. Appears to be, correct.
20  Q.   And the second page of the exhibit
21  is -- can you tell us what that would be?
22  A.   That would be a description of what
23  we do.
24  Q.   We being?
25  A.   Why do we exist.
```

7 (Pages 22 to 25)

**Page 30**

1 this challenge." Did I read that correctly?
2   A.   Read it correctly.
3   Q.   And would it be fair to say the
4 Venustas International is targeting fashion
5 specialty -- specialty retailers who want to get
6 into the beauty --
7   A.   Correct.
8   Q.   -- business?
9   A.   Correct.
10  Q.   Okay. And the list of companies as
11 examples that you gave to me a minute ago of
12 specialty retailers -- vertical specialty retailers,
13 all those companies are fashion specialty retailers,
14 correct?
15  A.   Correct.
16  Q.   All right.
17  A.   Correct in my definition.
18  Q.   Right. Okay.
19       (Discussion held off the record.)
20  Q.   Let's go back on the record. Are you
21 familiar with the article that appeared in Women's
22 Wear Daily on March 16th of this year that related
23 to your company?
24  A.   Yes.
25  Q.   Okay. Were you interviewed as part

**Page 31**

1 of that article?
2   A.   No.
3   Q.   Was Ms. McNeill interviewed?
4   A.   Yes, she was.
5   Q.   Okay. And do you know what the --
6 what the thrust of the article was?
7   A.   Yes.
8   Q.   And what was it?
9   A.   That Ann Taylor tabbed Robin Burns to
10 develop their business.
11  Q.   Okay. And in fact, it was Ms. Burns
12 and Venustas International, her company, correct?
13  A.   Correct.
14  Q.   Okay. Were you -- you or Ms.
15 Burns -- is it Ms. Burns or Ms. McNeill? I'm
16 getting confused.
17  A.   You can refer to her as Ms. Burns.
18  Q.   Okay. When we say Ms. Burns you'll
19 know we're talking about Robin Burns McNeill?
20  A.   Correct.
21  Q.   Do you know whether Ms. Burns was
22 given a copy of the article before it was published?
23  A.   I'm not aware of that.
24  Q.   Okay. In the article -- and it
25 refers obviously to the relationship that had been

**Page 32**

1 formed between your company and Ann Taylor. It also
2 mentions a second client of your company, do you
3 remember that?
4   A.   Yes, I remember that.
5   Q.   Do you know who the client is that
6 was referred to?
7       MR. SHEPHERD: This part of the
8 record now goes confidential, attorneys eyes only.
9       MR. HEPPT: Fine.
10  A.   Yes, Abercrombie & Fitch.
11  Q.   Okay. Do you have a similar
12 arrangement with Abercrombie & Fitch as you have
13 with Ann Taylor?
14  A.   Yes.
15      MR. HEPPT: Let's have this document
16 marked as Plaintiff's Exhibit Four. You might as
17 well stay on the special designation of this
18 transcript.
19      (Document received and marked P-4 for
20 identification.)
21  Q.   Now, Mr. Ghusson, I've just handed
22 you what's been marked as Plaintiff's Exhibit Four
23 for Identification. Can you tell us what that
24 document is?
25  A.   That is a vendor agreement between

**Page 33**

1 Venustas International and Ann Taylor.
2   Q.   I blanked out for a second when you
3 said that. What kind of agreement is it?
4   A.   A vendor agreement.
5   Q.   Vendor agreement, okay. Is this the
6 agreement that was the subject of the Women's Wear
7 Daily article on March 16th?
8   A.   Yes.
9   Q.   Okay. Can you tell me who first
10 initiated contact that lead to this -- this
11 agreement?
12  A.   A person by the name of George Leeds.
13  Q.   And who is Mr. Leeds?
14  A.   He's the editor of Beauty Fashion or,
15 I'm sorry, Cosmetic World.
16  Q.   What -- can you describe the role
17 that Mr. Leeds played in making --
18  A.   Yeah. Mr. Leeds contacted Robin
19 Burns and asked her if she would like to meet with
20 the chairman of Ann Taylor to discuss an opportunity
21 of developing a product for her.
