# Ex B to Decl of McCallion

# ORIGINAL

1

1

2   UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

3   ----------------------------------------x

4   AEDES DE VENUSTAS, INC.,

5                    Plaintiff,    Civil Action No.

6           -against-            1:07-04530

7   VENUSTAS INTERNATIONAL, LLC,

8                Defendants.

9   ----------------------------------------x

10                  June 18, 2007

3:13 p.m.

11

12       ** REDACTED TRANSCRIPT **

13

14       Deposition of ROBIN BURNS-McNEILL,

15   held at the offices of JOSEPH H. HEPPT, ESQ.,

16   521 Fifth Avenue, New York, New York, before

17   Vicky Galitsis, a Certified Shorthand

18   Reporter and Notary Public of the State of

19   New York.

20

21

22

23

              GREENHOUSE REPORTING, INC.

24        363 Seventh Avenue - 20th Floor

            New York, New York  10001

25               (212) 279-5108

6

1                    R. Burns-McNeill

2        Q.        If you could just give me a

3    summary of your professional background; the

4    companies you worked for, the years you work

5    there.  I don't need to know the details of

6    what you did in each one, but just the

7    companies and the years?

8        A.        Bloomingdale's from '74 to '83;

9    Calvin Klein Cosmetics Corporation from '83 to

10   '90; Estee Lauder from 1990 to '98; Victoria's

11   Secret from '98 to 2004.

12                 And the current company that I am

13   with is since when we incorporated, I want to

14   say a year ago August.  It's about 10 months

15   ago, so it would have been in '06 to present

16   is Venustas International.

17                 I hope that's right.

18       Q.        You did pretty well actually.

19       A.        Okay, good.

20       Q.        You said you were the CEO of

21   several companies.  Which companies were

22   those?

23       A.        Calvin Klein Cosmetics

24   Corporation, Estee Lauder, and Victoria's

25   Secret Beauty.  And I'm chairman of the

11

```
1                    R. Burns-McNeill
2   Venustas International, correct?
3         A.    Yes.
4         Q.    Can you just briefly describe
5   your duties and responsibilities as chairman?
6         A.    Primarily I'm involved in client
7   interfacing, client -- finding clients,
8   actually I shouldn't say finding because we
9   haven't looked for clients.  But the
10  interface, the senior interface with the
11  client.  And I'm also interfacing with the
12  creative side of our company, which is
13  predominantly product development and
14  marketing.
15        Q.    Product development?
16        A.    Formula and scent development,
17  and flavor.  Formula, flavor and scent.
18        Q.    Does the company develop edible
19  products, is that correct?
20        A.    We can, yes.
21        Q.    Has it done any edible products
22  to date?
23        A.    Well, nothing we've done to date
24  has been shipped yet, but we are going to be
25  shipping mints to one of our clients in the
```

17

1                    R. Burns-McNeill

2              And HR would be a part of that.

3    We don't have that person identified yet.

4         Q.    When you say, "that person

5    identified", you mean you haven't hired

6    anybody?

7         A.    Right.

8         Q.    Can you just describe the

9    business of Venustas International for me?

10        A.    We are a creative development

11   company and our focus is on various

12   classifications of beauty products that

13   include color cosmetics, fragrance, bath and

14   body care, skin care, home fragrances, and

15   edibles for men and woman.  And all of our

16   development is for private label products that

17   are developed for clients who are well

18   branded.

19              We set a criteria that includes

20   that they be a billion dollars of sales

21   revenue annually; that they have a true vision

22   for growth; that they have a very clear

23   branded identity; that they've had a

24   sustainable financial performance; and that

25   they are their own retailer, they retail in

21

1                    R. Burns-McNeill

2    test that if we don't do it ourselves we

3    oversee it, if it's done someplace where they

4    are.

5         Q.      Venustas International doesn't

6    presently have the facilities to do stability

7    testing and safety testing?

8         A.      You have to ask Sam.

9         Q.      When Venustas International is

10   developing a product for a client -- and I

11   understand you're doing that as we speak,

12   correct?

13        A.      Yes.

14        Q.      -- the company doesn't procure

15   raw materials for that product, it actually

16   hires an outside company to do that, isn't

17   that true?

18        A.      Yes, like all companies do, yeah.

19        Q.      And again with the development of

20   a product for a client, you hire an outside

21   company to insure that those new products

22   comply with FDA regulations?

23        A.      Very much so.

24        Q.      The name Venustas International,

25   can you tell me how that name was selected for

22

1                    R. Burns-McNeill

2  your new company?

3         A.      Sam's former assistant or current

4  assistance, I'm not sure which, I think it's

5  his former assistant, came up with it.  And we

6  were at the time just getting names from

7  everybody.  I had my kids working on it, my

8  husband, and we were submitting names.  And

9  that one Sam sent to me and he said, you know,

10  I really like this, and my daughter really

11  likes it.

