# Ex A to Decl of Shepherd

```
 1              UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF NEW YORK
 2            CIVIL ACTION NO. 1:07-04530 (LTS)
 3   AEDES DE VENUSTAS, INC.,
                 Plaintiff,         :
 4              -vs-                : CIVIL ACTION
     VENUSTAS INTERNATIONAL, LLC,   : DEPOSITION OF:
 5              Defendant.          : ALLEN M. SILK
     - - - - - - - - - - - - - - - - -
 6
 7           T R A N S C R I P T of stenographic notes of
 8   the proceedings in the above entitled matter, as taken
 9   before KAREN M. AHERN, a Notary Public and Certified
10   Court Reporter of New Jersey, License No. XI01061, at
11   the office of Stark & Stark, Lenox Drive, Lawrenceville,
12   New Jersey, on Thursday, March 20, 2008, commencing at
13   2:45 P.M.
14
15
16
17
18
19
20   - - - - - - - - - - - - - - - - - - - - - - - - - -
21              R.J. CAGGIANO & ASSOCIATES
                Certified Court Reporters
22              2517 Highway 35 - Building G
                Post Office Box 106
23              Manasquan, New Jersey 08736
                732-223-7200
24
25
```

Direct - Silk

Page 18

BY MR. HEPPT:
Q  Is that an E-mail that you sent to Miss Gibson?
A  Yes.
Q  And you're asking her to check this name in New Jersey. Do you see that?
A  Yes.
Q  What did you mean when you wrote that?
A  To see if it was available for the formation of an LLC in New Jersey.
Q  Okay. Had you discussed with Mr. Ghusson and Miss Burns prior to that date, February 6th, whether the name should be cleared in terms of trademark usage?
A  I believe there were two times I discussed this with Mr. Ghusson. I never had this discussion with Mrs. Burns.
Q  Okay. When was the first discussion that you had with Mr. Ghusson on that subject?
A  When we form an entity with a client, we discuss with them the fact that clearing the name in New Jersey just gives you the ability to form the entity. It would be wise to move forward and do a -- probably a knock-out search and then a full search for trademark work, and then if necessary move ahead and actually get a trademark or service mark depending upon the entity,

Page 19

that what we talk to our client about, if they're certainly going to use this in a national setting or regional setting that's what we I believe --
Q  I'm sorry to interrupt.
A  I believe Sam and I had that discussion probably early on, and then we had a second time. The second time was when Myra Gibson had given to me a breakdown, certain information which is the cost of running this search.
Q  We're going to get to that document in a second. I had that premarked. But let me ask you before we do that in terms of the first discussion which you say it was early on, was this prior to the formation of the entity?
A  Probably about the time when someone comes to me that's the discussion I have with people when we're forming an entity.
Q  Okay. And do you recall having that discussion with Mr. Ghusson?
A  I don't recall the exact time of having an initial discussion.
Q  Do you recall discuss -- having -- discussing that topic with Mr. Ghusson early on?
A  I have it with any of our clients in a situation like this.

Page 20

Q  Do you recall what Mr. Ghusson's reaction was?
A  We're just forming an entity. We don't know what we're going to do with it yet. Let's just wait and see.
Q  Now, you mentioned a second discussion or second time where you discussed the trademark search with Mr. Ghusson; is that correct?
A  Yes.
Q  And do you recall when that occurred?
A  Yes.
Q  When was that?
A  After this information was given to me by Myra Gibson.
Q  Okay. We're going to get to that in a second. I'm trying to do this in a logical way. We're jumping around a little bit, partially my fault here.
Let me hand you what's been marked as Silk Exhibit 8 which appears to be an E-mail from Myra Gibson to yourself dated February 6th. The subject is "Venustas is a possible name for the entity". The bates number is 10. Do you recall receiving that E-mail from Miss Gibson?
A  Yes. I've gone over the file. I've seen this before. I do recall getting this from her.