22  Q.   Would that be Ms. Kay Krill?
23  A.   Correct.
24  Q.   Did Mr. Leeds explain why he was
25 making this -- this phone call to Ms. Burns, other

## Page 34

1  than -- other than to make -- you know, to see if
2  she was interested?
3      A.    Because Ms. Krill was in discussion
4  with other people to do it for her and George Leeds
5  felt that Robin would be the best choice and asked
6  Ms. Krill to hold off on any decisions until she
7  meets with Robin.
8      Q.    Okay. And Mr. Leeds and Ms. Burns
9  have a prior working relationship?
10     A.    I don't -- I don't define it as a
11 work relationship. I define it that he's an editor
12 of Cosmetic World Magazine so he knows Robin and
13 everybody in the beauty industry I'm assuming.
14     Q.    Okay. What happened after Mr. Leeds
15 called Ms. Burns?
16     A.    We set up a meeting with Ms. Krill
17 and her team, Robin and I and George Leeds, and we
18 met with them to present the concept ourselves and
19 what we could do for them in the beauty business.
20     Q.    Okay. Was Mr. Leeds paid any kind of
21 finders fee?
22     A.    Yes.
23     Q.    Was it a flat fee or a percentage?
24     A.    No, just -- just a check.
25     Q.    Okay. And you participated in that

## Page 35

1  meeting, correct?
2      A.    Absolutely.
3      Q.    Okay. When did that meeting take
4  place?
5      A.    Oh, God, late 2006. I'm not sure
6  exactly as of when. It could be November 2006.
7      Q.    Prior to the meeting did you send any
8  documentation over to Ms. Krill or any member of her
9  team?
10     A.    I don't recall.
11     Q.    Okay. Did you provide any
12 information regarding the company, Venustas
13 International, prior to meeting with her?
14     A.    I don't recall.
15     Q.    Did the company produce any type of
16 promotional material that would be used in
17 soliciting new business?
18     A.    No.
19     Q.    Did the company produce any material
20 that would be used in connection with the meeting
21 that you had with Ms. Krill and her team?
22     A.    Yes.
23     Q.    Do you remember what that material
24 was?
25     A.    A presentation.

## Page 36

1      Q.    Was it a slide show presentation?
2      A.    It was, but we didn't present it on a
3  slide. We just handed out --
4          MR. SHEPHERD: It was produced.
5          MR. HEPPT: I have it. I have it,
6  yeah.
7          MR. SHEPHERD: Okay.
8      (Document received and marked P-5 for
9  identification.)
10     Q.    Mr. Ghusson, I've handed you what's
11 been marked as Plaintiff's Exhibit Five for
12 Identification. Can you tell us what this document
13 is?
14     A.    This is the presentation that we made
15 during our meeting with Ann Taylor -- our first
16 meeting with Ann Taylor.
17     Q.    Okay. Let me ask you if you look
18 at -- turn the document sideways -- first of all,
19 for the record, the document -- the exhibit bears
20 the bates numbers VEN38 through VEN60. And you'll
21 notice it says on the bottom, "highly confidential,
22 attorneys eyes only." Do you see that?
23     A.    Yes.
24     Q.    Who designated this document as
25 highly confidential, attorneys eyes only?

## Page 37

1      A.    I did.
2      Q.    Okay. Did you have discussions with
3  anyone regarding the designation of this document as
4  highly confidential, attorneys eyes only?
5      A.    My attorney.
6      Q.    Okay. Other than your attorney did
7  you discuss that designation with anyone else?
8      A.    No, sir.
9      Q.    Okay. Now, the title on the first
10 page is "Venustas International and Ann Taylor, how
11 we might work together." And then there's a date of
12 8th, November 2006. Do you see that?
13     A.    Yes, sir.
14     Q.    Okay. Is that the date of the first
15 meeting?