12                 And I looked at it and I said,

13  what I think it's good too -- no, I said, what

14  does it mean?  That's what it was.  And he

15  told me.

16                 I thought it was an interesting

17  name.  But we lived with it a long time and

18  then we talked about is it Venustas Beauty

19  Company, and then it was Venustas Companies,

20  and then Venustas International.  And we all

21  -- the consensus was Venustas International.

22         Q.      During that process, did you

23  actually come up with names that you threw

24  into the hopper?

25         A.      Yes.

23

1                    R. Burns-McNeill

2        Q.     Do you know what any of those

3   names were?

4        A.     Only the one that I really loved

5   which was Pulse and Robin's Nest, that quickly

6   went out because it didn't have Sam in the

7   nest.  I thought that would be very nice.  I

8   always wanted a store named that.

9        Q.     That's being very clever.

10        A.     I know.

11        Q.     You're preferred name for the

12   company, Pulse, why wasn't the company named

13   Pulse?

14        A.     I don't think anybody liked it

15   but me, quite honestly.

16        Q.     Do you know whether it was

17   submitted for a check by the lawyers to make

18   sure that the name was available?

19        A.     I don't, I don't remember.

20        Q.     Would it be fair to say that your

21   role in the company differs from Mr. Ghusson's

22   role in the company, in the sense that you're

23   more creative and he's more of the technical?

24        A.     I think that's fair.

25        Q.     To what extent do you get

32

1                    R. Burns-McNeill

2        Q.      What does that mean?

3        A.      That means that you go shopping

4    to look at competitive products that might be

5    on the market in whatever category you're

6    looking to shop for.

7        Q.      Sort of like a market research

8    function?

9        A.      I don't know if I would call it

10   market research.  But it's just a learning

11   exercise to see what's out there.

12       Q.      Okay.

13       A.      It's not as precise as research,

14   random.

15              MR. HEPPT:  Off the record.

16              (Discussion off the record.)

17       Q.      Obviously the Ann Taylor

18   relationship is central to this litigation.

19              Can you tell me how the Ann

20   Taylor contract first came to be?  I mean, who

21   made the introduction and so forth?

22       A.      The introduction was made by a

23   man named George Leads.

24       Q.      Who is Mr. Leads?

25       A.      He is a publisher of a cosmetic

33

```
1                  R. Burns-McNeill
2   industry paper publication called Cosmetic
3   World.
4          Q.      And why did Mr. Leads get
5   involved in making this introduction?
6          A.      He knew what Sam and I were
7   starting as a company.  He called me and said,
8   "You know, Ann Taylor would be a great client.
9   And I met Kay Krill at a dinner party the
10  other night, because her next door neighbor is
11  a good friend of mine that I play golf with.
12  And I told her that you would be the company
13  that they should be doing the beauty business
14  with.  And they're exploring some other
15  companies like Clarins and I think you should
16  do this."
17         Q.      How did Mr. Leads know that you
18  and Sam were starting this company?
19         A.      I probably -- I don't know.  I
20  don't know whether we told him or he heard
21  about it, I'm not sure.
22         Q.      Was there a press release that
23  was issued?
24         A.      No, never.  But he knows
25  everything, what's going on.
```

39

1               R. Burns-McNeill

2    this started, so it may have been done, I have

3    no idea.

4         Q.     Thank you.

5                Who would be the person at

6    Venustas International that would know whether

7    or not such notice was given?

8         A.     Sam, probably.

9         Q.     If you would turn to what has

10   been marked as Plaintiff's Exhibit 17.

11               MR. HEPPT:  For the record,

12          Plaintiff's Exhibit 17 is a two-page

13          document.

14        Q.     Have you seen that before?

15        A.     Yes.

16        Q.     Can you tell us what that is?

17        A.     This was an article that appeared

18   in Women's Wear Daily about Ann Taylor and

19   myself and Sam getting together to do their

20   business.

21        Q.     This is actually a front

22   page article that appeared on Women's Wear

23   Daily on March 16th, 2007, correct?

24        A.     Yes.

25        Q.     Does the article describe what

40

R. Burns-McNeill

you and your company would be doing for Ann

Taylor?

        MR. SHEPHERD:  If you need to

    read it, go ahead.

        MR. HEPPT:  Absolutely.

    A.    I think I was reading this

paragraph about the company.  "Venustas the

company that was founded six months ago whose

mission is to design and develop and deliver

private label beauty products."  That I think

sounds like what we do for them.

    Q.    If you look actually three

paragraphs after that.

    A.    "Under the agreement"?

    Q.    "Under the agreement", right.

Can you read that paragraph for me?

    A.    "Under the agreement with Ann

Taylor, Venustas will develop, source and

produce beauty products while Ann Taylor

stores will market and sell the products.

There won't be any third party brand included

in the strategy, Krill said, and the new

products will have their own names

accompanying the Ann Taylor logo.  That's a

41

R. Burns-McNeill

2  pretty good description of private labels.