Page 21

Q  And in that E-mail Miss Gibson is informing you that the name Venustas International was available for use in New Jersey; is that correct?
A  Yes.
Q  That has nothing to do with clearing the name for trademark usage; correct?
A  Yes.
   MR. SHEPHERD: What's that exhibit number?
   MR. HEPPT: The exhibit number is eight.
   THE WITNESS: Eight.
   MR. SHEPHERD: This is the one which starts Allen, the name Venustas International is available?
   MR. HEPPT: Yeah.
BY MR. HEPPT:
Q  After you got that E-mail from Miss Gibson, did you communicate to Mr. Ghusson the fact that the name was available in New Jersey?
A  I'm sure either I did or Myra did. I'm not sure who did it.
Q  And I take it from your prior testimony that someone at your firm went ahead to amend the certificate to use the name?
A  Myra Gibson did.
   MR. REILLY: Just note my objection to the

6 (Pages 18 to 21)

R.J. Caggiano & Associates (732) 223-7200

1fe3bd7a-80fd-4d7c-b077-c730f6dc07cf

Page 22

1  line of questioning since the E-mail is
2  February 6th and the amendment wasn't to like
3  March 21st. Your line of questioning made it
4  sound like one happened right after the other.
5      MR. HEPPT: Fair enough. Fair.
6  BY MR. HEPPT:
7      Q  Mr. Silk, let me hand you what's been
8  marked as Silk Exhibit 3. Have you seen that document
9  before today?
10     A  Yes.
11     Q  The document bears the bates numbers 54 on
12 the first page and 55 on the second page; is that
13 correct?
14     A  Yes.
15     Q  Okay. What is this document?
16     A  Well, this is what I probably asked Myra to
17 obtain for me which is a breakdown of the approximate
18 costs of doing the searches and doing the trademark
19 work.
20     Q  And why did you ask her to prepare that?
21     A  Because we thought it was time for them to
22 seriously think about doing this.
23     Q  Them being?
24     A  The client.
25     Q  And you thought it was time for the client

Page 23

1  to run the trademark search?
2  A  Yes.
3  Q  And was this before or after the
4  certificate, the LLC certificate had been amended?
5  A  I think it was at the time -- when did I have
6  the discussion?
7  Q  Well, actually when this E-mail --
8  A  This is before the filing I think of the change
9  of the name in New Jersey.
10 Q  In the E-mail, Miss Gibson says that she's
11 attaching a quote for trademark work based on her rate
12 -- I'm paraphrasing. Based on her rate and Rachel's
13 rates. You see that? Who's Rachel?
14 A  Rachel Stark is a partner here who does the
15 trademark work.
16 Q  Did you modify the quote in any way to
17 include your time or the projection of your costs?
18 A  No.
19 Q  Okay. What did you do with the quote if
20 anything?
21 A  I believe I discussed it with Sam, gave him the
22 approximations of the amounts.
23 Q  Do you recall whether that discussion was
24 over the phone or face-to-face?
25 A  I believe it was on the -- a telephone

Page 24

1  conference when we discussed the admendment of the
2  Certificate of Formation.
3      Q  Who was participating in that phone call?
4  A  At least me and Sam and it could have been Myra
5  I'm not sure.
6      Q  Tell me everything you remember about that
7  conversation, what you said, what Mr. Ghusson said.
8  A  I probably gave him a range of numbers, two
9  numbers we have here. It could probably be higher, and
10 he said he'd get back to me as to whether or not we
11 should perform the services.
12     Q  The two numbers are the --
13 A  Range of the -- probably say 3,000 to $4,000.
14 I'm not sure.
15     Q  Okay. The quote that's attached to Silk
16 Exhibit 3 -- is it? What number is that?
17        MR. SHEPHERD: Three.
18        MR. HEPPT: I should write them on my
19    copies so I know.
20 BY MR. HEPPT:
21     Q  The quote that's part of Exhibit 3 has two
22 numbers at the bottom of the second page. One is
23 $2,913, the other is $3,413. Do you see that?
24 A  Yes.
25     Q  Are those the numbers that you're