16     A.    Correct.
17     Q.    Okay. Did you draft this document?
18     A.    Not me, no.
19     Q.    Did you play any role in drafting
20 this document?
21     A.    Yes.
22     Q.    What role did you play in it?
23     A.    Robin and I worked with a consultant
24 to draft this document.
25     Q.    Which consultant?

42

1 way, on the bottom of each of these pages that we've
2 talked about, in addition to the highly
3 confidential, attorneys eyes only designation that
4 we discussed there's another designation which reads
5 "confidential, do not distribute." Do you see that?
6   A.   Correct.
7   Q.   When was that put on?
8   A.   That was put on when we presented it
9 to Ann Taylor.
10  Q.   Okay. On page five these are the
11 bios that we talked about earlier, correct?
12  A.   Uh-huh. Correct.
13  Q.   Were there any other members of your
14 team besides yourself and Ms. Burns that attended
15 the meeting on November 8th?
16  A.   No.
17  Q.   Okay. Okay. The next page, page
18 six. Can you describe what this information is?
19  A.   It's our core competency, what we
20 offer them. It says: "We develop the most creative
21 and innovative products, packaging and gift items.
22 We deliver the highest quality. We provide
23 outstanding service. We provide very competitive
24 pricing because we have great relationship with our
25 suppliers. Speed-to-market know how to get it done

43

1 and get it done quick. Deliver all products on time
2 and on budget." And we "react with agility to the
3 business."
4   Q.   Basically, this is trying to convince
5 them that your company is best suited to win this
6 contract, correct?
7   A.   Well, I wouldn't call it a contract.
8 I would call it, try to convince them they -- we
9 tried to explain to them who we are and how we do
10 it.
11  Q.   Okay. Was there -- was there a
12 contract that was going to be awarded -- what was
13 the purpose of this meeting?
14  A.   The purpose of this meeting is if
15 they selected us then we would go into a vendor
16 agreement where we would develop this for them and
17 provide --
18  Q.   And if they selected another company
19 they would enter into an agreement with another
20 company?
21  A.   I don't know what they would do.
22  Q.   Okay. Now, the next page is headed
23 "The Beauty Industry Today: Succeeding as a
24 Vertical Specialty Retailer."
25  A.   Uh-huh.

44

1   Q.   Okay. Without reading it, can you
2 just describe what the information contained on this
3 page is.
4   A.   Well, what the interesting -- the
5 thing on this is basically to explain to the
6 retailers that they can leverage their brand equity
7 by launching an assortment of products. Not only
8 stick to the fashion by selling sweaters or dresses
9 and so on, that they can enter into the beauty
10 category and use their brand in multiple categories
11 to sell a product.
12  Q.   And so it would be the Ann Taylor
13 brand that would be placed on new beauty products
14 that you developed for them?
15  A.   Absolutely.
16  Q.   Okay.
17  A.   Or a brand that they -- they select
18 within Ann Taylor. I should say, the Ann Taylor
19 brand, but they could have a different name
20 underneath it.
21  Q.   Okay.
22  A.   A trademark for a fragrance that --
23 they pick a name.
24  Q.   Okay.
25  A.   It's not us.

45

1   Q.   Was there any discussion regarding,
2 you know, your company selecting names for the
3 products that were developed?
4   A.   Not in this meeting, no.
5   Q.   Okay.
6   A.   This meeting was presenting to them
7 what we can do for them.
8   Q.   This was a, hi, how are you? Nice to
9 meet you kind of meeting?
10  A.   Yeah.
11  Q.   Okay.
12  A.   And try -- not just hi, how are you,
13 try to explain to them the beauty category. And, as
14 you can see, there is many pages of financial
15 numbers trying to explain to them what the category
16 can mean to them.
17  Q.   Okay. And in fact, that's basically
18 the balance of this document --
19  A.   Uh-huh.
20  Q.   -- is explaining the beauty industry,
21 the growth rates, so forth and so on, correct?
22  A.   Correct.
23  Q.   What does it mean when it refers --
24 the document refers to channel dynamics?
25 Specifically I'm looking at page twelve of the