3      Q.      That's a pretty good description

4  of what you would be doing under the agreement

5  with Ann Taylor?

6      A.      Yes.

7      Q.      Again I understand that the

8  writer of the article attributed this

9  statement for Ms. Krill.  But do you have any

10 understanding as to what she meant when she

11 said, "There wouldn't be any third-party

12 brands included in this strategy"?

13     A.      Yes, that means there wouldn't be

14 brands that don't have the Ann Taylor name on

15 it in her store.

16     Q.      The very next sentence reads,

17 "According to Burns, specialty stores

18 represent the fastest growing channel for the

19 beauty business growing at 9.1 percent rate

20 for 2001 to 2006."  Do you see that?

21     A.      Yes.

22     Q.      Is that a correct statement?

23     A.      It is based on the Klein's

24 definition of specialty, yes.  And it's in the

25 presentation that we had made to them showing

43

R. Burns-McNeill

And there are other sources that measure

things differently.

    Q.    Do you know whether Klein's

definition of specialty retail stores focuses

on the number of doors in a particular city?

    A.    It is not based on number of

doors.

    Q.    Is it based on the type of

product that's being sold?

    A.    I don't know.

    Q.    You obviously were interviewed

for this article, correct?

    A.    Yes.

    Q.    Were you given a draft of the

article before it was published?

    A.    No.

    Q.    Was the article written at the

request of either yourself or Ms. Krill?

    A.    Definitely not me; and

definitely, yes, Ms. Krill.

    Q.    Did she discuss with you the idea

that she was going to have an article written

about the agreement?

        MR. SHEPHERD:  I object to the

44

1                    R. Burns-McNeill

2          form of the question.

3          A.      No.

4          Q.      Let me try that again.

5                    Before the article was published,

6     did Ms. Krill discuss with you her intention

7     to have an article written?

8                    MR. SHEPHERD:  You can answer the

9          question.

10                   MR. HEPPT:  I think that one is

11         okay.

12                   MR. SHEPHERD:  Yes.

13         A.      She did not discuss that she was

14    having an article written.

15         Q.      Did she discuss with you her

16    desire that an article be written?

17         A.      Yes.

18

19                   (Pages 45 & 46 are designated

20         "Confidential - Attorneys' Eyes Only"

21         and are bound under separate cover.)

23

24

25

49

                    R. Burns-McNeill

1

2        A.      Yes.

3        Q.      Who is the other person?

4        A.      Pierre Dinand is a perfume bottle

5    designer, who's probably in his '80s at this

6    point, who I've known since the late '70's.

7    And I worked with him on my very first

8    fragrance which was Obsession.  He designed

9    the bottle; and went on to design many bottles

10   for me.

11                    And so I worked very intimately

12   with him for almost 30 years and his sons who

13   were in school who are now -- he references

14   Jerome, one of his sons, who has now become a

15   designer himself, and his father kind of had

16   retired.  But he is a wonderful man who I've

17   just known for a long time.  And his son I've

18   been actually working with in our new venture.

19                    And this was an e-mail that I

20   hadn't heard from him in a long time that

21   basically was saying --

22       Q.      He says to you, "Dear Robin, nice

23   to hear from you."  Had you contacted him?

24       A.      No, he contacted me, but it was

25   kind of like, where are you, and that kind of

50

1                    R. Burns-McNeill

2     thing.

3            Q.      You updated on your new company,

4     that you were starting a new company with

5     Mr. Ghusson?

6            A.      No, no, no.  It was - I don't

7     even know, I have to look it up.  This was the

8     only thing, because I brought it for Bob that

9     referenced anything.  Because this was the

10    first time I ever saw this name.  But this

11    was -- I can't remember exactly what the

12    previous e-mail was, but it had nothing to do

13    with this.

14                   This is the first time that he

15    had e-mailed me and mentioned this Aedes De

16    Venustas web site, which all I did is try to

17    correct his opinion, because he had designed

18    bottles.  He was all excited that I was in the

19    business selling his work.

20                   His other -- I know what it is.

21    His other e-mail is about the fact that he's

22    going to go into business with his son, and

23    wanted me to know about that.  And I sent it

24    back to him, congratulations, that kind of

25    thing.

51

1                         R. Burns-McNeill

2          Q.     So you replied to his e-mail and

3     you clarified that Aedes De Venustas is not

4     your company, that your company is actually

5     Venustas International?

6                    MR. SHEPHERD:   Objection to the

7               form.

8          A.     Right.  Can you repeat the

9     question?

10         Q.     I was just actually looking at

11    your reply to him, and looking at the

12    paragraph that begins, "Important for you to

13    know".  You were correcting him that Aedes De

14    Venustas was not your company, that your

15    company was, in fact, Venustas International?

16         A.      That's correct.  That's what it

17    was I was responding -- Oh, no.  Never mind.

18                    MR. HEPPT:  Thank you.

19                    (Time noted:  4:21 p.m.)

20

21

22

23

24

25