Page 25

1  referring to?
2  A  Yes.
3      Q  And Mr. Ghusson told you after some
4  discussion -- well, strike that.
5         During that conference call with
6  Mr. Ghusson, did you discuss the need or the
7  advisability of doing a trademark search with
8  Mr. Ghusson?
9  A  This was just a continuation of our prior
10 discussion.
11     Q  In the prior discussion, you had discussed
12 the advisability of doing such a search with the client;
13 correct?
14 A  Yes.
15     Q  And you indicated a minute ago that
16 Mr. Ghusson told you he would get back to you in terms
17 of authorizing you whether or not to do the work?
18 A  Yes. I mean we were spending more than double
19 what we spent to form it. They were still in the
20 initial stages of what they were doing here. We were
21 negotiating a buy-sell agreement. We didn't have a deal
22 done there. He said he would get back to me.
23     Q  Did he ever get back to you?
24 A  No.
25     Q  Did you ever receive any authorization

7 (Pages 22 to 25)

R.J. Caggiano & Associates (732) 223-7200

1fe3bd7a-80fd-4d7c-b077-c730f6dc07cf

Page 26

1  from the client to do the trademark clearing work?
2  A    No.
3  Q    Let me hand you what's been marked as Silk
4  Exhibit 2 which appears to be -- well, it's a two-page
5  document bearing the bates numbers 1214 and 1215, and my
6  first question, Mr. Silk, will be to have you identify
7  what that document is.
8  A    We keep time on even our fixed fee matters
9  internally. So, this was an internal time.
10 Q    Okay. And is this document the printout
11 from a computer program that you maintain at the firm?
12 A    Yes.
13      MR. SHEPHERD: What's the exhibit number
14      again?
15      MR. HEPPT: Two.
16 BY MR. HEPPT:
17 Q    And the entries that we see on the
18 document in the far left corner, there's a column that's
19 headed "atty" which I take to mean attorney?
20 A    Yes.
21 Q    And there are various initials below that?
22 A    Yes.
23 Q    The first one is SLK. Who is that?
24 A    Me.
25 Q    So, these are not initials? These are

Page 27

1  abbreviation of the last name?
2  A    One of my partners who's older then I am has my
3  initials.
4  Q    Thank you.
5       The other initials that appear in this
6  page are in fact -- or the other entries in that column
7  are in fact initials?
8  A    Yes.
9  Q    So, for example, the one below on the
10 second entry is MCG. Do you know who that is?
11 A    Myra C. Gibson.
12 Q    Does this document reflect all of the work
13 that was done by your firm in connection with the
14 formation of the LLC?
15      MR. REILLY: Hold on a second. Read back
16      the question.
17      (Whereupon the requested portion was read
18      back.)
19      MR. REILLY: Object to the form of the
20      question. You're not indicating which LLC, and
21      because we've already established there was
22      more than one --
23      MR. HEPPT: Okay.
24 BY MR. HEPPT:
25 Q    You testified that you were retained by

Page 28

1  Mr. Ghusson and Miss Burns to form an LLC in New Jersey;
2  correct?
3  A    Yes.
4  Q    And we've also had testimony that LLC went
5  through various names; correct?
6  A    Yep.
7  Q    Does this document reflect all of the work
8  that your firm did in connection with the formation of
9  that company and those name changes?
10 A    Probably not.
11 Q    What is the -- is there a procedure in
12 place at the firm for entering time?
13 A    Yes.
14 Q    And what is that procedure?
15 A    Each of us on our computer has a time entry
16 system that we use.
17 Q    And is there any guideline that the firm
18 has with respect to attorneys or paralegals entering
19 their time?
20 A    Yes.
21 Q    And what is that?
22 A    You're supposed to put in all of your time.
23 Q    But you don't think that was done in this
24 case?
25      MR. REILLY: Object to the form of the

Page 29

1  question. Counsel, I can represent to you that
2  there's a lot of work done regarding the
3  formation of the first corporation. Then,
4  there was work done for the amendment, and it's
5  not in this one monthly billing which has been
6  marked Silk-2 dated April 17th, 2006. I'll
7  respectfully submit that your subpoena did not
8  ask for all of Stark & Stark records or billing
9  regarding formations of all corporations. You
10 were just asking about Venustas, and you can
11 see that there are in E-mails which are not
12 identified on this bill, but this attempted to
13 indicate what happened on March 17th and what
14 Myra billed for, and you have that particular
15 E-mail.
16     MR. HEPPT: I'm just trying to get an
17     E-mail of what we're looking at, if there are
18     other -- if there are other similar documents
19     that would reflect work relating to the name
20     change or the formation of the LLC that
21     eventually became known as Venustas
22     International.
23     MR. REILLY: The answer to that is yes.
24     There's other E-mails, documents and billing
25     regarding the formation of the corporation in

Direct - Silk

Page 30

1  its various forms. They're in front of us, and
2  my position stands the same. You didn't ask
3  for everything. There's numerous documents.
4      MR. HEPPT: Yeah. The subpoena speaks for
5  itself. I think the subpoena is pretty clear
6  on what it asks for.
7      MR. REILLY: The whole file is here. If
8  for some reason you think we need to go through
9  that, we can do that.
10     MR. HEPPT: I'm just going to make a
11     request on the record for the production of all
12     billing, E-mails, other correspondence, all of
13     which are called for by the subpoena in
14     connection with the formation of the LLC which
15     eventually became known as Venustas
16     International.
17 BY MR. HEPPT:
18  Q   Let me ask you now going back to Silk
19 Exhibit 2 there's an entry on February 3rd, 2006 by
20 Miss Gibson. The description is "Corporate search for
21 name availability". Do you see that?
22  A   Yes.
23  Q   Do you know what name she was searching?
24  A   No.
25  Q   This was prior to the E-mail that you

Page 31

1  received from Mr. Ghusson on or about March 17th; isn't
2  that correct? This entry. I'm sorry.
3      MR. REILLY: We'll stipulate the time
4      periods are different, at least a month period.
5  BY MR. HEPPT:
6   Q   I think I marked that. I don't remember
7  what the exhibit number is, the E-mail you received from
8  Mr. Ghusson.
9   A   Silk Exhibit 6.
10  Q   And particularly bringing your attention
11 to the date of that E-mail.
12  A   March 17th, 2006.
13  Q   Does that refresh your recollection in any
14 way as to what name was being searched by Miss Gibson on
15 February 3rd?
16  A   No.
17  Q   Was she -- would she have been searching,
18 to your knowledge, the availability of the three names
19 that were discussed previously?
20  A   That would be my guess.
21  Q   Did you have any discussions with
22 Miss Gibson in terms of what she was doing in February
23 2006 in terms of searching for name availability?
24  A   I think she came back to us and told us that The
25 Pulse was not available and that the other two were when

Page 32

1  she did her search in New Jersey.
2   Q   Okay. So, would that lead you to conclude
3  that when she was searching for a corporate name
4  availability in February, she was searching for all
5  three names?
6       MR. SHEPHERD: I object to the form of
7       that question.
8  BY MR. HEPPT:
9   Q   You can answer.
10  A   Yes.
11  Q   Now, there's an entry, and I take it it's
12 by you, SLK, on February 3rd, 2006. Do you see that?
13  A   Yes.
14  Q   It reads "Conference with Myra C. Gibson,
15 legal assistant, to review her search of an LLC name and
16 E-mail she sent to Mr. Sam Ghusson". Do you see that?
17  A   Yes.
18  Q   Do you recall having that conference with
19 Miss Gibson?
20  A   Only vaguely, but she would normally come back
21 to me, show me what the search was, and I assume from
22 this she sent it on to Mr. Ghusson.
23  Q   And you made that entry; correct?
24  A   Yep.
25  Q   That was an entry you made on your

Page 33

1  computer at your desk?
2   A   Yes.
3   Q   When you met with her, Miss Gibson, did
4  you review or did she have a copy of the E-mail that she
5  sent to Mr. Ghusson?
6   A   I don't know.
7       MR. HEPPT: I don't believe I've seen a
8       copy of that E-mail unless I'm mistaken.
9       MR. REILLY: Off the record.
10      (Whereupon a discussion was held off the
11      record.)
12      MR. HEPPT: We've just spent a few minutes
13      going through the file trying to locate the
14      E-mail that Miss Gibson sent to Mr. Ghusson on
15      or about February 3rd, 2006, and it does not
16      appear to be in the file that's present in the
17      conference room, and I would -- and I would
18      just call for the production of that E-mail.
19      MR. SHEPHERD: I'm a little confused.
20      MR. HEPPT: Yeah.
21      MR. SHEPHERD: Because it seems to me that
22      the document I just gave you marked 0008 shows
23      -- is an E-mail that was sent on February 3rd,
24      2006 regarding searching.
25      MR. HEPPT: Is to Mr. Silk, not to

9 (Pages 30 to 33)

R.J. Caggiano & Associates (732) 223-7200

1fe3bd7a-80fd-4d7c-b077-c730f6dc07cf

Cross - Silk

Page 74

      MR. HEPPT: I'm just going to object to the form.
      THE WITNESS: Yes. I mean it would be my recollection that I first of all would not bill a client to just explain to them what an estimate is. My sense it was after I received that and I would have said that it was on 3/20/06 during my conversation with Sam about various things.
BY MR. SHEPHERD:
   Q   But there's no reference to trademarks in that particular entry; is there?
   A   Only because I went to bill him for getting an estimate on what the trademark was. I wouldn't bill for that.
   Q   Is there any other note or memo or anything in the file which memorializes a conversation that you had with Sam about searching the name Venustas International as a trademark?
   A   No.
      MR. SHEPHERD: Now, I'm going to do something a little bit unusual. I'm going to play a little piece of a tape recording and ask Mr. Silk to listen to it.
      MR. REILLY: I object to the form of this

Page 75

question. Do you have this conversation either typed -- we can take a look at it?
      MR. SHEPHERD: I do indeed.
      MR. REILLY: Why don't we mark that for identification.
      MR. SHEPHERD: It's got a phone number on the back. We'll get rid of that.
      Mark this.
      (Typed page of a taped conversation was marked Silk-16 for identification.)
      MR. REILLY: Can I read this before he listens?
      THE WITNESS: So, this was on June 6th; is that what you're saying?
BY MR. SHEPHERD:
   Q   Yes.
      MR. REILLY: 2007.
      THE WITNESS: Okay.
BY MR. SHEPHERD:
   Q   Okay.
      MR. REILLY: Before we begin, this was marked Silk-16, and it's entitled "Message from Allen" and it's Filk, F-i-l-k, which I'm sure meant Silk, June 6th, 2007 at twelve.
      (Whereupon a tape was played.)

Page 76

      TAPE RECORDING: "Hi, Bob. It's Allen Silk. I'm returning your call, but my paralegal that did the work for that company is not here today, and my guess is in talking to her before that was just the typical with New Jersey or whatever state we were looking at to just see if it was available formation. I know that we talk to all our clients about running some sort of federal, you know, check to see what's going to happen. Rachel Stark does most of that to see if we are going to try to protect the name federally, but I think that Sam was on his own course at that time and was going to deal with things as time went on, but I can't honestly remember at this point. I'm running to a meeting now, will be back around one-thirty. You can reach me in my office at 609-895-7265. Thank you."
BY MR. SHEPHERD:
   Q   Do you recognize that voice?
   A   That's my voice.
   Q   Do you remember leaving that message?
   A   No.
   Q   Okay. I want to focus on the last line of the message. You said "but I can't honestly remember a

Page 77

this point --" oh, I'm sorry. "Rachel Stark does most of that to see if we are going to protect the name federally, but I think Sam was on his own course at that time and was going to deal with things as time went on, but I can't honestly remember at that point." Today you've testified that you had two conversations with Sam and told him about doing a trademark search; is that correct?
   A   Yes.
   Q   And there is nothing in the file that memorializes either of those telephone -- either of those conversations with Sam; isn't that correct?
   A   Yes.
   Q   Well, then, what is it that happened between the time you left this message and now that makes you now remember that you had two telephones conversations with Sam about an issue that wasn't even memorialized in your file?
      MR. HEPPT: Objection to the form.
      THE WITNESS: Well, first of all, I don't remember if I said two telephone conversations, but I would have had a conversation with him initially about what we have to do. That would have been turned over to Rachel to do the work and Myra.

20 (Pages 74 to 77)

Redirect - Silk

**Page 78**

      Then, what refreshed my recollection was
the trademark search that Myra had sent to me,
and it made me recall at that point, this is
after the fact, that we did have a discussion.
So, irrespective of that, that's what occurred
after the fact when I went through the file.
    MR. SHEPHERD: Okay. That's all I have.
    MR. HEPPT: I have a couple of follow-up
questions. Do you have Exhibit number 11?
REDIRECT EXAMINATION
BY MR. HEPPT:
   Q   What is your understanding as to the purpose for this document?
   A   I think it's a checklist for Myra in doing her work.
   Q   Did it relate in any way to her entry of her time records?
   A   She tells me it does, but I don't know how it works.
   Q   Is it your understanding that this is a checklist that she would check off as she completed items?
   A   Or she understood what work she had to do.
   Q   This document by -- on its face relates to RBSG Enterprices, LLC; correct? I don't recall whether

**Page 79**

this was asked before. If it was, I apologize. But are you aware or is there a document in the file that relates to the Venustas International, LLC?
   A   I don't know.
   Q   Who would know that?
    MR. REILLY: Counsel, I can represent I went through the file and there is no such document. I think Attorney Shepherd has said the same thing.
BY MR. HEPPT:
   Q   Okay. Are you familiar with the way in which Miss Gibson used this document?
   A   No.
   Q   Can you testify today why Miss Gibson did not check off client confirmation regarding no trademark work?
   A   No.
   Q   Okay. Is there any doubt in your mind sitting here today that you discussed the advisability of conducting a trademark search with Mr. Ghusson regarding Venustas International, LLC?
   A   No.
   Q   Is there any doubt in your mind sitting here today that Mrs. Ghusson -- strike that.
    Is there any doubt in your mind sitting

**Page 80**

here today that you nor your firm were authorized by Mr. Ghusson to conduct a trademark search for Venustas International, LLC?
   A   I was not authorized.
   Q   I think we covered this earlier. You were the partner in charge of the engagement?
   A   Well, but Sam could have spoken to Mrya, could have spoken to Stuart Mickelberg or Rachel directly. I don't think he ever dealt with Rachel.
   Q   There was nothing in the file indicating a trade search had been done?
   A   No.
   Q   There was certainly no bill provided to the client for such work?
   A   No.
   Q   Is there any doubt in your mind that you discussed the quote that Miss Gibson prepared for doing a trademark search with Mr. Ghusson?
   A   No. Because I after saw that, I recalled that.
   Q   And he never authorized you to perform that work?
   A   No.
   Q   Now, turning to Exhibit 12 which is a copy of the engagement letter, the document or the exhibit appears to be two separate documents, if you will, the

**Page 81**

first being a letter from yourself to Mr. Ghusson and Miss Burns-McNeil bearing the bates number 1002, and that is the first page of the exhibit. The second document, if you will, would be the balance of the exhibit. Is that a fair characterization?
   A   Yes.
   Q   And what would constitute the engagement letter?
   A   Well, it's the totality of this, but it's the signed last page which is bate stamped 1005.
   Q   Okay. So, it's the entire document. You would consider this to be the engagement letter?
   A   Yes.
   Q   Okay. And you forwarded this document to Mr. Ghusson; correct?
   A   Yes, and to Mrs. McNeil.
   Q   They each in turn signed it as you indicated on the last page; correct?
   A   To the best of my knowledge. I didn't see it, but yes.
   Q   Did either of those individuals contact you with any questions before they signed it?
   A   I don't remember.
   Q   Okay. The first page, the last paragraph it says, "Please call me directly," and gives your phone