**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**AEDES DE VENUSTAS, INC.,**

                                        **Plaintiff,**          **07 Civ. 4530 (LTS) (THK)**

**vs.**

**VENUSTAS INTERNATIONAL, LLC,**

                                        **Defendant.**          **Document Electronically Filed**

JOSEPH M. HEPPT, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I represent the plaintiff, Aedes De Venustas, Inc., in the above captioned matter and I submit this declaration in opposition to Defendant's motion for partial summary judgment.

2.      On or about June 2, 2008, I spoke with Kristen McCallion, one of Defendant's new counsel in this matter, by telephone. I told her that, in my view, the motion for partial summary judgment should be withdrawn on the grounds that (a) in light of the Court's ruling on the motion for a protective order, the Court's prior ruling on "good faith" as part of the *Polaroid* factors could not be relied upon to establish good faith for purposes of the damages phase; and (b) while the Defendant contests Mr. Silk's sworn testimony, that testimony at the very least presents a credibility issue and a question of material fact that would preclude summary judgment in favor of the Defendant. Defendant's counsel disagreed and chose to pursue the motion.

3.      Annexed hereto as Exhibit A is a true and correct copy of the deposition transcript of Allen Silk, dated March 20, 2008.

4.      Annexed hereto as Exhibit B is a true and correct copy of the estimate for trademark work prepared by Mr. Silk's paralegal and that was marked as Exhibit 3 at his deposition.

5.      Annexed hereto as Exhibit C is a true and correct copy of the invoiced from Mr. Silk's firm dated April 19, 2006 and marked as Exhibit 5 at his deposition.

6.      Annexed hereto as Exhibit D is a true and correct copy of the relevant excerpts of the deposition transcript of Sam Ghusson, dated June 12, 2007.

7.      Annexed hereto as Exhibit E is a true and correct copy of a cease and desist letter that I wrote to the Defendant dated April 16, 2007.

8.      Annexed hereto as Exhibit F is a true and correct copy of the relevant excerpts from the Transcript of Trial Record, Aedes De Venustas, Inc. v. Venustas International, LLC, dated July 13, 2007.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in New York, New York on June 13, 2008.

Joseph M. Heppt, Esq. (JH-4974)

# EXHIBIT A
# TO THE DECLARATION
# OF JOSEPH M. HEPPT

Page I

1                   UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF NEW YORK
2              CIVIL ACTION NO. 1:07-04530 (LTS)
3    AEDES DE VENUSTAS, INC.,
                    Plaintiff,
4              -vs-                  CIVIL ACTION
     VENUSTAS INTERNATIONAL, LLC,   DEPOSITION OF:
5              Defendant.           ALLEN M. SILK

6

7          T RAN S C RIP T of stenographic notes of
8    the proceedings in the above entitled matter, as taken
9    before KAREN M. AHERN, a Notary Public and Certified
10   Court Reporter of New Jersey, License No. XIOI061, at
11   the office of Stark & Stark, Lenox Drive, Lawrenceville,
12   New Jersey, on Thursday, March 20, 2008, commencing at
13   2:45 P.M.
14
15
16
17
18
19
20   - - - - - - - - - - - - - - - - - - - - - - - - - -
21              R.J. CAGGIANO & ASSOCIATES
                Certified Court Reporters
22              2517 Highway 35 - Building G
                Post Office Box 106
23              Manasquan, New Jersey 08736
                732-223-7200
24
25

1fe3bd7a-80fd-4d7c-b077-c730ffidc07cf

Page 2

```
 1    A P P E A R A N C E S:
 2
      JOSEPH M. HEPPT, ESQ.
 3    Attorney for Plaintiff.
 4
      MATHEWS, SHEPHERD, MC KAY & BRUNEAU, P.A
 5    BY:  ROBERT G. SHEPHERD, ESQ.
      Attorneys for Defendant.
 6
 7    REILLY, SUPPLE & WISCHUSEN, L.L.C.
      BY:  ROBERT J. REILLY, III, ESQ.
 8    Attorneys for Allen M. Silk.
 9
10  Also Present:
11    Sam Ghusson
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

### EXHIBITS

| No. | Description | Page |
|-----|-------------|------|
| Silk-1 for id. | Subpoena. | 5 |
| Silk-2 for id. | Time records dated 4/17/06. | 5 |
| Silk-3 for id. | E-mail dated 3/17/06 with attachment. | 5 |
| Silk-4 for id. | Document entitled "New Jersey State Business Gateway Search". | 5 |
| Silk-5 for id. | Time record. | 5 |
| Silk-6 for id. | E-mail dated 3/17/06. | 15 |
| Silk-7 for id. | E-mail dated 2/6l06. | 15 |
| Silk-8 for id. | E-mail dated 2/6/06. | 15 |
| Silk-9 for id. | E-mail dated 2/15/06. | 47 |
| Silk-IO for id. | E-mail dated 2/15/06 with attachments. | 47 |
| Silk-II for id. | Document entitled "New Jersey LLC Formation Checklist". | 5 |
| Silk-12 for id. | Letter dated 12/30/05 with attachment. | 57 |
| Silk-13 for id. | Time record. | 61 |
| Silk-14 for id. | E-mail dated 2/3/06. | 63 |
| Silk-IS for id. | Time records. | 73 |
| Silk-I6 for id. | Typed page of a taped conversation. | 75 |

Page 3

### INDEX

Witness

| Name | Direct | Cross | Redir | Recro |
|------|--------|-------|-------|-------|
| Allen M. Silk | | | | |
| By Mr. Heppt | 5 | | 78 | |
| By Mr. Shepherd | | 53 | | |

Page 5

```
 1        (Subpoena was marked Silk-1 for
 2    identification.)
 3        (Time records dated April 17th, 2006 were
 4    marked Silk-2 for identification.)
 5        (E-mail dated March 17th, 2006 with
 6    attachment was marked Silk-3 for
 7    identification.)
 8        (Document entitled "New Jersey Business
 9    Gateway Search" was marked Silk-4 for
10    identification.)
11        (Time record was marked Silk-5 for
12    identification.)
13
14  ALLEN   M.   SILK,
15        first being duly sworn, testifies as follows:
16  DIRECT EXAMINATION
17  BY MR. HEPPT:
18        Q    Good afternoon, Mr. Silk.  We just met a
19    moment ago, but let me introduce myself on the record.
20    My name is Joseph Heppt.  I represent the plaintiff in
21    the litigation that's captioned Aedes DeVenustas, Inc.
22    versus Venustas International, LLC which is currently
23    pending in the United States District Court for the
24    Southern District of New York, and I'm here to take your
25    deposition this afternoon.  Have you ever been deposed
```

2 (Pages 2 to 5)

1fe3bd7a-80fd-4d7c-b077-c730f6dc07cf

Page 6

1  before?
2  A    Yes.
3      Q    So you know the drill.  I'm going to ask
4  you a series of questions and you're going to answer
5  those questions to the best of your ability.  That's
6  fine with you?
7  A    That's fine with me.
8      Q    Okay.  If at any point you don't
9  understand a question that I ask you, please let me know
10  because it's very important that we understand each
11  other.  Is that okay?
12  A    Yes.
13      Q    And if you need to take a break at any
14  point, just let me know.  Obviously, we'll be happy to
15  accommodate.
16  A    Yes.
17      Q    Great.
18      Let me hand you what's been marked as Silk
19  Exhibit number 1 for identification.  Have you seen that
20  document before today?
21  A    Yes.
22      Q    And can you tell us what that is?
23  A    It's a subpoena for me to appear in I believe
24  your office.
25      Q    We're here today for the deposition that

Page 7

1  the subpoena called for?
2  A    Yes.
3      Q    You turn to the last page of that exhibit
4  which is titled "Schedule A," and what steps have you
5  taken if any to locate the documents that are called for
6  in that schedule?
7  A    I have a -- I believe reviewed the file that we
8  had bate stamped.  There were a number of provisions i
9  there that deals with the time frame in 2006, around
10  this time of the year.
11      Q    And did you segregate those documents that
12  fall within that time frame?
13      MR. REILLY:  Counsel, I had faxed to you
14      what I had thought were the relevant documents.
15      If you want to put that in front of Mr. Silk,
16      that's what we discussed.
17  BY MR. HEPPT:
18      Q    Are you aware, Mr. Reilly, your counsel,
19  today faxed certain documents to me?
20  A    Yes.
21      Q    And did you review those documents before
22  they were faxed?
23  A    I took a look at them probably twice, once
24  before and once after.
25      Q    Okay.  And in your opinion, were those the

Page 8

1  documents that were relevant to the subpoena?
2  A    Yes.
3      Q    Were there any other documents in the file
4  that you're aware of that were relevant to the subpoena
5  that were not faxed to me?
6      MR. REILLY:  Object to the form of the
7  question because depending on what questions
8  you ask, what Attorney Shepherd asks, there may
9  be some additional ancillary documents.  I
10  don't want to represent to you that I gave you
11  everything that may be involved, but it
12  certainly is what I thought were the critical
13  documents that were warranted.
14      MR. HEPPT:  Okay.  I'm asking the witness
15  because we have a subpoena and your testimony
16  was subpoenaed as well as documents.
17      MR. REILLY:  Okay.
18      MR. HEPPT:  I want to make sure I got all
19  of the responsive documents.
20      MR. REILLY:  The entire file is here in
21  front of you.  As we discussed off the record,
22  there's an attorney-client privilege.  The
23  issue is what was waived and what Counsel wants
24  to be produced.  If you take what I sent to
25  you, have it marked, you can start to ask

Page 9

1  Mr. Silk questions, and you'll find that if
2  there is anything that is before or after those
3  documents.
4      MR. HEPPT:  Okay.  I'm just trying to do
5  this in the moist efficient way.  We'll proceed
6  on that basis.
7      MR. REILLY:  I'll represent to you if you
8  have those marked and start to ask him, there
9  may be something that may be before or after.
10  I don't think it's directed to your issue, but
11  we can find that out.
12      MR. HEPPT:  Okay.
13      MR. REILLY:  Because Mr. Silk and I have
14  to be careful as to what we answer and give you
15  because Counsel sitting here with the client
16  there's an attorney-client issue there.  We're
17  not going cart-blanche.
18      MR. HEPPT:  I don't want to take too much
19  of the record, but the schedule that's attached
20  to the subpoena was carefully drafted, and it's
21  limited in scope, and I believe it falls within
22  the waiver of the privilege, but, you know,
23  we'll proceed.  If there are other documents I
24  think that may be -- that may exist in the file
25  that I want produced, I'll make the request on

3 (Pages 6 to 9)

Direct - Silk

Page 10

1    the record.
2    BY MR. HEPPT:
3        Q    Okay. Mr. Silk, did there come a time
4    when you were retained, you or your firm was retained to
5    -- in connection -- let me start that -- strike that.
6    Try that one again.
7            Did there come a time when you or your
8    firm was retained to provide services in connection with
9    a company that was being formed that eventually became
10    known as Venustas International, LLC?
11    A    Yes.
12        Q    Okay. When was that?
13    A    Probably February of 2006, somewhere around
14    there.
15        Q    Okay. And who retained you?
16    A    We sent out an engagement letter that I believe
17    was signed by both Mr. Ghusson and Mrs. Bums.
18        Q    Okay. And in connection with the services
19    that were rendered pursuant to that engagement letter,
20    was there one or the other that you dealt with more
21    frequently, Mr. Ghusson or Miss Bums?
22    A    Generally Mr. Ghusson.
23        Q    Did you ever discuss the services that you
24    were providing pursuant to that engagement letter with
25    Miss Bums?

Page 11

1    A    I don't believe so.
2        Q    So, is it fair to say your sole contact
3    with the client was Mr. Ghusson?
4    A    I never met Mrs. Bums, but I've been on at
5    least one conference call with her.
6        Q    Okay. Was that conference call to discuss
7    the name of the company?
8    A    No.
9        Q    Okay. Can you describe to me what exactly
10    you or your firm was retained to do?
11    A    We were retained to form a limited liability
12    company in New Jersey.
13        Q    And can you describe for me what that
14    entailed in terms of the services you provided?
15    A    We discussed with the clients various names that
16    they may want to use. I believe they gave us three.
17    One of our paralegals, Myra Gibson, searched those for
18    purposes of filing a New Jersey limited liability
19    company. I believe at the time two of them were valid
20    one of them wasn't. We formed an entity called -- I
21    believe we used the initials of Robin Bums and Sam
22    Ghusson. I think it was RBSG, LLC, and at a later dat
23    we changed that name to Venustas International, LLC.
24        Q    Now, do you remember the three names that
25    they gave you?

Page 12

1    A    One was called Pulse, one was the initials I
2    just gave you, and the other one was Venustas
3    International.
4        Q    And I think you indicated a minute ago
5    that two were not valid. Can you explain?
6    A    No. Pulse I think was not available in New
7    Jersey to file that as an LLC.
8        Q    Okay. So, the two were valid, but one was
9    not?
10    A    Yes.
11        Q    That one being The Pulse?
12    A    Yes.
13        Q    Okay. And when you say valid, I think I
14    take it from your testimony that name had been taken
15    already in New Jersey?
16    A    Yes. I assume that which my secretary -- well,
17    my paralegal had done the search in New Jersey that sh
18    didn't believe we could file under that name.
19        Q    Okay. And was that fact communicated to
20    the client?
21    A    Yes.
22        Q    And how was that communicated to the
23    client?
24    A    I think Mrs. Gibson had told that to either one
25    or both of the clients.

Page 13

1        Q    Mrs. Gibson is the paralegal?
2    A    Yes, Myra Gibson.
3        Q    How did she tell them? Was it verbally or
4    in writing?
5    A    I don't know if it was by E-mail or by
6    telephone.
7        Q    Did the client -- at the time that the
8    client retained you to form the LLC in New Jersey, wer
9    you also retained to clear any names with respect to
10    trademark usage?
11    A    No.
12        Q    Okay. I think you testified a minute ago
13    that once it became apparent that The Pulse was not
14    available, you chose to use or -- not you chose the
15    name. RBSG was used --
16    A    Yes.
17        Q    -- for the formation of the entity?
18    A    Yes.
19        Q    And, obviously, there came a point in time
20    when that name was changed to the third name, the
21    Venustas International, LLC; correct?
22    A    Yes.
23        Q    When was that?
24    A    Again, it was probably around this time in 2006.
25        Q    Which time? I mean--

4 (Pages 10 to 13)

1fe3bd7a-80fd-4d7c-b077-c730f6dc07cf

Page 14

1    A    March --
2         Q    Okay.
3    A    -- 20th, 19th, 22nd.  I don't remember.
4         Q    Sometime in mid March?
5    A    Yes.
6         Q    Mid to late March 2006?
7    A    Yes.
8         Q    Who made the decision to change the name
9    to Venustas International?
10   A    The clients.
11        Q    And how is that communicated to you?
12   A    I don't know if it was by E-mail or telephone.
13        Q    Who communicated that to you?
14   A    I would think it was Mr. Ghusson, but I don't
15   recall.
16             MR. HEPPT:  To the extent that there's an
17             E-mail that's -- that is, you know,
18             communicating the decision to change the name,
19             I'd call for its production.
20             MR. REILLY:  Okay.
21   BY MR. HEPPT:
22        Q    When the client instructed you to change
23   the name to Venustas International, what did you have to
24   do to do that?
25   A    Myra Gibson prepared an amendment to the

Page 15

1    Certificate of -- Certificate of Formation to change the
2    name in New Jersey.
3         Q    Had the name already been cleared for use?
4    A    Only for New Jersey purposes.
5         Q    But prior to this date, the name had been
6    cleared for use in New Jersey?
7    A    It had been cleared prior.  I think she checked
8    again to see if it was available.  It was available for
9    New Jersey purposes.
10        Q    Okay.
11             MR. REILLY:  Off the record.
12             (Whereupon a discussion was held off the
13             record.)
14             (E-mailed dated March 17th, 2006 was marked
15             Silk-6 for identification.)
16             (E-mail dated February 6th, 2006 was marked
17             Silk-7 for identification.)
18             (E-mail dated February 6th, 2006 was marked
19             Silk-8 for identification.)
20   BY MR. HEPPT:
21        Q    Mr. Silk, let me hand you what's been
22   marked as Silk Exhibit number 6 which is -- why don't
23   you tell me what it is.
24   A    It's an E-mail from Sam Ghusson to myself dated
25   March 17th, 2006 at three twenty-nine P.M.

Page 16

1             MR. SHEPHERD:  What number is that?
2             MR. HEPPT:  The bates number is 53.
3    BY MR. HEPPT:
4         Q    In the body of the E-mail it says, I'll
5    quote, "Robin and I finally agreed on a name for our
6    company.  So, go ahead and register it.  Venustas
7    International".  Do you see that?
8    A    Yes.
9         Q    Did I read that correctly?
10   A    Yes.
11        Q    Was this the first time that Mr. Ghusson
12   had communicated to you that they had decided to use the
13   name Venustas International?
14   A    I believe so.
15        Q    And when he said go ahead and register it,
16   did you have an understanding as to what he meant?
17   A    Yes.
18        Q    What was that?
19   A    To file that change of the amendment of
20   Certificate of Fonnation in New Jersey.
21        Q    Okay.
22             MR. SHEPHERD:  What exhibit is that?  I'm
23             sorry.
24             MR.HEPPT:  It's six.
25   BY MR. HEPPT:

Page 17

1         Q    Had you communicated to Mr. Ghusson prior
2    to March 17th, 2006 that the name Venustas International
3    was available for use?
4    A    I think Myra Gibson had.
5         Q    And then further on in the E-mail he says,
6    I'll quote, "Thank you and I look forward to see you or
7    talk with you early in the week to follow up on the
8    voice message that I left for you earlier today".  Do
9    you see that?
10   A    Yes.
11        Q    I read that correctly?
12   A    Yes.
13        Q    Did that have anything -- that voice
14   message have anything to do with the change or the
15   election of the name of the company?
16   A    I don't remember.
17        Q    Okay.  Let me hand you what's been marked
18   as Silk Exhibit 7 which appears to be an E-mail from
19   yourself to Myra Gibson dated February 6th, 2006, and
20   the subject line is "Venustas is a possible name for the
21   entity". I'm sorry.  The bates number -- I didn't put
22   the bates number on the record.
23             MR. REILLY:  Number his number nine.
24             bates number is number nine.
25             MR. HEPPT:  Thank you.

Direct - Silk

Page 18

1  BY MR. HEPPT:
2      Q    Is that an E-mail that you sent to
3  Miss Gibson?
4  A    Yes.
5      Q    And you're asking her to check this name
6  in New Jersey.  Do you see that?
7  A    Yes.
8      Q    What did you mean when you wrote that?
9  A    To see if it was available for the formation of
10  an LLC in New Jersey.
11      Q    Okay.  Had you discussed with Mr. Ghusson
12  and Miss Bums prior to that date, February 6th, whether
13  the name should be cleared in terms of trademark usage?
14  A    I believe there were two times I discussed this
15  with Mr. Ghusson.  I never had this discussion with
16  Mrs. Bums.
17      Q    Okay.  When was the first discussion that
18  you had with Mr. Ghusson on that subject?
19  A    When we form an entity with a client, we discuss
20  with them the fact that clearing the name in New Jersey
21  just gives you the ability to form the entity.  It would
22  be wise to move forward and do a -- probably a knock-out
23  search and then a full search for trademark work, and
24  then if necessary move ahead and actually get a
25  trademark or service mark depending upon the entity,

Page 19

1  that what we talk to our client about, if they're
2  certainly going to use this in a national setting or
3  regional setting that's what we I believe --
4      Q    I'm sorry to interrupt.
5  A    I believe Sam and I had that discussion probably
6  early on, and then we had a second time.  The second
7  time was when Myra Gibson had given to me a breakdown,
8  certain information which is the cost of running this
9  search.
10      Q    We're going to get to that document in a
11  second.  I had that premarked.  But let me ask you
12  before we do that in terms of the first discussion which
13  you say it was early on, was this prior to the formation
14  of the entity?
15  A    Probably about the time when someone comes to me
16  that's the discussion I have with people when we're
17  forming an entity.
18      Q    Okay.  And do you recall having that
19  discussion with Mr. Ghusson?
20  A    I don't recall the exact time of having an
21  initial discussion.
22      Q    Do you recall discuss -- having --
23  discussing that topic with Mr. Ghusson early on?
24  A    I have it with any of our clients in a situation
25  like this.

Page 20

1      Q    Do you recall what Mr. Ghusson's reaction
2  was?
3  A    We're just forming an entity.  We don't know
4  what we're going to do with it yet.  Let's just wait and
5  see.
6      Q    Now, you mentioned a second discussion or
7  second time where you discussed the trademark search
8  with Mr. Ghusson; is that correct?
9  A    Yes.
10      Q    And do you recall when that occurred?
11  A    Yes.
12      Q    When was that?
13  A    After this information was given to me by Myra
14  Gibson.
15      Q    Okay.  We're going to get to that in a
16  second.  I'm trying to do this in a logical way.  We're
17  jumping around a little bit, partially my fault here.
18      Let me hand you what's been marked as Silk
19  Exhibit 8 which appears to be an E-mail from Myra Gibson
20  to yourself dated February 6th.  The subject is
21  "Venustas is a possible name for the entity".  The bates
22  number is 10.  Do you recall receiving that E-mail from
23  Miss Gibson?
24  A    Yes.  I've gone over the file.  I've seen this
25  before.  I do recall getting this from her.

Page 21

1      Q    And in that E-mail Miss Gibson is
2  informing you that the name Venustas International was
3  available for use in New Jersey; is that correct?
4  A    Yes.
5      Q    That has nothing to do with clearing the
6  name for trademark usage; correct?
7  A    Yes.
8      MR. SHEPHERD:  What's that exhibit number?
9      MR. HEPPT:  The exhibit number is eight.
10      THE WITNESS:  Eight.
11      MR. SHEPHERD:  This is the one which
12  starts Allen, the name Venustas International
13  is available?
14      MR. HEPPT:  Yeah.
15  BY MR. HEPPT:
16      Q    After you got that E-mail from
17  Miss Gibson, did you communicate to Mr. Ghusson the fact
18  that the name was available in New Jersey?
19  A    I'm sure either I did or Myra did.  I'm not sure
20  who did it.
21      Q    And I take it from your prior testimony
22  that someone at your firm went ahead to amend the
23  certificate to use the name?
24  A    Myra Gibson did.
25      MR. REILLY:  Just note my objection to the

6 (Pages 18 to 21)

1fe3bd7a-80fd-4d7c-b077-c730f6dc07cf

Direct - Silk

Page 22

1  line of questioning since the E-mail is
2  February 6th and the amendment wasn't to like
3  March 21st. Your line of questioning made it
4  sound like one happened right after the other.
5      MR. HEPPT: Fair enough. Fair.
6  BY MR. HEPPT:
7      Q  Mr. Silk, let me hand you what's been
8  marked as Silk Exhibit 3. Have you seen that documen
9  before today?
10 A  Yes.
11     Q  The document bears the bates numbers 54 on
12 the first page and 55 on the second page; is that
13 correct?
14 A  Yes.
15     Q  Okay. What is this document?
16 A  Well, this is what I probably asked Myra to
17 obtain for me which is a breakdown of the approximate
18 costs of doing the searches and doing the trademark
19 work.
20     Q  And why did you ask her to prepare that?
21 A  Because we thought it was time for them to
22 seriously think about doing this.
23     Q  Them being?
24 A  The client.
25     Q  And you thought it was time for the client

Page 23

to run the trademark search?
A  Yes.
    Q  And was this before or after the
certificate, the LLC certificate had been amended?
A  I think it was at the time -- when did I have
the discussion?
    Q  Well, actually when this E-mail --
A  This is before the filing I think of the change
of the name in New Jersey.
    Q  In the E-mail, Miss Gibson says that she's
attaching a quote for trademark work based on her rate
-- I'm paraphrasing. Based on her rate and Rachel's
rates. You see that? Who's Rachel?
A  Rachel Stark is a partner here who does the
trademark work.
    Q  Did you modify the quote in any way to
include your time or the projection of your costs?
A  No.
    Q  Okay. What did you do with the quote if
anything?
A  I believe I discussed it with Sam, gave him the
approximations of the amounts.
    Q  Do you recall whether that discussion was
over the phone or face-to-face?
A  I believe it was on the -- a telephone

Page 24

1  conference when we discussed the admendment of the
2  Certificate of Formation.
3      Q  Who was participating in that phone call?
4  A  At least me and Sam and it could have been Myra
5  I'm not sure.
6      Q  Tell me everything you remember about that
7  conversation, what you said, what Mr. Ghusson said.
8  A  I probably gave him a range of numbers, two
9  numbers we have here. It could probably be higher, an
10 he said he'd get back to me as to whether or not we
11 should perform the services.
12     Q  The two numbers are the --
13 A  Range of the -- probably say 3,000 to $4,000.
14 I'm not sure.
15     Q  Okay. The quote that's attached to Silk
16 Exhibit 3 -- is it? What number is that?
17     MR. SHEPHERD: Three.
18     MR. HEPPT: I should write them on my
19 copies so I know.
20 BY MR. HEPPT:
21     Q  The quote that's part of Exhibit 3 has two
22 numbers at the bottom of the second page. One is
23 $2,913, the other is $3,413. Do you see that?
24 A  Yes.
25     Q  Are those the numbers that you're

Page 25

referring to?
A  Yes.
    Q  And Mr. Ghusson told you after some
discussion -- well, strike that.
    During that conference call with
Mr. Ghusson, did you discuss the need or the
advisability of doing a trademark search with
Mr. Ghusson?
A  This was just a continuation of our prior
discussion.
    Q  In the prior discussion, you had discussed
the advisability of doing such a search with the client;
correct?
A  Yes.
    Q  And you indicated a minute ago that
Mr. Ghusson told you he would get back to you in term
of authorizing you whether or not to do the work?
A Yes. I mean we were spending more than double
what we spent to form it. They were still in the
initial stages of what they were doing here. We were
negotiating a buy-sell agreement. We didn't have a dea
done there. He said he would get back to me.
    Q  Did he ever get back to you?
A  No.
    Q  Did you ever receive any authorization

7 (Pages 22 to 25)

1fe3bd7a-80fd-4d7c-b077-c730f6dc07cf

Page 26

from the client to do the trademark clearing work?
2  A    No.
3      Q    Let me hand you what's been marked as Silk
4  Exhibit 2 which appears to be -- well, it's a two-page
5  document bearing the bates numbers 1214 and 1215, and rry
6  first question, Mr. Silk, will be to have you identify
7  what that document is.
8  A    We keep time on even our fixed fee matters
9  internally. So, this was an internal time.
10     Q    Okay. And is this document the printout
11 from a computer program that you maintain at the firm?
12 A    Yes.
13         MR. SHEPHERD:  What's the exhibit number
14     again?
15         MR. HEPPT:  Two.
16 BY MR. HEPPT:
17     Q    And the entries that we see on the
18 document in the far left corner, there's a column that's
19 headed "atty" which I take to mean attorney?
20 A    Yes.
21     Q    And there are various initials below that?
22 A    Yes.
23     Q    The first one is SLK. Who is that?
24 A    Me.
25     Q    So, these are not initials? These are

Page 27

1  abbreviation of the last name?
2  A    One of my partners who's older then I am has m
3  initials.
4      Q    Thank you.
5          The other initials that appear in this
6  page are in fact -- or the other entries in that column
7  are in fact initials?
8  A    Yes.
9      Q    So, for example, the one below on the
10 second entry is MCG. Do you know who that is?
11 A    Myra C. Gibson.
12     Q    Does this document reflect all of the work
13 that was done by your firm in connection with the
14 formation of the LLC?
15         MR. REILLY:  Hold on a second. Read back
16     the question.
17     (Whereupon the requested portion was read
18     back.)
19         MR.REILLY:  Object to the form of the
20     question. You're not indicating which LLC, and
21     because we've already established there was
22     more than one --
23         MR. HEPPT:  Okay.
24 BY MR. HEPPT:
25     Q    You testified that you were retained by

Page 28

1  Mr. Ghusson and Miss Bums to form an LLC in New Jersey
2  correct?
3  A    Yes.
4      Q    And we've also had testimony that LLC went
5  through various names; correct?
6  A    Yep.
7      Q    Does this document reflect all of the work
8  that your firm did in connection with the formation of
9  that company and those name changes?
10 A    Probably not.
11     Q    What is the -- is there a procedure in
12 place at the firm for entering time?
13 A    Yes.
14     Q    And what is that procedure?
15 A    Each of us on our computer has a time entry
16 system that we use.
17     Q    And is there any guideline that the firm
18 has with respect to attorneys or paralegals entering
19 their time?
20 A    Yes.
21     Q    And what is that?
22 A    You're supposed to put in all of your time.
23     Q    But you don't think that was done in this
24 case?
25         MR. REILLY:  Object to the form of the

Page 29

question. Counsel, I can represent to you that
2  there's a lot of work done regarding the
3  formation of the first corporation. Then,
4  there was work done for the amendment, and it's
5  not in this one monthly billing which has been
6  marked Silk-2 dated April 17th, 2006. I'll
7  respectfully submit that your subpoena did not
8  ask for all of Stark & Stark records or billing
9  regarding formations of all corporations. You
10 were just asking about Venustas, and you can
11 see that there are in E-mails which are not
12 identified on this bill, but this attempted to
13 indicate what happened on March 17th and what
14 Myra billed for, and you have that particular
15 E-mail.
16         MR. HEPPT:  I'm just trying to get an
17 E-mail of what we're looking at, if there are
18 other -- if there are other similar documents
19 that would reflect work relating to the name
20 change or the formation of the LLC that
21 eventually became known as Venustas
22 International.
23         MR. REILLY:  The answer to that is yes.
24 There's other E-mails, documents and billing
25 regarding the formation of the corporation in

Page 30

1    its various forms. They're in front of us, and
2    my position stands the same. You didn't ask
3    for everything. There's numerous documents.
4        MR. HEPPT: Yeah. The subpoena speaks fo
5    itself. I think the subpoena is pretty clear
6    on what it asks for.
7        MR. REILLY: The whole file is here. If
8    for some reason you think we need to go through
9    that, we can do that.
10       MR. HEPPT: I'm just going to make a
11   request on the record for the production of all
12   billing, E-mails, other correspondence, all of
13   which are called for by the subpoena in
14   connection with the formation of the LLC which
15   eventually became known as Venustas
16   International.
17   BY MR. HEPPT:
18       Q    Let me ask you now going back to Silk
19   Exhibit 2 there's an entry on February 3rd, 2006 by
20   Miss Gibson. The description is "Corporate search for
21   name availability". Do you see that?
22   A    Yes.
23       Q    Do you know what name she was searching?
24   A    No.
25       Q    This was prior to the E-mail that you

Page 31

1    received from Mr. Ghusson on or about March 17th; isn't
2    that correct? This entry. I'm sorry.
3        MR. REILLY: We'll stipulate the time
4        periods are different, at least a month period.
5    BY MR. HEPPT:
6        Q    I think I marked that. I don't remember
7    what the exhibit number is, the E-mail you received from
8    Mr. Ghusson.
9    A    Silk Exhibit 6.
10       Q    And particularly bringing your attention
11   to the date of that E-mail.
12   A    March 17th, 2006.
13       Q    Does that refresh your recollection in any
14   way as to what name was being searched by Miss Gibson o
15   February 3rd?
16   A    No.
17       Q    Was she -- would she have been searching,
18   to your knowledge, the availability of the three names
19   that were discussed previously?
20   A    That would be my guess.
21       Q    Did you have any discussions with
22   Miss Gibson in terms of what she was doing in February
23   2006 in terms of searching for name availability?
24   A    I think she came back to us and told us that The
25   Pulse was not available and that the other two were when

Page 32

1    she did her search in New Jersey.
2        Q    Okay. So, would that lead you to conclude
3    that when she was searching for a corporate name
4    availability in February, she was searching for all
5    three names?
6        MR. SHEPHERD: I object to the form of
7        that question.
8    BY MR. HEPPT:
9        Q    You can answer.
10A      Yes.
11       Q    Now, there's an entry, and I take it it's
12   by you, SLK, on February 3rd, 2006. Do you see that?
13   A    Yes.
14       Q    It reads "Conference with Myra C. Gibson,
15   legal assistant, to review her search of an LLC name an
16   E-mail she sent to Mr. Sam Ghusson". Do you see that
17   A    Yes.
18       Q    Do you recall having that conference with
19   Miss Gibson?
20   A    Only vaguely, but she would normally come back
21   to me, show me what the search was, and I assume from
22   this she sent it on to Mr. Ghusson.
23       Q    And you made that entry; correct?
24   A    Yep.
25       Q    That was an entry you made on your

Page 33

1    computer at your desk?
2    A    Yes.
3        Q    When you met with her, Miss Gibson, did
4    you review or did she have a copy of the E-mail that sh
5    sent to Mr. Ghusson?
6    A    I don't know.
7        MR. HEPPT: I don't believe I've seen a
8        copy of that E-mail unless I'm mistaken.
9        MR. REILLY: Off the record.
10       (Whereupon a discussion was held off the
11       record.)
12       MR. HEPPT: We've just spent a few minutes
13   going through the file trying to locate the
14   E-mail that Miss Gibson sent to Mr. Ghusson on
15   or about February 3rd, 2006, and it does not
16   appear to be in the file that's present in the
17   conference room, and I would -- and I would
18   just call for the production of that E-mail.
19       MR. SHEPHERD: I'm a little confused.
20       MR. HEPPT: Yeah.
21       MR. SHEPHERD: Because it seems to me tha
22   the document I just gave you marked 0008 shows
23   -- is an E-mail that was sent on February 3rd,
24   2006 regarding searching.
25       MR. HEPPT: Is to Mr. Silk, not to

9 (Pages 30 to 33)

1  Mr. Ghusson.
2        MR. SHEPHERD:  Oh, okay.
3        MR. REILLY:  Counsel, you're correct.  As
4  far as I know, there is no such E-mail in the
5  file that was being produced.  If one exists,
6  obviously I'll provide that to both Counsel.
7        MR. HEPPT:  Thank you.
8        MR. SHEPHERD:  I reviewed the file too and
9  I've seen nothing.
10        MR. HEPPT:  If it exists, I'd like to get
11  a copy.  If it doesn't, I'd like somebody to
12  tell me you can't find it, it doesn't exist.
13  That's fine.
14  BY MR. HEPPT:
15        Q     Now, going back to Exhibit 2, Mr. Silk, do
16  you see there's an entry by Miss Gibson on March 17th,
17  2006 and her entry reads "Follow-up regarding Trademar
18  Search and Registration, Corporate Search for name
19  availability".  You see that?
20  A     Yes.
21        Q     Do you know what she meant by that entry?
22        MR. SHEPHERD:  Objection to the form of
23  the question.
24  BY MR. HEPPT:
25        Q     You can answer it.

1  A     Yes.
2        Q     And what is that?
3  A     This is when she prepared the estimate for the
4  work.
5        Q     Okay.  And that's the document that's been
6  marked as Exhibit 3?
7  A     Yes.  Well, I shouldn't say yes.  Let me look.
8        Q     I'm not trying to trick you.
9  A     Yes.
10        Q     What did she mean, if you know, by
11  follow-up regarding trademark search?
12  A     Myra--
13        MR. SHEPHERD:  Objection to the form of
14  the question.
15        THE WITNESS:  Myra has a listing of items
16  that she would just check off and,
17  unfortunately, they're not -- I mean they're
18  preprinted statements.  So, they don't all fit
19  into the box, and this was the one she checked
20  which is when she does this, that's the wording
21  or the coding that comes up in our system.
22  BY MR. HEPPA:
23        Q     Oh, okay.  She didn't actually type in the
24  words follow-up regarding trademark search?
25  A     I don't believe so.  I think -- no, no.  I think

1  she hit a box that brings that out.
2        Q     Okay.
3        MR. REILLY:  We're discussing the internal
4  billing that's been marked Silk-2 when you're
5  answering this line of questioning?
6        THE WITNESS:  Yes.
7        MR. HEPPT:  Yes.
8  BY MR. HEPPT:
9        Q     Do you know whether Miss Gibson had any
10  discussion with Mr. Ghusson or Miss Bums regarding the
11  trademark search and registration?
12  A     Independent of any discussion I may have had the
13  answer is no.
14        Q     Thank you.
15        And you testified that you had two
16  discussions that you recall with Mr. Ghusson regarding
17  the trademark search; is that correct?
18        MR. SHEPHERD:  Objection to the form of
19  the question.
20        THE WITNESS:  Yes.
21  BY MR. HEPPT:
22        Q     Let me hand you what's been marked as Silk
23  Exhibit 4, and this document has the bates number 56.
24  Can you tell my what this document is, Mr. Silk?
25  A     I believe this is my last search of the name

1  availability of Venustas International in New Jersey.
2        Q     Okay.  And is this a printout from the New
3  Jersey website?
4  A     I don't know.
5        Q     Have you ever conducted a search yourself
6  regarding --
7  A     No.
8        Q     -- the New Jersey corporate names?
9  A     No.
10        Q     Okay.  The document there's a -- towards
11  the bottom of the document, I guess it's about, well,
12  maybe two-thirds of the way down it says "Enter text"
13  and the words "Venustas International" appear.  Do you
14  see that?
15  A     Yes.
16        Q     Is it your understanding that Miss Gibson
17  entered those words to conduct the search on that name
18  A     I assume.
19        Q     Okay.  And about a third of the way down
20  there's a line that reads "There were no records found
21  that meet your search criteria".  Do you see that?
22  A     Yes.
23        Q     Do you have any understanding as to what
24  that means?
25  A     I only assume that it means they could not find

Page 38

1 another Venustas International in New Jersey.
2       Q     Did you discuss this document with
3 Miss Gibson?
4 A     No.
5       Q     Did you discuss this document with
6 Mr. Ghusson?
7 A     No.
8       Q     There are various boxes that appear on
9 this document with what appear to be Xs in them. Do you
10 see that?
11 A     Yes.
12       Q     Do you have any idea what those are?
13 A     No.
14       Q     The instructions that appear about a third
15 of the way down states "Select one search criterion from
16 the list below". Do you see that?
17 A     Yes.
18       Q     And then there are three, what appear to
19 be three criterion, business entity search, UCC search
20 and -- the document is a little cut off. Looks like
21 trade name service mark. Do you see that?
22 A     Yes.
23       Q     Do you know which one of those three
24 criterion Miss Gibson chose when she conducted the
25 search?

Page 39

1 A     No.
2       MR. SHEPHERD: Object to the form of the
3 question.
4       THE WITNESS: No.
5 BY MR. HEPPT:
6       Q     When I asked you a little bit earlier
7 about the quote that Miss Gibson had prepared with
8 regard to the trademark name search, you used the phrase
9 that I'm not familiar with. It was a knock-out report I
10 think.
11 A     Knock-out search.
12       Q     Can you explain what that is?
13 A     No. I sort of have a general idea, but the
14 answer is no.
15       Q     What's your general understanding as to
16 what that means?
17 A     It's a fast search with the name that she uses
18 initially, and that may be an initial search just to
19 check to see if there is any problem with a similar
20 name.
21       Q     Do you know where she would conduct that
22 search?
23 A     From her computer.
24       Q     What website would she would go to?
25 A     No.

Page 40

1       Q     She was never told by anyone in the firm
2 to conduct that search; correct?
3 A     I don't believe so.
4       Q     And why is that?
5 A     Because we weren't retained at that point to do
6 that search. Our normal -- our normal search when we
7 form these entities is just in the state that we're
8 going to form them within.
9       Q     Right. And you described the discussion
10 that you generally have with clients regarding the
11 advisability of a trademark search; is that correct?
12 A     Yes.
13       Q     And you testified I believe, correct me if
14 I'm wrong, that you recall having that discussion with
15 Mr. Ghusson?
16 A     Yes.
17       Q     On at least two occasions?
18 A     Correct, on two occasions. I don't believe more
19 than two.
20       Q     Okay. And the second occasion was around
21 the time that Miss Gibson had prepared the quote or
22 conducted the search?
23 A     It had to be after the quote and probably before
24 the filing or approximately around the filing of the
25 amendment of the Certificate of Formation.

Page 41

1       Q     Okay. Your firm was never authorized to
2 perform that work; correct?
3 A     I wasn't.
4       Q     Was anyone in your firm authorized to do
5 so?
6 A     No one has come forward to tell me that they
7 have.
8       Q     Okay. Were you the engagement partner, so
9 to speak, on this engagement?
10 A     If you want to use that term, yes.
11       Q     And you were the partner with primary
12 responsibility for communicating with the client;
13 correct?
14 A     Yes.
15       Q     So, if anyone had been authorized in your
16 firm, you would expect to know that; isn't that fair to
17 say?
18 A     Well, not necessarily.
19       Q     Can you explain what you mean?
20 A     If the client had spoken to Mrs. Gibson directly
21 or if Stuart Mickelberg, who is an associate working
22 with me at the time, was given authorization, then
23 certainly there would probably have at that time sent
24 out another engagement letter and done the search or if
25 he had forgotten to send out the new engagement letter

11 (Pages 38 to 41)

1fe3bd7a-80fd-4d7c-b077-c730ffidc07cf

Direct - Silk

Page 42

1  -- we have an engagement letter for this type of work.
2  They may have gone ahead and just done it.
3      Q     To your knowledge sitting here today, was
4  that work done?
5  A     No.
6      Q     Do you have any understanding as to why
7  that work was not done?
8  A     I can only assume because we were never given
9  the authorization to do the work.
10     Q     Okay. Let me hand you what's been marked
11 as Silk Exhibit 5, and this document bears the bates
12 number 1213. Can you tell me what this document is?
13 A     Yes. This is a fixed fee bill that -- it's a
14 memo bill we sent out based upon a couple different
15 things, number one, the engagement letter, and the Silk
16 Exhibit 2 which is the information we receive on a
17 monthly basis or when we ask for it of how much time was
18 on that particular account.
19     Q     Was it -- was the invoice that's been
20 marked as Silk Exhibit 5 for a particular time period or
21 was this for the entire engagement?
22 A     Because it's a fixed fee, it would have been for
23 the entire engagement.
24     Q     And is this an invoice you would have
25 provided to the client at the conclusion of the work?

Page 43

1  A     Yes.
2      Q     And do you recall providing this invoice
3  to the client?
4  A     No, but I'm sure it went out from -- at that
5  time, whoever my secretary was.
6      Q     Did you -- did the client question this
7  bill in any way?
8  A     I don't believe so.
9      Q     Okay. If you look at the description of
10 legal services, the document -- the document reads "For
11 Professional Services rendered, including corporate and
12 trademark search for name availability". Do you see
13 that?
14 A     Yes.
15     Q     Did you explain why your invoice reflected
16 trademark searching for name availability?
17 A     Because Jean Krumm, who is the secretary at the
18 time, took a look at this document here, saw the wordin
19 on March -- this is -- excuse me. Silk-2. Saw the
20 wording trademark search and just decided to put that in
21 the language of the fixed file.
22     Q     With what -- what is the name of the
23 secretary? I'm sorry.
24 A     Jean Krumm, K-r-u-m-m.
25     Q     So, Miss Krumm -- it is Miss Krumm;

Page 44

1  correct?
2  A     Yes.
3      Q     Miss Krumm prepared the invoice that's
4  been marked as Silk Exhibit 5 based on her review of
5  what's been marked as Silk Exhibit 3?
6  A     Yes.
7      Q     And--
8  A     Silk Exhibit 2.
9      Q     I'm sorry. Thank you.
10         Did you review the invoice before it went
11 out?
12 A     No.
13     Q     Did anyone at the firm review the invoice
14 before it went out --
15 A     No.
16     Q     -- to your knowledge?
17         So, Miss Krumm would have prepared it and
18 mailed it out to the client?
19 A     Yes.
20     Q     Is that standard practice at the firm?
21 A     Yes.
22     Q     Sitting here today is it fair to say that
23 Silk Exhibit 5 is inaccurate?
24 A     Yes.
25     Q     Because the trademark search was never

Page 45

1  done; correct?
2  A     Yes.
3      Q     Is it inaccurate in any other way?
4  A     I don't know if the search is really a -- you
5  know, discussed as a corporate search as opposed to a
6  limited liability company search.
7      Q     Okay. Other than that, are there any
8  other inaccuracies that you can spot?
9  A     No.
10     Q     Okay. The total amount due is the correct
11 amount; correct?
12 A     I believe so.
13     Q     Okay. Can you tell me why the file was
14 bate stamped?
15         MR. REILLY: Object to the form of the
16         question. Counsel, I had it bate stamped. I
17         don't think that's a proper line of
18         questioning.
19 BY MR. HEPPT:
20     Q     Has there been a claim asserted against
21 the firm by the client?
22         MR. REILLY: Object to the form of the
23         question. Has nothing to do with this
24         particular deposition.
25         MR. HEPPT: He can answer yes or no. Are

12 (Pages 42 to 45)

1fe3bd7a-80fd-4d7c-b077-c730f6dc07cf



Page 46

1    you instructing him not to answer?
2        MR. REILLY: I'm instructing you there's
3    been no claim made.
4    BY MR. HEPPT:
5        Q   Mr. Ghusson, to your knowledge has there
6    been a claim asserted?
7        MR. SHEPHERD: No. He's Silk.
8    BY MR. HEPPT:
9        Q   I'm sorry.
10       Has there been a claim asserted?
11   A    Not my knowledge.
12       Q   What's your understanding of the term a
13   claim asserted?
14   A    Someone has stated that we have done something
15   wrong, whether it be malpractice or what have you, and
16   to the best of my knowledge, there's been no claim made.
17       Q   Okay. Has the client criticized the work
18   that was done by the firm?
19   A    I don't know.
20       Q   Have you had any discussions with the
21   client along those lines?
22   A    No.
23       Q   Has anyone at the firm had those types of
24   discussions with the client?
25   A    I don't know.

Page 47

1        Q   You indicated a little earlier that your
2    primary contact with the client was with Mr. Ghusson.
3    Was that correct?
4    A    Yes.
5        Q   You also told me I think -- and correct me
6    if I'm wrong. I don't mean to characterize you or put
7    words in your mouth. You may have been on one or mor
8    conference calls with Miss Burns?
9    A    Yes.
10       Q   And do you remember whether any of those
11   conference calls involved the selection of a name of the
12   entity?
13   A    No. I don't believe they dealt with the name.
14       Q   Okay. Just give me a minute.
15       MR. HEPPT: Mark these.
16       (E-mail dated February 15th, 2006 was marked
17       Silk-9 for identification.)
18       (E-mail dated February 15th, 2006 with
19       attachments was marked Silk-10 for
20       identification.)
21   BY MR. HEPPT:
22       Q   Okay. We are back on.
23       Mr. Silk, let me hand you what's been
24   marked as Silk Exhibit 9 which is bate stamped 15. It
25   appears to be an E-mail from Miss Gibson to yourself

Page 48

1    dated February 15th, 2006 regarding "Sam Ghusson - Th(
2    Pulse, LLC". Remember receiving that E-mail from
3    Miss Gibson?
4    A    No, but I seen this.
5        Q   You have no reason to believe that you did
6    not receive this E-mail?
7    A    No.
8        Q   In that E-mail.it.s very short, she is
9    just basically saying The Pulse is not available;
10   correct?
11   A    Yes.
12       Q   Did you have any discussions with her
13   regarding why the name The Pulse was not available?
14   A    No, not that I remember.
15       Q   Okay. Did you ask her to provide any
16   documentation indicating why she had concluded that Th
17   Pulse was not available?
18   A    No.
19       Q   Okay. Let me hand you what's been marked
20   as Silk Exhibit 10 which is a multi-page document, the
21   first page of which -- well, the bates range is 16
22   through 27, and the first page appears to be an E-mail
23   from Miss Gibson to AlIen Silk dated February 15th, 200
24   at four-eleven P.M., and the subject is "Pulse - See
25   Attached".

Page 49

1        MR. SHEPHERD: This is Exhibit 10?
2        MR. HEPPT: Yes.
3        MR. SHEPHERD: The one before that, the
4        one Pulse not available, that's nine?
5        MR. HEPPT: Yeah, bates 15, right.
6    BY MR. HEPPT:
7        Q   Have you seen that document before today?
8    A    I've seen the cover. I'm not sure I opened up
9    the attachment.
10       Q   Okay.
11   A    And I may have opened up, saw what it was and
12   decided not to review it.
13       Q   I wouldn't blame you. The E-mail
14   indicates -- this is explaining why the Pulse was not
15   available; is that correct?
16   A    Yes.
17       Q   And the attachment, can you explain your
18   understanding of what the attachment is?
19   A    It seems to be the search of all the names using
20   the word Pulse I would think within New Jersey.
21       Q   Okay. Okay. Is it fair to say these
22   documents are similar to the document we looked at
23   earlier that Miss Gibson had conducted a search in the
24   New Jersey data base for Venustas International?
25   A    I would just be assuming. I don't know.

13 (Pages 46 to 49)

Page 50

1    Q    Let me find that. That was a terrible
2  question anyway.
3         MR. REILLY: Off the record.
4         (Whereupon a discussion was held off the
5         record.)
6  BY MR. HEPPT:
7    Q    Okay. Mr. Silk, I've handed you again
8  Silk Exhibit 4. Does this document appear to be similar
9  to the attachment to Silk Exhibit 10?
10 A    It has the statement that it's New Jersey State
11 Business Gateway Service. It talks about in the one
12 hand there may not have been anything with the name
13 Venustas in New Jersey. This one, the word Pulse, which
14 is a very common -- may have had many.
15   Q    Apparently it did. Apparently it did.
16 Okay.
17        I apologize because I don't remember
18 whether I've asked you this question before. If I did,
19 I apologize. Did you inform Mr. Ghusson or Miss Burns
20 that the name Venustas International was available for
21 use by their LLC?
22 A    I don't remember if I did it or Myra did it.
23   Q    Okay. We saw on that printout at the time
24 that there was a reference to an E-mail by Miss Gibson
25 to Mr. Ghusson regarding the search of an LLC name. D

Page 51

1  you see that? Remember that testimony, that document?
2         MR. REILLY: Which date is it?
3         MR. HEPPT: It's February 3rd, 2006.
4         MR. REILLY: We're looking at Silk-2?
5         MR. HEPPT: Correct.
6  BY MR. HEPPT:
7    Q    Do you remember we talked about that entry
8  a little earlier?
9  A    Yes.
10   Q    Is it your understanding that that --
11 well, strike that.
12        The E-mail that's referenced in that
13 entry, would that be the time that Miss Gibson would
14 have communicated the name availability to Mr. Ghusson?
15        MR. SHEPHERD: Can you read the question
16        back please? I need what exhibit we're
17        referring to.
18        MR. HEPPT: Two.
19        (Whereupon the requested portion was read
20        back.)
21        THE WITNESS: I would assume so.
22 BY MR. HEPPT:
23   Q    And that is the E-mail that we've looked
24 for in the file and weren't able to find. I've made
25 that request that it be -- that that search be

Page 52

1  conducted; is that correct?
2  A    I believe.
3    Q    It's fair to say though Miss Gibson or
4  yourself or someone told Mr. Ghusson at some point in
5  time that the name Venustas International was available
6  for use by the LLC that was being formed; correct?
7         MR. SHEPHERD: Objection to the form of
8         the question.
9         THE WITNESS: Yes. I believe that Myra or
10        I, more likely Myra told Mr. Ghusson that the
11        name was available.
12 BY MR. HEPPT:
13   Q    Okay. When she told Mr. Ghusson the name
14 was available, was she telling Mr. Ghusson it was clear
15 for all purposes?
16        MR. SHEPHERD: Objection to the form of
17        the question.
18 BY MR. HEPPT:
19   Q    Do you understand what I mean when I
20 say it was clear for all purposes?
21 A    I understand.
22   Q    Okay.
23 A    I would say no because the scope of our
24 engagement had nothing to do at that time with the
25 trademark work.

Page 53

1         MR. HEPPT: Okay. That's all I have right
2  now. Thank you, Mr. Silk.
3         MR. SHEPHERD: I need to redact something
4  or I can -- I don't know what I'm going to do.
5  I have to redact something.
6         MR. REILLY: Off the record.
7         (Whereupon a discussion was held off the
8         record.)
9         (Whereupon a recess was taken.)
10 CROSS EXAMINATION
11 BY MR. SHEPHERD:
12   Q    Mr. Silk, my name is Bob Shepherd. I
13 represent the defendant in a litigation entitled Aedes
14 DeVenustas versus Venustas International, now Batallure
15 Beauty, LLC in the Southern District of New York, and I
16 am going to ask you now some questions on behalf of the
17 defendant LLC. I'm going to show you a document.
18        MR. SHEPHERD: Mark this.
19        (Document entitled "New Jersey LLC Formation
20        Checklist" was marked Silk-II for
21        identification.)
22 BY MR. SHEPHERD:
23   Q    I had a document marked Silk-II. Can you
24 tell me what that is?
25 A    This is a list --

14 (Pages 50 to 53)

1fe3bd7a-80fd-4d7c-b077-c730f6dc07cf

Page 54

1        MR. REILLY:  Before you answer, it's been
2     bate stamped 01000.  Okay.
3        MR. HEPPT:  Single-page document.
4        MR. SHEPHERD:  Two pages.
5        MR. REILLY:  And 01001.
6        THE WITNESS:  This is a form that I only
7     seen after the fact by Myra Gibson that she
8     uses to determine her billing as I understand
9     it.
10   BY MR. SHEPHERD:
11      Q    Okay.  Was it -- what has to happen--
12   well, let's -- what does box one say on that list?
13   A     "Client confirmation, re: no trademark work."
14      Q    Is that box checked in this file?
15   A     No.
16      Q    What has to happen with regard to a client
17   before that box can be checked?
18   A     I don't know.
19      Q    Are you aware of whether there was a
20   similar -- strike that.
21         As you can see from the top of the
22   document, this particular document relates to --
23      MR. SHEPHERD:  I'm sorry.  I should have
24     passed copies out.
25      MR. REILLY:  Do you have copies?

Page 55

       MR. SHEPHERD:  Do you have copies?
       MR. REILLY:  No.
BY MR. SHEPHERD:
   Q    I note that this form coming from the file
relates to an LLC named RBSG Enterprises, LLC.  Was
there a similar checklist in the file for Venustas
Inlernalional, LLC?
A     I don't know.
   Q    Okay.
       MR. REILLY:  Counsel, I can represent my
     review of the file indicates there's not.
       MR. SHEPHERD:  Okay.
BY MR. SHEPHERD:
   Q    Now, do you consider as a corporate
attorney the issue of trademark law to be important when
you're choosing a name to form a corporation?
A     Depends on the type of entity.
   Q    Well, can you explain the circumstances
under which it would be important and would not be
important?
A     Certainly I would admit for a company like the
Venustas International if it was going out and doing
work on a national and regional basis, it would be
important for them to have this work performed.
   Q    Okay.  When wouldn't it be important in

Page 56

1     your mind?
2     A    My wife and I form an LLC to buy a piece of
3     property.  We're not going out and doing any work in th
4     general area.  We don't care if someone tells us to
5     change our name from Allen and Judy Silk, LLC.
6        Q    Now, when you formed this company, did yo
7     come to a conclusion as to whether or not this would be
8     a company that would be operating on a national or
9     regional basis?
10       MR. HEPPT:  Objection to the form.
11   BY MR. SHEPHERD:
12      Q    You can answer.
13   A     Can you repeat that for me please?
14       MR. SHEPHERD:  Read it back.
15       (Whereupon the requested portion was read
16       back.)
17       THE WITNESS:  I asked Mr. Ghusson what h
18     thought would happen with the name of this
19     company, and he felt that this was a temporary
20     name that would be changed at a later date.
21   BY MR. SHEPHERD:
22      Q    Which name are we talking about?  RBSG?
23   A     RBSG, LLC or Enterprises, LLC.
24      Q    When the name Venustas International was
25   chosen, did you have an opinion as to whether or not

Page 57

1     this corporation would be doing business on a national
2     or regional basis?
3     A     It was still very early on.  At the time that we
4     had changed the name, to the best of my knowledge, a
5     discussion to me was we were just seeing whether or not
6     we could come to an agreement.  This is Mr. Ghusson an
7     his partner, and that at that moment they weren't doing
8     any work that would have created the use of that name
9     out of the general public.
10      Q    Okay.
11   A     This is by the way in March of 2006.
12       MR. SHEPHERD:  Mark this.
13       (Letter dated December 30th, 2005 with
14       attachment was marked Shepherd-12 for
15       identification.)
16   BY MR. SHEPHERD:
17      Q    I've had the court reporter hand you a
18   document we've marked as Silk-12.  Can you tell me wha
19   that is?
20       MR. REILLY:  Just so the record is
21     correct, it's a document that's been marked
22     1002 and that's Silk-12.
23       THE WITNESS:  This is an engagement letter
24     that we sent out to Mr. Ghusson and
25     Mrs. Bums-McNeil (phonetic).

15 (Pages 54 to 57)

Page 58

1 1        MR. REILLY:  Also note that Silk-12 runs
2      to 1005.
3  BY MR. SHEPHERD:
4      Q    Now, I'd like you to look at page two of
5  Exhibit 12.  Down at the bottom you see the section
6  entitled LLC.
7        MR. REILLY:  There's no question pending.
8        MR. SHEPHERD:  I know.  I had to catch up
9      with my questions.
10 BY MR. SHEPHERD:
11     Q    In section two of the letter it states
12 that with regard to the LLC you will conduct a name
13 availability search; isn't that correct?
14 A    Yes.
15     Q    It doesn't say in that letter that this
16 name availability search will not include a trademark
17 search; does it?
18       MR. REILLY:  Object to the form of the
19     question.  You can answer.
20       THE WITNESS:  No.
21 BY MR. SHEPHERD:
22     Q    It doesn't tell the client that the
23 trademark search will cost extra; does it?
24       MR. REILLY:  Object to the form of the
25     question.  There's no reference to trademark

Page 59

1  search in this document.
2        You can answer.
3        THE WITNESS:  There's nothing in this
4      letter that discusses it.
5  BY MR. SHEPHERD:
6      Q    Is there another letter that you -- is
7  relevant to this particular file that does talk about a
8  trademark search?
9  A    We didn't get that far, but a new engagement
10 letter would have gone out if in fact we were doing the
11 trademark search.
12     Q    Okay.  Now, when did you start, first
13 start doing work for Mr. Ghusson in any capacity?
14 A    Me or Stark & Stark?
15     Q    Let's start with you first.
16 A    This probably was the -- I'm just guessing.
17 This was the first matter I worked on for Mr. Ghusson.
18     Q    Had Stark & Stark done work for
19 Mr. Ghusson before?
20 A    Yes.
21     Q    What type of work was that?
22 A    Estate planning.
23     Q    When Mr. Ghusson came to see you, did
24 anyone give you any information about his background?
25 A    No, but I knew Mr. Ghusson from prior, prior to

Page 60

1  this time.
2      Q    Well, what did you know about him?
3  A    That he had been a successful individual in his
4  field and that he was now looking to get involved in a
5  new business.
6      Q    Okay.  Were you -- do you know whether or
7  not he had run his own business before or whether he
8  worked for other people?
9  A    I only knew that he had worked for other people.
10     Q    Okay.  Did you consider him to be a
11 sophisticated person when it comes to the incorporation
12 of a business?
13 A    I considered him to be a sophisticated business
14 person.  I don't know if he had ever formed or been
15 involved in the formation of an entity.
16     Q    Do you -- when you are engaged by someone
17 for the first time and you don't know whether they are a
18 sophisticated entrepreneur, someone who starts their own
19 companies, do you speak to them differently then you do
20 someone who is an entrepreneur?
21       MR. HEPPT:  Objection to the form.
22       THE WITNESS:  I don't know that I speak to
23     them differently.  We may have discussed more
24     things explicitly as opposed to generalities.
25 BY MR. SHEPHERD:

Page 61

1      Q    Okay.  Now, Mr. Silk, I'm going to hand
2  you -- it's my copy of Silk Exhibit 2.  Why don't we go
3  Silk Exhibit 2.
4        MR. SHEPHERD:  I'd like to mark this
5      Exhibit Silk-13.
6        (Time record was marked Silk-13 for
7        identification.)
8  BY MR. SHEPHERD:
9      Q    Now, Mr. Silk --
10       MR. REILLY:  You have asked him to look a
11     Silk-2.  Are you finished with it?
12       MR. SHEPHERD:  He's going to need both o
13     them.  They work together.
14       MR. REILLY:  Got you.
15 BY MR. SHEPHERD:
16     Q    I'd like you to take a look at that and
17 tell me is Silk -- Silk-2 and Silk-13 from the same
18 file, same billing file?
19 A    No.  When I say the same billing file, they're
20 to the same clients, but two different matters.
21     Q    Was -- we know that Silk-2 deals with the
22 formation of the LLC and that was a fixed fee bill; is
23 that correct?
24 A    Yes.
25     Q    And for Silk-13, what does that relate to?

16 (Pages 58 to 61)

Page 62

    A    The general business hourly portion.

2    Q   Okay. So, there were things that were

3 done that fell outside of the formation of the LLC that

4 you were doing for Mr. Ghusson and Mrs. Burns?

5        MR. HEPPT: Objection to the form.

6        THE WITNESS: I don't know if this is an

7    incorrect entry because it's difficult for us

8    at times to understand whether it's going to be

9    charged three or charged the four.

10 BY MR. SHEPHERD:

11    Q  I understand.

12    A   My sense here is Myra and myself may have

13 decided that this was not part of the fixed fee at least

14 for myself. It was part of the hourly fee.

15    Q   That's fine. I asked a different question

16 though.

17        MR. SHEPHERD: Repeat my -- read back mll

18    question.

19    (Whereupon the requested portion was read

20    back.)

21        MR. HEPPT: Objection to the form again.

22    Just repeat the objection.

23        THE WITNESS: Yes, but again I'm not sure

24    these items shouldn't have been over in dash

25    four as opposed to dash three.

Page 63

1 BY MR. SHEPHERD:

2    Q   That's fine. I think this is -- leave

3 those there.

4        MR. SHEPHERD: I thought we had marked

5    0008 as an exhibit number, but I can't --

6        MR. HEPPT: Sounds familiar.

7        MR. SHEPHERD: We at least talked about

8    it.

9        MR. HEPPT: I don't think I marked it.

10        MR. SHEPHERD: Mark this.

11    (E-mail dated February 3rd, 2006 was marked

12    Silk-14 for identification.)

13        MR. REILLY: Document marked Silk-14 is

14    bate stamped 08.

15 BY MR. SHEPHERD:

16    Q   Okay. It says -- it says on the -- in the

17 document now marked Silk-14 that RBSG Enterprises, LL<

18 is available. Is that at the time -- does that relate

19 to the MCG reference on Silk Exhibit 2 and dated 2/3/06

20 and then the following entry 2/3/06 "Conference with

21 Myra C. Gibson, legal assistant, to review her search of

22 an LLC name and E-mail she sent to Mr. Sam Ghusson"?

23    A   They line up on the same bates. I have to

24 assume that that is true.

25    Q   Okay. Now, there's no indication on

Page 64

1 either of these bills that at this point you've had a

2 discussion with Mr. Ghusson or anyone else regarding

3 trademarks; is that correct?

4    A   Nothing on the bill.

5    Q   Right. Is there anything in the file at

6 all that's a memo that indicates you had a discussion

7 with Mr. Ghusson or Mrs. Burns regarding trademarks at

8 this point?

9    A   Not to my knowledge.

10    Q   I'm going to show you two exhibits, Silk-7

11 and Silk-8.

12        MR. REILLY: Off the record.

13    (Whereupon a discussion was held off the

14    record.)

15 BY MR. SHEPHERD:

16    Q   To which entries on -- to which -- which

17 entries on these two bills correspond to those two

18 E-mails?

19        MR. HEPPT: Objection to the form.

20        MR. REILLY: Understand the question?

21        THE WITNESS: My -- in looking at the

22    bates, it would seem to me that Myra billed her

23    time and so did I unfortunately to dash three

24    for the Silk-7 and the same is true of eight.

25 BY MR. SHEPHERD:

Page 65

1    Q   Okay.

2        MR. HEPPT: I'm going to object to the

3    characterization of documents that are before

4    Mr. Silk as bills. The question you asked and

5    prior question you asked referred to those

6    documents as bills. I think there's been

7    testimony today that those were not in fact

8    bills.

9        MR. SHEPHERD: Time records. Would that

10 be better? Let's just call them time records.

11        THE WITNESS: You asked me a question.

12        MR. HEPPT: Okay. We're objecting and

13    trying to clarify the record.

14 BY MR. SHEPHERD:

15    Q   Now, there are also on Silk Exhibit 2,

16 there are three entries on 2/6. The first one is

17 telephone -- the second one. Pardon me. The second

18 one. No. Who's SAM? I'm sorry.

19    A   Stuart Mickelberg.

20    Q   And then the last one is a telephone

21 conference with Mr. Ghusson. Is this the same telephone

22 conversation that was -- that Mr. Mickelberg was on?

23    A   I don't know.

24    Q   Okay. Is this the conversation in which

25 you also discussed trademarks?

17 (Pages 62 to 65)

Page 66

1  A    I don't know if it was here or was when we first
2  discussed the formation of an entity. I go through it
3  with a client.
4      Q    So, you have no specific recollection of
5  when you had a conversation with Sam Ghusson about
6  searching corporate names as trademarks?
7  A    I know that in the initial stages which was
8  prior to Myra doing this work it was clear to both of us
9  that we weren't doing any trademark work. We were
10  merely searching to see if the entity was available in
11  the State of New Jersey.
12      Q    And when you say both of us, to whom are
13  you referring?
14  A    Sam Ghusson and myself.
15      Q    Okay. What made that clear to
16  Mr. Ghusson? I believe it was clear to you.
17  A    Because we discussed the fact that he would have
18  to do more searches. He'd have to go into greater depth
19  to deal with this if he was going to be using this on a
20  regional or nationals basis. At this time, he wanted to
21  form an entity so he could start his accounting, deal
22  with the expenses and start negotiating with
23  Mrs. Bums-McNeil for the -- to see whether or not they
24  could have a partnership together.
25      Q    Was it -- was the conversation in which

Page 67

1  you discussed trademarks with Mr. Ghusson was it just
2  you and he that were involved in that conversation?
3  A    I don't know whether Stuart was on that or not.
4      MR. REILLY: Note my objection to the line
5  of questioning because of the prior testimony
6  regarding what occurred in March.
7      MR. SHEPHERD: So noted.
8  BY MR. SHEPHERD:
9      Q    And I think it's your testimony that there
10  was no confirming E-mail to Sam regarding the trademar
11  issue?
12  A    Nothing that we would have said something in the
13  negative that we're not doing this work.
14      Q    Okay. Do you do that in any instance,
15  send a negative E-mail that you're not going to do
16  something?
17  A    I don't, but I saw something checked off about
18  that where there is a checkoff.
19      Q    And in this case it wasn't checked?
20  A    Only because I don't know if that comes from a
21  form book they found or something else. It's her way of
22  keeping track of what she does, but I know it's not
23  something that I had seen before this case.
24      Q    Okay. Now, I'll take those two E-mail
25  exhibits back, but not the bills, not the time records.

Page 68

1  I'm missing a link here. Just a second.
2      MR. REILLY: What are you looking for?
3      MR. SHEPHERD: I'm looking for -- there's
4  an E-mail on or about --
5      MR. REILLY: Off the record.
6  (Whereupon a discussion was held off the
7  record.)
8  BY MR. SHEPHERD:
9      Q    Okay. I'm going to show you Silk-9 and
10  Silk-IO.
11      MR. REILLY: Those were previously marked
12  Counsel.
13      MR. SHEPHERD: Yes. Those are previously
14  marked exhibits.
15  BY MR. SHEPHERD:
16      Q    Now, looking at Silk-2 and Silk-14, do
17  these E-mails relate to the entries on Silk-14 of
18  2/15/06 and on Silk Exhibit 2 of 2/15/06?
19      MR. HEPPT: I believe you're referring to
20  Silk-13, not 14.
21      MR. SHEPHERD: Yes. You're right.
22      THE WITNESS: Well, what it looks like is
23  that on that date, which is February 15th, Myra
24  billed her time to the dash four number which
25  is the fixed file shown on Silk-2, and I billed

Page 69

1  my time to the Silk-13 which is dash three
2  which is the hourly general business.
3  BY MR. SHEPHERD:
4      Q    But those two entries relate to that
5  E-mail -- those E-mail exchanges and the attached
6  documents regarding what was discovered on the New
7  Jersey State website for Pulse?
8      MR. HEPPT: Objection to the form.
9      THE WITNESS: Yes.
10  BY MR. SHEPHERD:
11      Q    Okay. Now, for your entry it says that
12  you had a telephone conference with Mr. Ghusson to
13  discuss a new name for the LLC. Is that how -- is that
14  how you got the -- knew to search the Pulse?
15      MR. REILLY: Object to the form of the
16  question. You didn't provide a date I don't
17  believe in your question. Which exhibit are
18  you referring to?
19      MR. SHEPHERD: We're looking at Exhibit
20  Silk-13, and we're looking at the entry of
21  2/15/06.
22      THE WITNESS: I can only assume that whe
23  the Pulse wasn't any good I probably conveyed
24  that information verbally to Mr. Ghusson.
25  BY MR. SHEPHERD:

18 (Pages 66 to 69)

Page 70

1  Q   Okay. It would -- but there are two
2  telephone conversations in that entry from 2/15/06;
3  aren't there?
4  A   I assume there were.
5  Q   It also says that you reviewed the
6  searches prepared by Mrs. Gibson. Did you do that?
7  A   Yes. I said that, you know, this is something
8  that I mayor may not have opened. I probably did open
9  it and take a look through it. That's the search on the
10  Pulse.
11  Q   Okay.
12  A   I don't remember it but.
13  Q   And you didn't provide any of these
14  documents, these search documents to Mr. Ghusson. YOU
15  just told him it wasn't available?
16  A   The best of my knowledge it was just the
17  conveyance of the message.
18  Q   Okay. You can give me back the two
19  non-bill exhibits and take a look at that one.
20  MR. HEPPT: What exhibit is that?
21  MR. REILLY: Silk-6.
22  BY MR. SHEPHERD:
23  Q   Now, there's no -- -- this is an E-mail to
24  you; correct?
25  A   Yes.

Page 71

1  Q   What did you do after you received this
2  E-mail?
3  A   I believe that's when I asked Myra to prepare
4  the estimate for doing the trademark work, and I asked
5  her to prepare the change in the name from RBSG to
6  Venustas International.
7  Q   Now, there's no entry on Silk Exhibit 2,
8  that time sheet for you on 3/17/06; is there?
9  A   I don't see it.
10  Q   Okay.
11  MR. HEPPT: I'm going to object to that
12  question also because we've had a series of
13  questions regarding the time sheets that are
14  marked as Exhibits 2 and 13, and there's been
15  testimony by the witness that some entries on
16  13 which relate to the 003 client matter number
17  should have been entered on 004 client matter
18  number, and, so, it's a misleading question in
19  the sense we've been going back and forth
20  between these two time sheets. I just note for
21  the record that Exhibit 13, which is a time
22  sheet, time records is one that has been
23  heavily redacted.
24  MR. SHEPHERD: It was redacted because
25  those are the only entries that really relate

Page 72

1  on the 003. That's Exhibit Silk-B. Those are
2  the only entries that relate to corporate
3  formation and trademarks.
4  MR. HEPPT: I'll just note for the record
5  that there is no entry on Exhibit 13 for anyone
6  on March 17th. The only entries that appear on
7  Exhibit 13 have to do with February 6th and
8  February 15th.
9  MR. SHEPHERD: Okay.
10  BY MR. SHEPHERD:
11  Q   Now, it's your testimony that once you got
12  Silk-3 from Myra Gibson relating to the quote for
13  trademark work that you had a conversation with Sam
14  about that?
15  A   Yes.
16  Q   Why doesn't that conversation show up in
17  the billing records for either Exhibit 2 or Exhibit 13?
18  A   I don't know that they don't show up in three.
19  MR. REILLY: Note my objection to this
20  line of questioning. Counsel, if you want to
21  see the internal billing which has the phone
22  call with Sam, we'll produce it, but I didn't
23  produce it to date. Let me rephrase that. You
24  want to see the billable event where he talks
25  to Sam?

Page 73

1  MR. SHEPHERD: Yes.
2  MR. REILLY: You want me to produce that?
3  MR. SHEPHERD: Yes.
4  MR. REILLY: Off the record for one
5  second.
6  (Whereupon a discussion was held off the
7  record.)
8  MR. SHEPHERD: Mark this.
9  (Time records were marked Silk-IS for
10  identification.)
11  BY MR. SHEPHERD:
12  Q   I'm going to show you two exhibits.
13  Again, you're going to see Exhibit 2 and Exhibit 15.
14  Those are from your time sheets for this matter, and I'm
15  going to show you Exhibit Silk-3 which is the E-mail
16  that Myra Gibson sent to you that included information
17  about trademarks. As I said -- when I asked the
18  question before at the break, can you point to the entry
19  on either of those bills in which you discussed with
20  Mr. Ghusson the trademark issue, the searching of the
21  name as a trademark?
22  MR. HEPPT: Can I have that question
23  again?
24  (Whereupon the requested portion was read
25  back.)

19 (Pages 70 to 73)

Page 74

1    MR. HEPPT: I'm just going to object to
2    the fonn.
3    THE WITNESS: Yes. I mean it would be my
4    recollection that I first of all would not bill
5    a client to just explain to them what an
6    estimate is. My sense it was after I received
7    that and I would have said that it was on
8    *3120/06* during my conversation with Sam about
9    various things.
10   BY MR. SHEPHERD:
11   Q    But there's no reference to trademarks in
12   that particular entry; is there?
13   A    Only because I went to bill him for getting an
14   estimate on what the trademark was. I wouldn't bill for
15   that.
16   Q    Is there any other note or memo or
17   anything in the file which memorializes a conversation
18   that you had with Sam about searching the name Venusta
19   International as a trademark?
20   A    No.
21       MR. SHEPHERD: Now, I'm going to do
22   something a little bit unusual. I'm going to
23   playa little piece of a tape recording and ask
24   Mr. Silk to listen to it.
25       MR. REILLY: I object to the form of this

Page 75

1    question. Do you have this conversation either
2    typed -- we can take a look at it?
3        MR. SHEPHERD: I do indeed.
4        MR. REILLY: Why don't we mark that for
5    identification.
6        MR. SHEPHERD: It's got a phone number 01
7    the back. We'll get rid of that.
8        Mark this.
9    (Typed page of a taped conversation was markel
10   Silk-16 for identification.)
11       MR. REILLY: Can I read this before he
12   listens?
13       THE WITNESS: So, this was on June 6th; is
14   that what you're saying?
15   BY MR. SHEPHERD:
16   Q    Yes.
17       MR. REILLY: 2007.
18       THE WITNESS: Okay.
19   BY MR. SHEPHERD:
20   Q    Okay.
21       MR. REILLY: Before we begin, this was
22   marked Silk-16, and it's entitled "Message from
23   Allen" and it's Filk, F-i-I-k, which I'm sure
24   meant Silk, June 6th, 2007 at twelve.
25   (Whereupon a tape was played.)

Page 76

1    TAPE RECORDING: "Hi, Bob. It's Allen
2    Silk. I'm returning your call, but my
3    paralegal that did the work for that company is
4    not here today, and my guess is in talking to
5    her before that was just the typical with New
6    Jersey or whatever state we were looking at to
7    just see if it was available fonnation. I know
8    that we talk to all our clients about running
9    some sort of federal, you know, check to see
10   what's going to happen. Rachel Stark does most
11   of that to see if we are going to try to
12   protect the name federally, but I think that
13   Sam was on his own course at that time and was
14   going to deal with things as time went on, but
15   I can't honestly remember at this point. I'm
16   running to a meeting now, will be back around
17   one-thirty. You can reach me in my office at
18   609-895-7265. Thankyou."
19   BY MR. SHEPHERD:
20   Q    Do you recognize that voice?
21   A    That's my voice.
22   Q    Do you remember leaving that message?
23   A    No.
24   Q    Okay. I want to focus on the last line of
25   the message. You said "but I can't honestly remember a

Page 77

1    this point --" oh, I'm sorry. "Rachel Stark does most
2    of that to see if we are going to protect the name
3    federally, but I think Sam was on his own course at that
4    time and was going to deal with things as time went on,
5    but I can't honestly remember at that point." Today
6    you've testified that you had two conversations with Sam
7    and told him about doing a trademark search; is that
8    correct?
9    A    Yes.
10   Q    And there is nothing in the file that
11   memorializes either of those telephone -- either of
12   those conversations with Sam; isn't that correct?
13   A    Yes.
14   Q    Well, then, what is it that happened
15   between the time you left this message and now that
16   makes you now remember that you had two telephones
17   conversations with Sam about an issue that wasn't even
18   memorialized in your file?
19       MR. HEPPT: Objection to the fonn.
20       THE WITNESS: Well, first of all, I don't
21   remember if I said two telephone conversations,
22   but I would have had a conversation with him
23   initially about what we have to do. That would
24   have been turned over to Rachel to do the work
25   and Myra.

20 (Pages 74 to 77)

1fe3bd7a-80fd-4d7c-b077-c730f6dc07cf

Page 78

1        Then, what refreshed my recollection was
2    the trademark search that Myra had sent to me,
3    and it made me recall at that point, this is
4    after the fact, that we did have a discussion.
5    So, irrespective of that, that's what occurred
6    after the fact when I went through the file.
7        MR. SHEPHERD:  Okay.  That's all I have.
8        MR. HEPPT:  I have a couple of follow-up
9    questions.  Do you have Exhibit number II?
10   REDIRECT EXAMINATION
11   BY MR. HEPPT:
12       Q    What is your understanding as to the
13   purpose for this document?
14   A    I think it's a checklist for Myra in doing her
15   work.
16       Q    Did it relate in any way to her entry of
17   her time records?
18   A    She tells me it does, but I don't know how it
19   works.
20       Q    Is it your understanding that this is a
21   checklist that she would check off as she completed
22   items?
23   A    Or she understood what work she had to do.
24       Q    This document by -- on its face relates to
25   RBSG Enterprices, LLC; correct?  I don't recall whethe

Page 79

1    this was asked before.  If it was, I apologize.  But are
2    you aware or is there a document in the file that
3    relates to the Venustas International, LLC?
4    A    I don't know.
5        Q    Who would know that?
6        MR. REILLY:  Counsel, I can represent I
7        went through the file and there is no such
8        document.  I think Attorney Shepherd has said
9        the same thing.
10   BY MR. HEPPT:
11       Q    Okay.  Are you familiar with the way in
12   which Miss Gibson used this document?
13   A    No.
14       Q    Can you testify today why Miss Gibson did
15   not check off client confirmation regarding no trademar
16   work?
17   A    No.
18       Q    Okay.  Is there any doubt in your mind
19   sitting here today that you discussed the advisability
20   of conducting a trademark search with Mr. Ghusson
21   regarding Venustas International, LLC?
22   A    No.
23       Q    Is there any doubt in your mind sitting
24   here today that Mrs. Ghusson -- strike that.
25            Is there any doubt in your mind sitting

Page 80

1    here today that you nor your firm were authorized by
2    Mr. Ghusson to conduct a trademark search for Venustas
3    International, LLC?
4    A    I was not authorized.
5        Q    I think we covered this earlier.  You were
6    the partner in charge of the engagement?
7    A    Well, but Sam could have spoken to Mrya, could
8    have spoken to Stuart Micke1berg or Rachel directly.  I
9    don't think he ever dealt with Rachel.
10       Q    There was nothing in the file indicating a
11   trade search had been done?
12   A    No.
13       Q    There was certainly no bill provided to
14   the client for such work?
15   A    No.
16       Q    Is there any doubt in your mind that you
17   discussed the quote that Miss Gibson prepared for doing
18   a trademark search with Mr. Ghusson?
19   A    No.  Because I after saw that, I recalled that.
20       Q    And he never authorized you to perform
21   that work?
22   A    No.
23       Q    Now, turning to Exhibit 12 which is a copy
24   of the engagement letter, the document or the exhibit
25   appears to be two separate documents, if you will, the

Page 81

1    first being a letter from yourself to Mr. Ghusson and
2    Miss Bums-McNeil bearing the bates number 1002, and
3    that is the first page of the exhibit.  The second
4    document, if you will, would be the balance of the
5    exhibit.  Is that a fair characterization?
6    A    Yes.
7        Q    And what would constitute the engagement
8    letter?
9    A    Well, it's the totality of this, but it's the
10   signed last page which is bate stamped 1005.
11       Q    Okay.  So, it's the entire document.  You
12   would consider this to be the engagement letter?
13   A    Yes.
14       Q    Okay.  And you forwarded this document to
15   Mr. Ghusson; correct?
16   A    Yes, and to Mrs. McNeil.
17       Q    They each in turn signed it as you
18   indicated on the last page; correct?
19   A    To the best of my knowledge.  I didn't see it,
20   but yes.
21       Q    Did either of those individuals contact
22   you with any questions before they signed it?
23   A    I don't remember.
24       Q    Okay.  The first page, the last paragraph
25   it says, "Please call me directly," and gives your phone

21 (Pages 78 to 81)

1  number, "if you have any questions". Do you see that?
2  A    Yes.
3      Q    But you don't remember whether either of
4  them called with any questions before they signed?
5  A    I don't remember talking to Mrs. McNeil other
6  than maybe a conference call. I don't remember Sam
7  calling me to ask me.
8      Q    Do you remember whether you discussed this
9  document with either Miss McNeil or Mr. Ghusson befor
10 they signed it?
11 A    I don't remember.
12     Q    Okay. Who prepared this document?
13 A    This was prepared by Jean Krumm.
14     Q    And did Miss Krumm prepare it under your
15 supervision?
16 A    Yes.
17     Q    You reviewed the document before it went
18 out?
19 A    Yes.
20     Q    You understood what it meant when it went
21 out?
22 A    Yes.
23     Q    On page two, the section entitled LLC, the
24 first -- it seemed to be a list of items underneath the
25 introductory paragraph of that section, the first item

1  being name availability search. Do you see that?
2  A    Yes.
3      Q    You understood what that meant; correct?
4  A    New Jersey only.
5      Q    Was there any doubt -- is there any doubt
6  in your mind Mr. Ghusson understood that to be the case
7  as well?
8  A    I mean that's all we were doing. I can't tell
9  you what he was thinking.
10     Q    Okay. Did you have an understanding as to
11 the reasons for the formation of the LLC? Did
12 Mr. Ghusson communicate to you his reasons for wanting
13 to form the LLC at that time?
14 A    He and his partner wanted to have a partnership
15 actually with the limited liability protection of New
16 Jersey LLC law so they could operate a business.
17     Q    During that discussion, would that have
18 been the time when you first discussed trademark
19 searches with Mr. Ghusson?
20 A    In general.
21     MR. SHEPHERD: Objection.
22     THE WITNESS: We talked --
23     MR. SHEPHERD: Go ahead.
24     THE WITNESS: -- in general. Again, in
25 forming these types of entities, that's a

1  general discussion I have. It could have been
2  an LLC. It could have been a corporation. You
3  could have an S corporation. We should talk to
4  your accountant about these things. If you're
5  going to do something down the road that's
6  going to be in converse, you need some
7  protection. I don't think it went on any
8  further than that, the initial discussion.
9  BY MR. HEPPT:
10     Q    Okay. But I think you testified at the
11 time that Mr. Ghusson signed the engagement letter and
12 retained you and your firm to form the LLC they didn't
13 -- Mr. Ghusson wasn't even sure they could reach an
14 agreement, he and his partner could reach an agreement
15 with respect to the business?
16     MR. SHEPHERD: Object to the form. Sorry
17 to step on it.
18     THE WITNESS: That's true.
19     MR. HEPPT: Okay. That's all I have.
20     MR. REILLY: Before you go off the record
21 -- off the record.
22 (Whereupon a discussion was held off the
23 record.)
24     MR. REILLY: Counsel, you've asked for
25 copies of all documents regarding the formation

1  of corporations of any name. I have to go
2  through this. Is this something that you want
3  us to sit and do now or can I just make the
4  copies and send it to you?
5      MR. HEPPT: I think we indicated or
6  discussed off the record it would be fine with
7  me if you just made the copies and send them
8  along to me with a cover letter indicating that
9  they came from the file as maintained by the
10 firm.
11     MR. REILLY: Okay.
12
13 (Whereupon the deposition was adjourned.)

22 (Pages 82 to 85)

Page 86

1      UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF NEW YORK
2         CIVIL ACTION NO. 1:07-04530 (LTS)
3   AEDES DE VENUSTAS, INC.,
           Plaintiff,
4          -vs-        CERTIFICATE
    VENUSTAS INTERNATIONAL, LLC,
5          Defendant.

6
7      I, KAREN M. AHERN, the officer before whom the
8   foregoing deposition was taken, do hereby certify that
9   the witness whose testimony appears in the foregoing
10  deposition was duly sworn by me, and that said
11  deposition is a true record of the testimony given by
12  said witness; that I am neither attorney nor counsel for
13  nor related to or employed by any of the parties to the
14  action in which the deposition was taken; and further
15  that I am not a relative or employee of any attorney or
16  counsel employed by the parties or financially
17  interested in the action.
18
19
20
21     CERTIFIED SHORTHAND REPORTER & NOTARY PUBLIC
              LICENSE NO. XIOI061
22
    DATED:  March 29, 2008    NOTARY J.D. NO. 2084523
23
    NOTE:  THE CERTIFICATE APPENDED TO THIS TRANSCRIPT DOES
24  NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS
    UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE
25  CERTIFYING COURT REPORTER.

23 (Page 86)

1fe3bd7a-80fd-4d7c-b077-c730f6dc07cf

**A**

abbreviation 27: 1
lbility 6:5 18:21
able 51 :24
about 19:1,1522:22
24:629:10 31:1
33:1537: 11,1938:14
39:750:1151:7
56:22 59:7,24 60:2
63:766:567:1768:4
72:1473:1774:8,18
76:877:7,17,2384:4
above 1:8
accommodate 6: 15
account 42: 18
accountant 84:4
accounting 66:21
action 1:2,486:2,14,17
35:2383:15
additional 8:9
adjourned 85:13
admendment 24: 1
admit55:21
advisability 25:7,12
40:11 79:19
Aedes 1:3 5:2153:13
86:3
after 7:249:2,920:13
21:1622:423:325:3
40:23 54:771:1 74:6
78:4,6 80: 19
afternoon 5:18,25
again 10:6 13:24 15:8
26: 1450:762:21,23
73:13,2383:24
against 45:20
ago 5:19 12:4 13:12
25:15
agreed 16:5
agreement25:2157:6
84:14,14
ahead 16:6,15 18:24
21:2242:283:23
AHERN 1:9 86:7
Allen 1:52:83:421:12
48:23 56:5 75:23
76:1
along46:2185:8
already 12:15 15:3
27:21
amend 21:22
amended 23:4
amendment 14:25
16:1922:229:4
40:25
amount 45: 10, 11
amounts 23:22
ancillary 8:9

AND/OR 86:24
another 38: 1 41 :24
59:6
answer 6:49: 1429:23
32:9 34:25 36: 13
39:1445:2546:1
54:156:1258:19
59:2
answering 36:5
anyone 40: 1 41:4,15
44:1346:2359:24
64:272:5
anything 9:2 17: 13, 14
23:2050:1264:5
74:17
anyway 50:2
apologize 50: 17, 19
79: 1
apparent 13:13
Apparently 50:15,15
appear 6:23 27:5 33:16
37:1338:8,9,14,18
50:872:6
appears 17:1820:19
26:447:2548:22
80:2586:9
APPENDED 86:23
APPLY 86:24
approximate 22: 17
approximately 40:24
approximations 23:22
April 5:3 29:6
area 56:4
around 7:9 10:13 13:24
20: 1740:20,2476: 16
asked 22:16 39:6 50:18
56:1761:10 62:15
65:4,5,11 71:3,4
73:1779:184:24
asking 8: 14 18:529: 10
asks 8:830:6
asserted 45:2046:6,10
46: 13
assistant 32:15 63:21
ASSOCIATES 1:21
assume 12:16 32:21
37:18,2542:851:21
63:2469:2270:4
assuming 49:25
attached 9:1924:15
48:2569:5
attaching 23: 11
attachment 4:6,19 5:6
49:9,17,1850:9
57:14
attachments 4: 15
47:19
attempted 29: 12

attention 31: 10
attorney 2:3 8:826:19
55:1579:886:12,15
attorneys 2:5,828: 18
attorney-client 8:22
9:16
atty 26:19
authorization 25:25
41:2242:9
authorized 41:1,4,15
80:1,4,20
authorizing 25: 17
availability 30:21
31:18,2332:434:19
37:143:12,1651:14
58:13,1683:1
available 12:6 13:14
15:8,817:3 18:921:3
21:13,1831:2548:9
48:13,1749:4,15
50:2052:5,11,14
63:1866:10 70:15
76:7
aware7:18 8:4 54:19
79:2

**B**

B 4:1
back 24: 10 25: 16,22,23
27:15,1830:1831:24
32:2034:1547:22
51:16,2056:14,16
62:17,2067:2570:18
71:1973:2575:7
76:16
background 59:24
balance 81:4
base 49:24
based 23: 11 ,12 42: 14
44:4
basically 48:9
basis 9:642: 1755:23
56:957:266:20
Batallure 53:14
bate 7:845: 14,1647:24
54:263:1481:10
bates 16:2 17:21,22,24
20:21 22:11 26:5
36:23 42: 11 48:21
49:563:23 64:22
81:2
bearing 26:5 81:2
bears 22: 11 42: 11
Beauty 53: 15
became 10:913:13
29:2130:15
before 1:96:1,207:21
7:249:2,919:12
20:2522:923:3,8

40:23 44: 10, 1449:3
49:750:1854:1,17
59:1960:765:3
67:2373:1875:11,21
76:5 79: 1 81 :22 82:4
82:9,1784:2086:7
begin 75:21
behalf 53: 16
being 5:15 10:9 12:11
22:23 31: 1434:5
52:681:1 83:1
believe 6:237:79:21
10:16 11:1,16,19,21
12:1816:1418:14
19:3,523:21,2533:7
35:2536:2540:3,13
40:1843:845:12
47:1348:552:2,9
66:1668:1969:17
71:3
below 26:2127:938:16
best 6:546: 1657:4
70:1681:19
better 65: 10
between 71:20 77:15
bill29:12 42:13,14 43:7
61:22 64:4 74:4,13
74:1480:13
billable 72:24
billed 29: 14 64:22
68:24,25
billing 29:5,8,24 30: 12
36:454:861:18,19
72:17,21
bills 64:1,17 65:4,6,8
67:2573:19
bit 20: 17 39:6 74:22
blame 49: 13
Bob 53:12 76:1
body 16:4
book67:21
both 10: 17 12:25 34:6
61:1266:8,12
bottom 24:2237: 11
58:5
box 1:22 35:19 36:1
54:12,14,17
**boxes** 38:8
break 6: 13 73:18
breakdown 19:722: 17
bringing 31: 10
brings 36:1
BRUNEAU 2:4
Building 1:22
Burns 10:17,21,25 11:4
11:21 18:12,1628:1
36:1047:850:19
62:464:7
Burns-McNeil 57:25

66:23 81:2
business 4:85:838:19
50:1157:160:5,7,12
60: 13 62: 1 69:2
83:1684:15
buy 56:2
buy-sell 25 :21

**C**

C 1:72:127:1132:14
63:21
CAGGIANO 1:21
call 11 :5,6 14: 1924:3
25:533:1865:10
72:2276:281:25
82:6
called 7:1,5 11:20 12:1
30: 13 82:4
calling 82:7
calls 47:8,11
came 13:19 31:24
59:23 85:9
capacity 59: 13
captioned 5:21
care 56:4
careful 9:14
carefully 9:20
cart-blanche 9: 17
case 28:24 67:19,23
83:6
catch 58:8
certain 7:1919:8
certainly 8: 12 19:2
41:2355:21 80:13
certificate 15:1,1 16:20
21 :2323:4,4 24:2
40:25 86:4,23
Certified 1:9,21 86:21
certify 86:8
CERTIFYING 86:25
change 14:8,18,22 15: 1
16:1917:1423:8
29:20 56:5 71:5
changed 11:23 13:20
56:2057:4
changes 28:9
characterization 65:3
81:5
characterize 47:6
charge 80:6
charged 62:9,9
check 18:5 35:1639:19
76:978:21 79:15
checked 15:735:19
54:14,1767:17,19
checklist 4: 17 53:20
55:678:14,21
checkoff 67: 18
choosing 55:16

chose 13:14,14 38:24
chosen 56:25
circumstances 55: 18
CIVIL 1:2,4 86:2
claim 45:2046:3,6,10
46:13,16
clarify 65: 13
clear 13:9 30:552:14
52:2066:8,15,16
cleared 15:3,6,7 18:13
clearing 18:2021:5
26: 1
client 9: 15 11:3 12:20
12:23 13:7,8 14:22
18: 19 19:1 22:24,25
25:1226:141:12,20
42:2543:3,644:18
45:2146:17,21,24
47:254:13,1658:22
66:371:16,1774:5
79:1580:14
clients 11:15 12:25
14:1019:2440:10
61:2076:8
coding 53:21
column 26: 1827:6
come 10:3,7 32:20 41:6
56:757:6
comes 19:15 35:21
60:11 67:20
coming 55:4
commencing 1: 12
common 50:14
communicate 21: 17
83:12
communicated 12:19
12:2214:11,13 16:12
17:151:14
communicating 14:18
41:12
companies 60: 19
company 10:911:7,12
11:1916:617:15
28:945:655:21 56:6
56:8,1976:3
completed 78:21
computer 26: 11 28: 15
33:139:23
conclude 32:2
concluded 48:16
conclusion 42:25 56:7
conduct 37:17 39:21
40:258:1280:2
conducted 37:5 38:24
40:2249:23 52: 1
conducting 79:20
conference 11 :5,6 24: 1
25:532:14,1833:17
47:8,1163:2065:21

69: 1282:6
confirmation 54: 13
79:15
confirming 67:10
confused 53: 19
connection 10:5,8,18
27:1328:830:14
consider 55:1460:10
81: 12
considered 60: 13
constitute 81 :7
contact 11:2 47:281:21
continuation 25:9
CONTROL 86:24
conversation 4:2424:7
65:22,24 66:5,25
67:272:13,1674:8
74:1775:1,977:22
conversations 70:2
77:6,12,17,21
converse 84:6
conveyance 70: 17
conveyed 69:23
copies 24: 19 54:24,25
55:1 84:2585:4,7
copy 33:4,834:1161:2
80:23
corner 26: 18
corporate 30:20 32:3
34:1837:843:11
45:555:1466:672:2
corporation 29:3,25
55:1657:1 84:2,3
corporations 29:985: 1
correct 13:2120:821:3
21:622:13 25:13
28:2,5 31:2 32:23
34:3 36: 17 40:2,11
40:13,1841:2,13
44:145:1,10,1147:3
47:548:1049:15
51:552:1,657:21
58:1361:2364:3
70:24 77:8,1278:25
81:15,1883:3
correctly 16:917:11
correspond 64: 17
correspondence 30: 12
cost 19:8 58:23
costs 22: 18 23: 17
counsel 7:13,18 8:23
9: 1529: 1 34:3,6
45:1655:10 68:12
72:20 79:6 84:24
86:12,16
course 76: 13 77:3
court 1:1,10,215:23
57:1786:1,25

cover 49:8 85:8
covered 80:5
created 57:8
criteria 37:21
criterion 38:15,19,24
critical 8: 12
criticized 46: 17
Cross 3:3 53:10
currently 5:22
cut 38:20

D

D 3:1
dash 62:24,25 64:23
68:2469:1
data 49:24
date 11:22 15:518:12
31: 11 51:2 56:20
68:2369:1672:23
dated 4:4,5,10,11,12,13
4:14,18,21 5:3,5
15:14,16,18,2417:19
20:2029:647:16,18
48:1,2357:1363:11
63:1986:22
DE 1:3 86:3
deaI25:2166:19,21
76:1477:4
deals 7:9 61:21
dealt 10:2047: 13 80:9
December 57: 13
decided 16:1243:20
49:1262:13
decision 14:8,18
defendant 1:5 2:5
53:13,1786:5
depending 8:7 18:25
Depends 55: 17
deposed 5:25
deposition 1:4 5:25
6:2545:2485:13
86:10,11,14
depostion 86:8
depth 66:18
describe 11:9,13
described 40:9
description 4:2 30:20
43:9
desk33:1
determine 54:8
DeVenustas 5:21 53: 14
different 31:4 42: 14
61:2062:15
differently 60: 19,23
difficult 62:7
Direct 3:35:1686:24
directed 9: 10
DIRECTION 86:24
directly 41 :20 80:8

81 :25
discovered 69:6
discuss 10:23 11:6
18:19 19:2225:6
38:2,569:13
discussed 7: 16 8:21
11:1518:11,1420:7
23:2124:125:11
31:1945:560:23
65:2566:2,1767:1
73:1979:1980:17
82:883:1885:6
discusses 59:4
discussing 19:23 36:3
discussion 15:12 18:15
18:1719:5,12,16,19
19:2120:623:6,23
25:4,10,11 33:10
36:10,1240:9,14
50:453:757:564:2,6
64:1368:673:678:4
83:1784:1,8,22
discussions 31 :21
36:1646:20,2448:12
District 1:1,1 5:23,24
53:1586:1,1
document4:7,165:8
6:2019:1022:8,11
22:1526:5,7,10,18
27: 1228:7 33:22
35:536:23,2437:10
37: 11 38:2,5,9,20
42:11,1243:10,10,18
48:2049:7,2250:8
51 :1 53: 17,19,23
54:3,22,2257:18,21
59:163:13,17 78:13
78:2479:2,8,12
80:2481:4,11,14
82:9,12,17
documentation 48: 16
documents 7:5,11,14
7:19,218:1,3,9,13,16
8:199:3,2329:18,24
30:3 49:22 65:3,6
69:670:14,1480:25
84:25
doing 22:18,18,2225:7
25:12,2031:2255:22
56:357:1,759:10,13
62:466:8,967:13
71:477:778:14
80:1783:8
done 12:17 25:2227:13
28:23 29:2,4 41 :24
42:2,4,745:146:14
46:1859:1862:3
80: 11
double 25: 18

doubt 79: 18,23,25
80:1683:5,5
down 37:12,19 38:15
58:584:5
drafted 9:20
drill 6:3
Drive 1: 11
due45:10
duly 5:1586:10
during 25:5 74:8 83:17

E

E 2:1,13:14:15:14
each 6: 1028:15 81: 17
earlier 17:839:647: 1
49:2351:880:5
early 19:6,13,23
57:3
efficient 9:5
eight 21 :9, 1064:24
either 12:2421:1964:1
72:1773:1975:1
77:11,11 81:2182:3
82:9
election 17: 15
employed 86:13,16
employee 86:15
engaged 60:16
engagement 10:16,19
10:2441:8,9,24,25
42: 1,15,21,23 52:24
57:23 59:9 80:6,24
81:7,1284:11
enough 22:5
entailed 11: 14
Enter 37:12
entered 37:1771:17
entering 28: 12,18
Enterprices 78:25
Enterprises 55:5 56:23
63:17
entire 8:20 42:21,23
81:11
entities 40:7 83:25
entitled 1:84:7,165:8
53:13,1958:675:22
82:23
entity 11:2013:17
17:21 18:19,21,25
19:14,1720:3,21
38:1947:1255:17
60:1566:2,10,21
entrepreneur 60: 18,20
entries 26: 1727:6
64:16,1765:1668:17
69:471:15,2572:2,6
entry 27:10 28:15
30:1931:232:11,23
32:2534:16,17,21

51:7,13 62:763:20
69:11,2070:271:7
72:573:1874:12
78:16
ESQ 2:2,5,7
established 27:21
Estate 59:22
estimate 35:3 71:474:6
74:14
even 26:877:1784:13
event 72:24
eventually 10:9 29:21
30:15
ever 5:25 10:23 25:23
25:2537:560:14
80:9
everything 8:11 24:6
30:3
exact 19:20
exactly 11:9
EXAMINATION 5:16
53:1078:10
example 27:9
exchanges 69:5
excuse 43:19
exhibit 6:197:3 15:22
16:22 17:1820:19
21:8,922:824:16,21
26:4,13 30:1931:7,9
34:1535:636:23
42:11,16,2044:4,5,8
44:2347:2448:20
49:150:8,951:16
58:561:2,3,563:5,19
65:1568:1869:17,19
70:2071:7,21 72:1,5
72:7,17,1773:13,13
73:1578:980:23,24
81:3,5
exhibits 64:10 67:25
68:1470:1971:14
73:12
exist 9:24 34:12
exists 34:5,10
expect 41:16
expenses 65:22
explain 12:5 39:12
41:1943:1549:17
55:1874:5
explaining 49:14
explicitly 60:24
extent 14:16
extra 58:23
E-mail 4:5,10,11,12,13
4:14,215:513:5
14:12,17 15:16,18,24
16:417:5,1818:2
20:19,2221:1,16
22:123:7,1029:15

29:1730:2531:7,11
32:1633:4,8,14,18
33:2334:447:16,18
47:2548:2,6,8,22
49:13 50:2451:12,23
63:11,22 67:10,15,24
68:4 69:5,5 70:23
71:273:15
E-mailed 15:14
E-mails29:11,2430:12
64:1868:17

## F

face 78:24
face-to-face 23:24
fact 12:1918:2021:17
27:6,754:759:10
65:766:1778:4,6
fair 11:2 22:5,5 41:16
44:22 49:21 52:3
81:5
fall 7:12
falls 9:21
familiar 39:9 63:6
79:11
far 26:18 34:4 59:9
fast 39:17
fault 20:17
faxed 7:13,19,228:5
February 10:13 15:16
15:18 17:19 18:12
20:2022:230:19
31:15,22 32:4,12
33:15,2347:16,18
48:1,2351:363:11
68:2372:7,8
federal 76:9
federally 76:1277:3
fee 26:842:13,22 61:22
62:13,14
fell 62:3
felt 56:19
few 33:12
field 60:4
file 7:7 8:3,209:24 12:7
12:1816:1920:24
30:733:13,1634:5,8
43:2145:13 51:24
54:1455:4,6,11 59:7
61:18,18,1964:5
68:2574:1777:10,18
78:6 79:2,7 80:10
85:9
filing 11:18 23:840:24
40:24
Filk 75:23
finally 16:5
financially 86:16
find 9:1,11 34:1237:25

50:151:24
fine 6:6,734:13 62:15
63:285:6
finished 61:11
firm 10:4,8 11:10 21:22
26:1127:13 28:8,12
28:1740:141:1,4,16
44:13,2045:2146:18
46:2380:184:12
85:10
first 5:15 16:11 18:17
19:12 22:12 26:6,23
29:348:21,2259:12
59:15,1760:1765:16
66:1 74:477:2081:1
81:3,2482:24,25
83:18
fit 35:18
fixed 26:842: 13,22
43:2161:2262:13
68:25
focus 76:24
follow 17:7
following 63:20
follows 5:15
follow-up 34:17 35:11
35:2478:8
foregoing 86:8,9
forgotten 41:25
form 8:6 11:11 13:8
18:19,2125:1927:19
28:1,25 32:6 34:22
35:13 36:1839:2
40:7,845:15,2252:7
52:1654:655:4,16
56:2,1058:18,24
60:21 62:5,21 64:19
66:2167:2169:8,15
74:2,2577:1983:13
84:12,16
formation 4:17 13:17
15:1 16:2018:9
19:1324:227:14
28:8 29:3,20,25
30:1440:2553:19
60:1561:22 62:3
66:272:376:783:11
84:25
formations 29:9
formed 10:9 11:20 52:6
56:660:14
forming 19: 1720:3
83:25
forms 30:1
forth 71:19
forward 17:6 18:22
41:6
forwarded 81:14
found 37:2067:21

four 62:9,25 68:24
four-eleven 48:24
frame 7:9,12
frequently 10:21
from 12:14 15:24 17:18
20:19,22,2521:16,21
26:1,11 31:1,732:21
37:238:1539:23
43:447:2548:2,23
54:21 55:4 56:5
59:2561:1767:20
70:271:572:12
73:1475:2281:1
85:9
front 7:158:21 30:1
full 18:23
further 17:584:886:14
F-i-I-k 75:23

## G

GI:222:5
Gateway 4:8 5:9 50:11
gave 8:10 11:16,25
12:223:2124:8
33:22
general 39:13,15 56:4
57:962:169:283:20
83:2484:1
generalities 60:24
generally 10:22 40:10
getting 20:25 74:13
Ghusson 2:11 10:17,21
10:22 11:3,22 14:14
15:2416:11 17:1
18:11,15,18 19:19,23
20:821:1724:725:3
25:6,8,1628:131:1,8
32:16,2233:5,14
34:136:10,1638:6
40:1546:547:248:1
50:19,2551:1452:4
52:10,13,1456:17
57:6,2459:13,17,19
59:23,25 62:4 63:22
64:2,765:21 66:5,14
66:1667:169:12,24
70:1473:2079:20,24
80:2,1881:1,1582:9
83:6,12,1984:11,13
Ghusson's 20:1
Gibson 11:17 12:24
13:1,2 14:25 17:4,19
18:3 19:720:14,19
20:2321:1,17,24
23:1027:1130:20
31:14,2232:14,19
33:3,1434:1636:9
37:1638:3,2439:7
40:2141:2047:25

48:3,23 49:23 50:24
51:13 52:3 54:7
63:21 70:672:12
73:1679:12,1480:17
give 9:14 47:14 59:24
70:18
given 19:720:1341:22
42:886:11
gives 18:21 81:25
go 16:6,15 30:8 39:24
66:2,1883:2384:20
85:1
going 6:3,4 9:17 19:2
19:1020:4,1530:10
30:1833:13 34:15
40:853:4,16,17
55:2256:361:1,12
62:864:1065:2
66:1967:1568:9
71:11,1973:12,13,15
74:1,21,2276:10,11
76:14 77:2,4 84:5,6
gone 20:24 42:2 59:10
good 5:18 69:23
Great 6:17
greater 66:18
guess31:2037:1176:4
guessing 59:16
guideline 28:17

## H

H4:1
hand6:1815:2117:17
20:18 22:7 26:3
36:2242:10 47:23
48:1950:1257:17
61:1
handed 50:7
happen 54:11,1656:18
76:10
happened 22:4 29:13
77:14
happy6:14
having 19:18,20,22
32:1840:14
headed 26:19
heavily 71:23
held 15:1233:1050:4
53:764:1368:673:6
84:22
HEPPA35:22
Heppt 2:23:5 5:17,20
7:178:14,189:4,12
9:1810:214,16,21
15:20 16:2,3,24,25
17:2518:121:9,14
21:1522:5,624:18
24:2026:15,1627:23
27:2429:1630:4,10

30:1731:5 32:833:7
33:12,20,2534:7,10
34:14,2436:7,8,21
39:545:19,2546:4,8
47:15,2149:2,5,6
50:651:3,5,6,18,22
52:12,1853:154:3
56:1060:2162:5,21
63:6,964:1965:2,12
68:1969:870:20
71: 11 72:473:22
74:1 77:1978:8,11
79:1084:9,1985:5
her 11:5 18:5 20:25
22:2023:11,1232:1
32:1533:334:17
39:23 44:448: 12,15
54:863:2164:22
67:2168:2471:5
76:578:14,16,17
Hi 76:1
higher 24:9
Highway 1:22
him 9:823:2124:8
46:160:2,10,13
61:1070:1574:13
77:7,22
hit 36:1
Hold 27:15
honestly 76:15,2577:5
hourly 62: 1,14 69:2

I

id 4:3,4,5,7,9,10,11,12
4: 13,14,16,18,20,21
4:22,23
idea 38:1239:13
identification 5:2,4,7
5:10,126:1915:15
15:17,1947:17,20
53:2157:1561:7
63:1273:10 75:5,10
identified 29: 12
identify 26:6
1112:7
important 6: 10 55:15
55:19,20,24,25
inaccuracies 45:8
inaccurate 44:23 45:3
Inc 1:3 5:21 86:3
include 23:17 58:16
included 73: 16
including 43: 11
incorporation 60: 11
incorrect 62:7
indeed 75:3
Independent 36:12
indicate 29: 13
indicated 12:425:15

47:181:1885:5
indicates 49: 1455: 11
64:6
indicating 27:20 48:16
80:1085:8
indication 63 :25
individual 60:3
individuals 81 :21
inform 50: 19
information 19:820:13
42:1659:2469:24
73: 16
informing 21:2
initial 19:21 25:20
39: 18 66:7 84:8
initially 39:18 77:23
initials 11:21 12: 1
26:21,2527:3,5,7
instance 67: 14
instructed 14:22
instructing 46: 1,2
instructions 38:14
interested 86: 17
interna126:9 36:3
72:21
internaJly 26:9
International 1:4 5:22
10:1011:23 12:3
13:21 14:9,23 16:7
16:13 17:221:2,12
29:2230:1637:1,13
38: 1 49:24 50:20
52:3531:1455:7,22
56:2471:674:19
79:3,21 80:386:4
interrupt 19:4
introduce 5:19
introductory 82:25
invoice 42: 19,24 43:2
43:1544:3,10,13
involved 8:1147:11
60:4,1567:2
irrespective 78:5
issue 8:239:10,16
55:1567:11 73:20
77:17
item 82:25
items35:1562:24
78:2282:24
LD 86:22

J

J2:7
Jean 43: 17,2482:13
Jersey 1:10,12,234:7
4:165:8 11:12,18
12:7,15,17 13:8 15:2
15:4,6,916:2018:6
18:10,2021:3,18

23:928:132:137:1,3
37:838:149:20,24
50:10,1353:1966:11
69:776:683:4,16
Joseph 2:25:20
Judy 56:5
jumping 20: 17
June 75:13,24
just 5:186:149:412:2
18:21120:3,421:25
25:929:10,1630:10
33:12,18,2235:16
39:1840:742:2
43:2047:1448:9
49:25 57:5,20 59: 16
62:2265:1067:1
68:1 70:15,1671:20
72:474: 1,5 76:5,7
85:3,7

K

K5:14
KAREN 1:9 86:7
KAY 2:4
keep 26:8
keeping 67:22
knew 59:2560:969:14
knock-out 18:22 39:9
39: 11
know 6:3,9,149:22
13:5 14:12,1720:3
24:1927:1030:23
33:634:4,2135:10
36:937:4 38:23
39:2141:1645:4,5
46: 19,25 49:25 53:4
54:1855:858:860:2
60:6,14,17,2261:21
62:665:2366:1,7
67:3,20,22 70:7
72:1876:7,978:18
79:4,5
knowledge 31: 1842:3
44:1646:5,11,16
57:464:970:16
81 :19
known 10:1029:21
30: 15
Krumm 43:17,24,25,25
44:3,1782:13,14
K-r-u-m-m 43 :24

L

L 5:14,14,14
language 43 :21
last7:327:136:25
65:2076:2481:10,18
81:24
late 14:6

later 11 :22 56:20
law 55:1583:16
Lawrenceville 1: 11
lead 32:2
least 11:5 24:4 31:4
40:1762:13 63:7
leave 63:2
leaving 76:22
left 17:8 26:18 77:15
legal 32:15 43:10 63:21
Lenox 1: 11
let 5:196:9,14,1810:5
15:21 17:1719:11
20:1822:726:3
30:1835:736:22
42:1047:2348:19
50:1 72:23
letter 4: 18 10: 16,19,24
41:24,2542:1,15
57:13,2358:11,15
59:4,6,10 80:24 81: 1
81:8,1284:1185:8
let's 20:4 54: 1259: 15
65:10
liability 11: 11,1845:6
83: 15
License 1: 10 86:21
like 19:25 22:2,4 34:10
34:1138:2055:21
58:4 61:4,16 68:22
likely 52: 10
limited 9:21 11:11,18
45:683:15
line 17:20 22:1,336:5
37:2045:1763:23
67:4 72:20 76:24
lines 46:21
link 68: 11
list38:16 53:25 54:12
82:24
listen 74:24
listens 75: 12
listing 35:15
litigation 5:21 53:13
little 20:17 33:19 38:20
39:647:1 51:874:22
74:23
LLC 1:44:17 5:22
10:1011:22,23 12:7
13:8,21 18:1023:4
27:14,2028:1,4
29:2030:1432:15
48:250:21,2552:6
53:15,17,1955:5,5,7
56:2,5,23,23 58:6,12
61:22 62:3 63:17,22
69: 13 78:25 79:3,21
80:382:2383:11,13
83:1684:2,1286:4

locate 7:533:13
logical 20: 16
look 7:23 17:635:7
43:9,1858:461:10
61:1670:9,1975:2
looked 49:22 51 :23
looking 9: 17 51:4
60:464:2168:2,3,16
69: 19,2076:6
looks 38:2068:22
lot 29:2
LTS 1:2 86:2
L.L.C.2:7

M

M 1:5,92:2,83:45:14
86:7
made 14:822:3 32:23
32:2546:3,1651:24
66:1578:385:7
mailed 44:18
maintain 26: 11
maintained 85:9
make8:18 9:25 30:10
85:3
makes 77:16
malpractice 46: 15
Manasquan 1:23
many 50:14
March 1:125:5 14:1,4
14:6 15:14,25 17:2
22:329:1331:1,12
34:1643:1957:11
67:6 72:6 86:22
mark 18:2538:21
47:1553:1857:12
61:4 63:10 73:875:4
75:8
marked 5:1,4,6,9,11
6:188:259:8 15:14
15:16,18,2217:17
20: 18 22:8 26:3 29:6
31:633:2235:636:4
36:2242:10,2044:4
44:547:16,19,24
48:1953:20,23 57:14
57:18,2161:663:4,9
63: 11,13,1768:11,14
71:1473:975:9,22
MATHEWS 2:4
matter 1:8 59:17 71:16
71:1773:14
matters 26:861 :20
may 8:8,11 9:9,9,24,24
11:1636:1239:18
42:247:749:11
50:12,1460:2362:12
70:8,8
maybe 37: 1282:6

MC2:4
MCG 27:10 63:19
McNeil 81: 16 82:5,9
mean 13:2518:825:18
26:1935:10,1741:19
47:652:1974:383:8
means 37:24,25 39:16
86:24
meant 16:16 34:21
75:2482:2083:3
meet 37:21
meeting 76: 16
mem042:14 64:6 74:16
memorialized 77:18
memorializes 74: 17
77: II
mentioned 20:6
merely 66: 10
message 17:8,14 70:17
75:2276:22,2577:15
met 5:18 11:4 33:3
Mickelberg 41 :21
65:19,2280:8
mid 14:4,6
mind 56:1 79: 18,23,25
80:1683:6
minute 12:4 13: 12
25:1547:14
minutes 33: 12
misleading 71: 18
Miss 10:21,25 18:3,12
20:23 21: 1,17 23: I0
28:130:2031:14,22
32:1933:3,1434:16
36:9,1037:1638:3
38:2439:740:21
43:25,2544:3,17
47:8,25 48:3,23
49:2350:19,2451:13
52:3 79: 12, 14 80: 17
81:282:9,14
missing 68: 1
mistaken 33:8
modify23:16
moist 9:5
moment5:1957:7
month 31:4
monihiy 29:5 42: 17
more 10:2025:18
27:2240:1847:7
52:1060:2366:18
most76:10 77:1
mouth 47:7
move 18:22,24
Mrya 80:7
much9:1842:17
multi-page 48:20
Myra 11:1713:2 14:25
17:4,1919:720: 13

20: 19 21:19,24 22: 16
24:427: II 29: 14
32:1435:12,1550:22
52:9,1054:762:12
63:21 64:2266:8
68:2371:372:12
73:1677:2578:2,14
myselfl5:1915:24
62:12,1466:14

N

NI:72:13:15:14
name3:3 5:2011:7,23
12:14,18 13:15,20,20
14:8,18,23 15:2,3,5
16:5,13 17:2,15,20
18:5,13,2020:21
21:2,6,12,18,2323:9
27: I 28:9 29: 19
30:21,2331:14,23
32:3,1534:1836:25
37:1738:2139:8,17
39:2043:12,16,22
47:11,1348:1350:12
50:20,25 51:14 52:5
52:11,1353:1255:16
56:5,18,20,22,24
57:4,858:12,16
63:2269:1371:5
73:2174:1876:12
77:283: 1 85: 1
named 55:5
names 11:15,2413:9
28:531:1832:537:8
49:1966:6
national 19:2 55:23
56:8 57: 1
nationals 66:20
necessarily 41: 18
necessary 18:24
need 6: 13 25:6 30:8
51:1653:361:12
84:6
negative 67:13,15
negotiating 25 :21
66:22
neither 86: 12
never 11:4 18:15 40:1
41:142:844:25
80:20
new 1:1,10,12,234:7
4:165:8,2411:12,18
12:6,15,1713:8 15:2
15:4,6,9 16:20 18:6
18:10,2021:3,18
23:928: 1 32:1 37:1,2
37:838:141:25
49:20,2450:10,13
53:15,1959:960:5

66: II 69:6,13 76:5
83:4,1586:1
nine 17:23,2449:4
non-bill 70: 19
normal 40:6,6
normally 32:20
Notary 1:9 86:21,22
note21:25 55:4 58:1
67:471:2072:4,19
74:1686:23
noted 67:7
notes 1:7
nothing 21:534:9
45:2352:2459:3
64:4 67:12 77:10
80:10
number6:19 7:815:22
16:1,217:21,22,23
17:23,24,2420:22
21:8,924:1626:13
31:736:2342:12,15
63:568:2471:16,18
75:678:981:282:1
numbers 22: II 24:8,9
24: 12,22,2526:5
numerous 30:3

0

object 8:6 27: 1928:25
32:639:245:15,22
58:18,2465:269:15
71:1174:1,2584:16
objecting 65:12
objection 21 :25 34:22
35:1336:1852:7,16
56: 10 60:21 62:5,21
62:2264:1967:4
69:872:1977:19
83:21
obtain 22: 17
obviously 6:14 13:19
34:6
occasion 40:20
occasions 40: 17,18
occurred 20: I0 67:6
78:5
off8:21 15:11,1233:9
33:10 35:16 38:20
50:3,453:6,764:12
64: 13 67: 17 68:5,6
73:4,678:21 79:15
84:20,21,22 85:6
office 1: 11,22 6:24
76:17
officer 86:7
oh 34:235:2377:1
okay 6:8, II 7:25 8: 14
8:179:4,1210:3,12
10:15,18 11:6,9 12:8

12:13,1913:1214:2
14:2015:1016:21
17:1718:11,1719:18
20:1522:1523:19
24:1526:1027:23
32:234:235:5,23
36:237:2,10,19
40:2041:1,842:10
43:945:7,10,13
46:1747:14,2248:15
48:1949:10,21,21
50:7,16,2352:13,22
53:154:2,1155:9,12
55:2557:1059:12
60:6,1061:162:2
63:16,2565:1,12,24
66:1567:14,2468:9
69:1170:1,11,18
71:1072:975:18,20
76:2478:779:11,18
81:11,14,2482:12
83:1084:10,1985:11
older 27:2
once7:23,2413:13
72:11
one 10:6,20 11:5,17,20
12:1,1,2,8,11,24
21:1122:424:22
26:23 27:2,9,2229:5
34:535:1938:15,23
41:642:1547:749:3
49:450:11,1354:12
65:16,17,18,2070:19
71:22 73:4
one-thirty 76: 17
only 15:432:2037:25
42:854:660:967:20
69:2271:2572:2,6
74:1383:4
open 70:8
opened 49:8,11 70:8
operate 83: 16
operating 56:8
opinion 7:2556:25
opposed 45:560:24
62:25
other 6: II 8:3 9:23
10:20 12:222:4
24:2327:5,629:18
29: 18,24 30: 1231:25
45:3,7,860:8,974:16
82:5
out9:1110:1636:1
41:24,2542:1443:4
44:11,14,1854:24
55:2256:3 57:9,24
59:1082:18,21
outside 62:3
over 20:2423:2462:24

77:24
own 60:7,1876:1377:3

P

PI:72:1,1
page4:2,23 7:3 22:12
22:1224:2227:6
48:21,22 58:4 75:9
81:3,10,18,2482:23
pages 54:4
paragraph 81 :24 82:25
paralegalI12:1713:1
76:3
paralegals 11: 1728: 18
paraphrasing 23: 12
Pardon 65:17
part 24:21 62:13,14
partially 20: 17
participating 24:3
particular 29:14 42:18
42:2045:2454:22
59:774:12
particularly 31 :I0
parties 86:13,16
partner 23:1441 :8,11
57:780:683:14
84:14
partners 27:2
partnership 66:24
83: 14
passed 54:24
pending 5:23 58:7
people 19: 16 60:8,9
perform 24: 11 41:2
80:20
performed 55:24
period 31:442:20
periods 31 :4
person 60:11,14
phone 23:2424:3 72:21
75:681:25
phonetic 57:25
phrase 39:8
piece 56:2 74:23
place 28:12
plaintiff 1:32:3 5:20
86:3
planning 59:22
play 74:23
played 75:25
please 6: 9 51:16 56:13
81:25
point 6:8, 14 13: 1940:5
52:464:1,873:18
76:1577:1,578:3
portion 27:17 51:19
56:1562:1,1973:24
position 30:2
possible 17:2020:21

Post 1:22
practice 44:20
premarked 19:11
prepare 22:20 71:3,5
  82:14
prepared 14:25 35:3
  39:740:2144:3,17
  70:680:1782:12,13
preprinted 35:18
present 2:10 33:16
pretty 30:5
previously 31:19 68:11
  68:13
primary41:1147:2
printout 26:1037:2
  50:23
prior 15:5,7 17:1 18:12
  19:1321:2125:9,11
  30:2559:25,2565:5
  66:867:5
privilege 8:229:22
probably 7:23 10:13
  13:2418:22 19:5,15
  22:1624:8,9,13
  28:1040:2341:23
  59:1669:2370:8
problem 39:19
procedure 28:11,14
proceed 9:5,23
proceedings 1:8
produce 72:22,23 73:2
produced 8:24 9:25
  34:5
production 14:19
  30:1133:18
Professional43:11
program 26:11
projection 23:17
proper 45:17
property 56:3
protect 76:12 77:2
protection 83:15 84:7
provide 10:8 34:6
  48:1569:1670:13
provided 11:1442:25
  80:13
providing 10:2443:2
provisions 7:8
public 1:9 57:9 86:21
Pulse 12:1,6,11 13:13
  31:2548:2,9,13,17
  48:2449:4,14,20
  50:1369:7,14,23
  70:10
purpose 78:13
purposes 11:1815:4,9
  52:15,20
pursuant 10:19,24
put7:1517:2128:22

43:2047:6
P.A2:4
P.M 1:13 15:2548:24

Q

question 6:98:726:6
  27:16,2029:1 32:7
  34:2335:1436:19
  39:343:645:16,23
  50:2,1851:1552:8
  52:1758:7,19,25
  62:15,1864:2065:4
  65:5,1169:16,17
  71:12,1873:18,22
  75:1
questioning 22:1,336:5
  45:1867:572:20
questions 6:4,5 8:7 9:1
  53:1658:971:13
  78:981:2282:1,4
quote 16:517:623:11
  23:16,1924:15,21
  39:740:21,2372:12
  80:17

R

R 1:7,72:1
RacheI23:13,1476:10
  77:1,24 80:8,9
Rachel's 23:12
range 24:8,13 48:21
rate23:11,12
rates 23:13
RBSG 11:22 13:15
  55:556:22,2363:17
  71:578:25
re 54:13
reach 76:1784:13,14
reaction 20:1
read 16:9 17:1 127:15
  27:1751:15,1956:14
  56:1562:17,1973:24
  75:11
reads 32:14 34:17
  37:2043:10
really 45:4 71:25
reason 30:8 48:5
reasons 83:11,12
recall 14:15 19:18,20
  19:2220:1,10,22,25
  23:2332:1836:16
  40:1443:278:3,25
recalled 80:19
receive 25:25 42:16
  48:6
received 3 1:1,7 71:1
  74:6
receiving 20:22 48:2
recess 53:9

recognize 76:20
recollection 31:13 66:4
  74:478:1
record 4:9,205:11,19
  8:219:1910:1 15:11
  15:13 17:2230:11
  33:9,11 50:3,5 53:6,8
  57:2061:664:12,14
  65:13 68:5,7 71:21
  72:473:4,7 84:20,21
  84:23 85:686: 11
recording 74:23 76:1
records 4:4,225:329:8
  37:2065:9,10 67:25
  71:2272:1773:9
  78:17
Recro 3:3
redact 53:3,5
redacted 71:23,24
Redir 3:3
REDIRECT 78:10
reference 50:24 58:25
  63:1974:11
referenced 51:12
referred 65:5
referring 25:1 51:17
  66:1368:1969:18
reflect 27:1228:7
  29:19
reflected 43:15
refresh 31:13
refreshed 78:1
regard 39:854:16
  58:12
regarding 29:2,9,25
  33:2434:1735:11,24
  36:10,1637:640:10
  48:1,1350:2564:2,7
  67:6,10 69:6 71:13
  79:15,2184:25
regionaI19:355:23
  56:957:266:20
register 16:6,15
registration 34:18
  36:11
Reilly 82:7,7 7:13,188:6
  8:17,209:7,13 14:20
  15:11 17:2321:25
  27:15,1928:2529:23
  30:731:3 33:934:3
  36:345:15,2246:2
  50:351:2,453:654:1
  54:5,25 55:2,10
  57:2058:1,7,18,24
  61:10,1463:13 64:12
  64:2067:468:2,5,11
  69:1570:21 72:19
  73:2,4 74:2575:4,11
  75:17,2179:684:20

84:2485:11
relate 61:25 63:18
  68:1769:4 71:16,25
  72:278:16
related 86:13
relates 54:22 55:5
  78:2479:3
relating 29:19 72:12
relative 86:15
relevant 7:14 8:1,4
  59:7
remember 11:24 14:3
  17:1624:631:6
  47:10 48:2,1450:17
  50:2251:1,770:12
  76:15,22,25 77:5,16
  77:2181:2382:3,5,6
  82:8,11
rendered 10:1943:11
repeat 56:13 62:17,22
rephrase 72:23
report 39:9
reporter 1:10 57:17
  86:21,25
Reporters 1:21
represent 5:20 8:10 9:7
  29:153:1355:10
  79:6
REPRODUCTION
  86:24
request 9:25 30:11
  51:25
requested 27:17 51:19
  56:1562:1973:24
respect 13:928:18
  84:15
respectfully 29:7
responsibility 41:12
responsive 8:19
retained 10:4,4,8,15
  11:10,11 13:8,9
  27:25 40:5 84:12
returning 76:2
review 7:21 32:15 33:4
  44:4,10,13 49:12
  55:11 63:21
reviewed 7:7 34:8 70:5
  82:17
rid 75:7
right 22:440:949:5
  53:164:568:21
road 84:5
ROBERT 2:5,7
Robin 11:21 16:5
room33:17
run 23:1 60:7
running 19:8 76:8,16
runs58:11
RJ 1:21

S

S 1:72:14:15:1484:3
Sam2:1111:2115:24
  19:523:2124:4
  32:1648:163:22
  65:1866:5,1467:10
  72:13,22,2574:8,18
  76:1377:3,6,12,17
  80:782:6
same30:261:17,18,19
  61:2063:2364:24
  65:21 79:986:24
saw43:18,1949:11
  50:2367:1780:19
saying 48:9 75:14
says 16:4 17:523:10
  37:1263:16,1669:11
  70:581:25
schedule 7:4,6 9:19
scope 9:21 52:23
search 4:8 5:912:17
  18:23,23 19:920:7
  23:125:7,1230:20
  32:1,15,2134:18,18
  35:11,2436:11,17,25
  37:5,17,2138:15,19
  38:19,2539:8,11,15
  39:18,22 40:2,6,6,11
  40:2241:2443:12,20
  44:2545:4,5,649:19
  49:23 50:25 51:25
  58:13,16,17,2359:1
  59:8,1163:2169:14
  70:9,1477:778:2
  79:20 80:2,11,18
  83:1
searched 11:1731:15
searches 22:18 66:18
  70:683:19
searching 30:23 31:17
  31:2332:3,4 33:24
  43:1666:6,1073:20
  74:18
second 19:6,6,11 20:6,7
  20:1622: 1224:22
  27:10,1540:2065:17
  65:1768:1 73:581:3
secretary 12:16 43:5
  43:17,23
section 58:5,11 82:23
  82:25
see 15:816:717:6,9
  18:6,920:523:13
  24:23 26:1729: 11
  30:2132:12,1634:16
  34:1937:14,2138:10
  38:16,2139:1943:12
  48:2451:154:21
  58:5 59:23 66: 10,23

71:972:21,2473:13
76:7,9,11  77:2  81: 19
82:183:1
jeeing 57:5
seem 64:22
seemed 82:24
seems 33:21  49: 19
seen 6: 1920:2422:8
33:734:948:4 49:7,8
54:767:23
segregate 7: 11
Select 38:15
selection 47: 11
send 41:25  67:1585:4
85:7
sense 62:1271:1974:6
sent 8:24  10: 16  18:2
32:16,2233:5,14,23
41:2342:1457:24
63:2273:1678:2
separate 80:25
series 6:4  71: 12
seriously 22:22
service 18:2538:21
50: 11
services 10:8,18,23
11:1424:1143:10,11
setting 19:2,3
sheet 71 :8,22
sheets 71:13,2073:14
Shepherd 2:4,5  3:6  8:8
16:1,2221:8,11
24: 1726: 13 32:6
33:19,2134:2,8,22
35:1336:1839:2
46:749:1,351: 15
52:7,1653:3,11,12
53:18,2254:4,10,23
55:1,3,12,1356:11
56:14,2157:12,16
58:3,8,10,21  59:5
60:2561:4,8,12,15
62:10,1763:1,4,7,10
63:1564:15,2565:9
65:1467:7,868:3,8
68:13,15,2169:3,10
69:19,2570:2271:24
72:9,10 73:2,8 11
74:10,21  75:3,6,15
75:1976:1978:7
79:883:21,2384:16
Shepherd-12 57:14
short48:8
SHORTHAND 86:21
show32:2153:17
64:1068:972:16,18
73: 12, 15
shown 68:25
shows 33:22

signed 10:17 81:10,17
81 :22  82:4,10  84: 11
Silk 1:5 2:8 3:4 5:18
6:187:159:1,13  10:3
15:21,2217:1820:18
22:7,824:1526:3,6
30:1831:933:25
34: 15  36:22,2442: 11
42:15,2044:4,5,8,23
46:747:23,2448:20
48:23  50:7,8,953:2
53:1256:561:1,2,3,9
61:1763:1965:4,15
68:1871:774:24
75:2476:2
Silk-l 4:3  5:1
Silk-IO 4:1447: 19
68: 10
Silk-114:1653:20,23
Silk-12 4:1857:18,22
58: 11
Silk-13 4:2061 :5,6,17
61:2568:2069:1,20
72:1
Silk-14 4:21  63: 12, 13
63:1768:16,17
Silk-154:2273:9
Silk-16 4:2375:10,22
Silk-2 4:4  5:4  29:6  36:4
43:1951:4 61:11,17
61:2168:16,25
Silk-3 4:55:672: 12
73: 15
Silk-4 4:7  5:9
Silk-5 4:9  5: 11
Silk-6 4:10  15:1570:21
Silk-7 4:11  15:1764:10
64:24
Silk-8 4:12  15:1964:11
Silk-94:13  47:17 68:9
similar 29:1839:19
49:22 50:8 54:20
55:6
since 22: 1
Single-page 54:3
sit 85:3
sitting 9: 15 42:3 44:22
79:19,23,25
situation 19:24
six 16:24
SLK26:2332:12
sole 11:2
some 8:925:3  30:8
52:453:1671:15
76:984:6
somebody 34: 11
someone 19:15 21:22
46:1452:456:4
60: 16,18,20

something 9:946: 14
53:3,567:12,16,17
67:21,2370:774:22
84:5 85:2
Sometime 14:4
somewhere 10:13
sophisticated 60: 11,13
60:18
sorry 16:23  17:21  19:4
31:243:2344:946:9
54:2365:1877:1
84:16
sort39:1376:9
sound 22:4
Sounds 63:6
Southern  1: 1 5:24
53:1586:1
speak41:960:19,22
speaks 30:4
specific 66:4
spending 25: 18
spent25:1933:12
spoken 41:2080:7,8
spot45:8
stages 25:2066:7
stamped 7:8 45:14,16
47:2454:263:14
81:10
standard 44:20
stands 30:2
Stark 1:11,1123:14
29:8,859:14,14,18
59:1876:1077:1
start 8:259:8  10:5
59:12,13,1566:21,22
starts21:1260:18
state 4:8  40:7  50: 10
66: 11 69:7 76:6
stated 46: 14
statement 50: 10
statements 35:18
states 1:1  5:23  38:15
58:11  86:1
stenographic 1:7
step 84:17
steps 7:4
still 25:19 57:3
stipulate 31:3
strike 10:5 25:4 51:11
54:2079:24
Stuart41:2165:19
67:380:8
subject 17:2018:18
20:2048:24
submit29:7
subpoena4:3  5: 1 6:23
7:18:1,4,159:20
29:7 30:4,5,13
subpoenaed 8: 16

successful60:3
supervision 82: 15
SUPPLE 2:7
supposed 28:22
sure 8:18 21:19,19 24:5
24:1443:449:8
62:2375:2384:13
sworn 5:1586:10
system 28:1635:21

---

T

T 1:7,74:1
take 5:246: l3 8:24
9:1812:1421:21
26:1932:1161:16
67:2470:9,1975:2
taken 1:87:5  12:14
53:986:8,14
talk 17:7  19: 1 59:7
76:8  84:3
talked 51:7 63:7 83:22
talking 56:2276:482:5
talks 50: 11  72:24
tape 74:2375:2576:1
taped 4:23  75:9
telephone 13:6  14:12
23:2565:17,20,21
69:1270:277:11,21
telephones 77: 16
tell 6:2213:3  15:23
24:634: 1236:24
41:642:1245:13
53:2457:1858:22
61:1783:8
telling 52:14
tells 56:4  78:18
temporary 56: 19
term 41:1 046: 12
terms 11:1418:13
19:1225:1631:22,23
terrible 50: 1
testified 13: 12  27:25
36:1540:1377:6
84:10
testifies 5: 15
testify 79: 14
testimony 8:15  12:14
21:21 28:4 51:1 65:7
67:5,971:1572:11
86:9,11
text 37: 12
Thank 17:6,25 27:4
34:736:1444:953:2
76:18
their 28: 1950:21  60: 18
thing 79:9
things 42: 15 60:2462:2
74:976:1477:4 84:4
think 9: 10,24  11:22

12:4,6,13,24  13:12
14:1415:717:4
22:2223:5,828:23
30:5,831 :6,2435:25
35:2539:1045:17
47:549:2063:2,9
65:667:976:1277:3
78:1479:880:5,9
84:7,1085:5
thinking 83:9
third 13:2037:19
38:14
though 52:362:16
thought 7:14  8:12
22:21,2556:1863:4
three 11:16,2415:25
24:1731:1832:5
38:18,19,2362:9,25
64:23 65:1669:1
72:18
through 28:5  30:8
33:1348:2266:2
70:978:679:7 85:2
Thursday 1:12
time 4:4,9,20,22 5:3,11
7:9,10,1210:3,7
11:1913:7,19,24,25
16:11  19:6,7,15,20
20:722:21,2523:5
23:1726:8,928: 12
28: 15,19,2231:3
40:2141:22,2342:17
42:2043:5,1850:23
51:13  52:5,2457:3
60:1,1761:663:18
64:2365:9,10 66:20
67:25 68:2469: 1
71:8,13,20,21,22
73:9,1476:13,14
77:4,4,1578:17
83:13,1884:11
times 18:1462:8
titled 7:4
today 6:20,25  7:19
17:832:942:3 44:22
49:765:776:477:5
79:14,19,2480:1
together 61: 1306:24
told 12:2425:3,16
31:2440:147:552:4
52:10,1370:1577:7
top 54:21
topic 19:23
tota145:10
totality 81 :9
towards 37:10
track 67:22
trade 38:21  80: 11
trademark 13:1018:13

18:23,2520:721:6
22: 18 23: 1,11 ,15
25:726:134:17
35: 11,24 36: 11,17
39:840:11 43:12,16
43:2044:2552:25
54:1355:1558:16,23
58:2559:8,1166:9
67:1071:4 72:13
73:20,21 74:14,19
77:778:279:15,20
80:2,1883:18
trademarks 64:3,7
65 :25 66:6 67: 1 72:3
73:1774:11
TRANSCRIPT 86:23
trick 35:8
true 63 :2464:24 84: 18
86: 11
try 10:6 76: 11
trying 9:4 20:16 29:16
33:1335:865:13
turn 7:381:17
turned 77:24
turning 80:23
twelve 75:24
twenty-nine 15:25
twice 7:23
two 11:19 12:5,8 18:14
24:8,12,2126:15
31:2536:1540:17,18
40:1951:1854:4
58:4,1161:2064:10
64: 17,1767:2469:4
70:1,1871:2073:12
77:6,16,2180:25
82:23
two-page 26:4
two-thirds 37: 12
type 35:2342: 1 55: 17
59:21
typed 4:23 75:2,9
types 46:23 83:25
typica176:5

**U**

UCC 38:19
**under** 12:18 55:19
82: 1486:24
underneath 82:24
understand 6:9,10
52: 19,21 54:8 62:8
62:1164:20
understanding 16: 16
37:16,2339:1542:6
46:1249:1851:10
78:12,2083:10
understood 78:23
82:2083:3,6

unfortunately 35: 17
64:23
United 1: 1 5:23 86: 1
unless 33:8 86:24
unusua174:22
usage 13:1018:13 21:6
use 11:1613:1415:3,6
16:1217:3 19:221:3
21:2328:1641:10
50:21 52:657:8
used 11:2113:1539:8
79:12
uses 39: 17 54:8
using49:1966:19

**V**

vaguely 32:20
valid 11:19 12:5,8,13
various 11:1526:21
28:530: 1 38:874:9
Venustas 1:3,45:22
10:1011:2312:2
13:21 14:9,23 16:6
16:13 17:2,2020:21
21:2,1229:10,21
30:1537:1,1338:1
49:2450: 13,2052:5
53:1455:6,2256:24
71:674:1879:3,21
80:286:3,4
verbally 13:3 69:24
versus 5:2253:14
very 6:10 48:850:14
57:3
voice 17:8,13 76:20,21
vs 1:486:4

**W**

wait 20:4
waived 8:23
waiver 9:22
want 7:158:10,189:18
9:2511:1641:10
72:20,2473:276:24
85:2
wanted 66:20 83:14
wanting 83:12
**wants** 8:23
warranted 8: 13
wasn't 11 :2022:241:3
67:1969:2370:15
77:1784:13
way 9:520:1623:16
31:1437:12,1938:15
43:745:3 57: 11
67:2178:1679:11
website 37:3 39:24
69:7
week 17:7

well 8:16 12:1622:16
23:725:426:435:7
37:1141:1848:21
51:1154:1255:18
60:268:2277:14,20
80:781:983:7
went 21 :2228:443:4
44:10,1474:1376:14
77:4 78:6 79:7 82: 17
82:2084:7
were 5:37:8,14,22,25
8:1,3,4,5,12,13 10:4
10: 19,24 11: 11,19
12:5,8 13:8 18:14
25:18,19,20,2027:25
29:1031:19,2537:20
41 :8,11 42:8 57:5
59: 10 60:6 62:2,2,4
65:766:967:268: 11
70:473:976:680:1,5
83:8
weren't 40:5 51:24
57:766:9
we'll 6: 149:5,23 31:3
72:2275:7
we're 6:259:16 19:10
19:1620:3,4,15,16
29: 1736:340:751:4
51:1656:365:12
67:1369:19,20
we've 27:21 28:433: 12
51:2357:1871:12,19
whole 30:7
wife 56:2
WISCHUSEN 2:7
wise 18:22
witness 3:28:1421:10
35:1536:6,2039:4
51:2152:954:6
56:1757:2358:20
59:3 60:22 62:6,23
64:2165:1168:22
69:9,2271:1574:3
75:13,1877:2083:22
83:2484:1886:9,12
word 49:2050:13
wording 35:20 43:18
43:20
words 35:2437: 13,17
47:7
work 18:23 22:19
23: 11,1525:1726: 1
27:1228:729:2,4,19
35:441:242:1,4,7,9
42:25 46: 17 52:25
54:1355:23,2456:3
57:859:13,18,21
61:1366:8,967:13
71:472:1376:3

77:2478: 15,23 79: 16
80:14,21
worked 59: 17 60:8,9
working 41 :21
works 78:19
wouldn't 49: 13 55:25
74:14
write 24:18
writing 13:4
wrong 40: 1446: 15
47:6
wrote 18:8

**X**

X 3:14:1
XI010611:10 86:21
Xs 38:9

**Y**

Yeah 21: 1430:4 33:20
49:5
year7:10
Yep 28:6 32:24
York 1:15:2453:15
86: 1

**$**

$2,913 24:23
$3,413 24:23
$4,00024:13

**0**

000833:2263:5
003 71: 16 72: 1
00471:17
0100054:2
0100154:5
0863:14
087361:23

**1**

16:19
1:07-04530 1:286:2
1020:2248:2049: 1
50:9
100257:2281:2
100558:281:10
1061:22
11 78:9
1258:5 80:23
12/30/054: 18
121342:12
121426:5
121526:5
13 71:14,16,21 72:5,7
72:17
1468:20
154:10,11,1247:24
49:573:13

15th 47: 16, 1848: 1,23
68:2372:8
1648:21
17th 5:3,5 15:14,25
17:229:6,13 31:1,12
34:1672:6
19th 14:3

**2**

226:430:1934:15
42:1644:861:2,3
63:1965:1568:18
71:7,1472:1773:13
2/15/064:13,1468:18
68:1869:21 70:2
2/3/064:21 63: 19,20
2/665:16
2/6/064: 11, 12
2:451:13
20 1: 12
20th 14:3
200557:13
20065:3,57:910:13
13:2414:615:14,16
15:18,25 17:2,19
29:630:1931:12,23
32:1233:15,2434:17
47:16,1848:1,23
51:357:1163:11
200775: 17,24
2008 1: 12 86:22
208452386:22
21st 22:3
22nd 14:3
25171:22
**27** 48:22
2986:22

**3**

322:824:16,2135:6
44:5
3rd 30:19 31:15 32:12
33:15,2351:363:11
3,00024:13
3/17/064:5,10 71:8
3120/0674:8
30th 57:13
351:22

**4**

436:2350:8
4/17/064:4
474:13,14

**5**

53:54:3,4,5,7,942: 11
42:2044:4,23
533:64:1616:2
5422:11

**5522:12**
**5636:23**
**574:18**

---
6
---
615:22 31:9
**6th** 15: 16, 18  17: 19
   18:12 20:2 20:22:2
   72:7 75:13,24
**609-895-726576:** 18
614:20
**634:21**

---
7
---
717:18
**734:22**
**732-223-7200** 1:23
**754:23**
**783:5**

---
8
---
820:19

---
9
---
947:24

# EXHIBIT B
# TO THE DECLARATION
# OF JOSEPH M. HEPPT

Allen Silk - ghusson                                                                      Page 1

From:     Myra Gibson
To:       Silk, Allen
Date:     Fri, Mar 17, 2006  5:15 PM
Subject:  ghusson

Allen, the name Venustas International is available.  I'm attaching a quote for trademark work, based on
my rate and Rachel's Rate.  I don't know where to fit you in so you can play around with it if you want.



| | A | B | C | D |
|---|---|---|---|---|
| 1 | Trademark Search & Registration Fee Estimate | | | |
| 2 | Quote for 1 trademark | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | No. of | Cost | |
| 6 | | Searches | Per Search | Total |
| 7 | Knock-out Search | 1 | $125 | $125 |
| 8 | TM Search (standard turn-around=3 business days) | 1 | $513 | $513 |
| 9 | | | | |
| 10 | | Hours | Rate | Total |
| 11 | Paralegal Review of Searches | 2 | $125 | $250 |
| 12 | Paralegal Preparation of Opinion Letter | 2 | $125 | $250 |
| 13 | Attorney Review and Completion of Opinion Letter | 1.5 | $325 | $488 |
| 14 | | | | |
| 15 | Review & Letter | 5.5 | | $988 |
| 16 | | | | |
| 17 | Total Searches, Review & Letter | | | $1,626 |
| 18 | | | | |
| 19 | Paralegal Preparation of 1 TM Application | 1.5 | $125 | $188 |
| 20 | | | | |
| 21 | | | | |
| 22 | | Class | Fee | Total |
| 23 | USPTO Filing Fees (one class) | | | |
| 24 | | | | |
| 25 | Words only | 1 | $325 | $325 |
| 26 | | | | |
| 27 | Total Filing Fees | | | $325 |
| 28 | | | | |
| 29 | Total for 1 Trademarks | | | $2,138 |
| 30 | | | | |
| 31 | | | | |
| 32 | | | Est. Per Mark | Total |
| 33 | | | | |
| 34 | Follow-up with USPTO | $ 500 | $1,000 | |
| 35 | Prepartion of ITU App | | $125 | |
| 36 | ITU Filing Fee | | $150 | |
| 37 | | | | |
| 38 | Follow-up Fees | 1 | | |
| 39 | | $775 | $1,275 | |
| 40 | | | | |
| 41 | Total Cost Estimate | $2,913 | $3,413 | |
| 42 | | | | |
| 43 | | | | |
| 44 | | | | |

6/19/2007

000000055

# EXHIBIT C
# TO THE DECLARATION
# OF JOSEPH M. HEPPT

**STARK & STARK**
A Professional Corporation
Attorneys at Law
993 Lenox Drive
Lawrenceville, New Jersey 08648
April 19, 2006

**In Account With:**
Sam Ghusson and Robin Burns McNeill
56 Fitch Way
Princeton, New Jersey 08540

EXHIBIT
Silk- 5
3/20/08 Kmn

**Re:    Formation of LLC – Fixed Fee**
     Account No. 19655-4

Legal Services:

　　　　For Professional Services rendered, including corporate and trademark
　　　　search for name availability; preparation and filing of Certificate of
　　　　Formation; preparation and filing of SS4 and Business Registration;
　　　　and initial drafting of Operating Agreement ......................................................$1,500.00

Disbursements:

　　　　Secretary of State filing fee; file storage and maintenance............. ..........................$60.00

**TOTAL DUE AND OWING STARK & STARK ..............$1,560.00**

_Please Note:_    _Stark & Stark reserves the right to request reimbursement in the future of any
additional disbursements which are not included on this invoice as a result of this
transaction._

000001213

# EXHIBIT D
# TO THE DECLARATION
# OF JOSEPH M. HEPPT

1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2              DOCKET NO. 07 CIV 4530 (LTS) (THK)

 3

 4  AEDES DE VENUSTAS, INC.,

 5         Plaintiff,                 CONFIDENTIAL
                                      DEPOSITION OF:
 6         vs.
                                      SAM GHUSSON
 7  VENUSTAS INTERNATIONAL, LLC,

 8         Defendants.

 9  ----------------------------------

10

11

12

13

14         T R A N S C R I P T  of the stenographic notes of

15  the proceedings, taken in the above-entitled matter, by and

16  before SHAUNNA H. MORAN, a Certified Shorthand Reporter,

17  License No. X100213700, Registered Professional Reporter,

18  and Notary Public of the State of New Jersey, held at the

19  offices of MATHEWS, SHEPHERD, McKAY & BRUNEAU, P.A., 29

20  Thanet Road, Princeton, New Jersey, on Tuesday, June 12,

21  2007, commencing at 10:10 a.m.

22

23

24

25
```

GHUSSON-direct

1    an executive position?

2          A.      At Calvin Klein, Elizabeth Arden,

3    Griffin and Victoria Secret Beauty, the last four.

4          Q.      Okay.  Was Griffin a privately held

5    or publicly held company?

6          A.      It was owned by the Limited.

7          Q.      Okay.  During your career in the

8    beauty industry did you have occasion to deal with

9    trademark issues?

10          A.      Yes.

11          Q.      Okay.  Would it be fair to say that

12    trademark issues are a big part of the beauty

13    industry?

14          A.      I would say it is part of it.

15          Q.      It's an important -- it's an

16    important issue, especially in product development;

17    isn't that true?

18          A.      In product name, correct.

19          Q.      And have you had occasion personally

20    to -- to deal with any trademark issues during the

21    course of your career in the beauty industry?

22          A.      Not personally, but my team did.

23          Q.      Okay.  And have you worked with

24    attorneys, outside counsel or inside counsel, on

25    trademark issues from time to time?

GHUSSON-direct

1          A.      Yes.

2          Q.      Okay.  Are you familiar with a

3    publication called Women's Wear Daily?

4          A.      Yes.

5          Q.      Do you read that publication?

6          A.      Yes.

7          Q.      Do you read it with any -- any sort

8    of regularity?

9          A.      Yes.

10         Q.      Okay.  Would it be fair to say that

11   you read it on a daily basis?

12         A.      Yes.

13         Q.      Okay.  When you read Women's Wear

14   Daily do you read the entire issue cover to cover?

15         A.      No.

16         Q.      Okay.  Can you explain.  Do you have

17   a practice of how you read that publication?

18         A.      Yes, I do.  I receive it on line, I

19   click on the retail end to see what interesting

20   retail is going on.  Then I click on the beauty

21   section and see if anything interesting in the

22   beauty.

23         Q.      Okay.  What would -- what would, in

24   your mind, constitute an interesting article in the

25   beauty section?

# EXHIBIT E
# TO THE DECLARATION
# OF JOSEPH M. HEPPT

JOSEPH M. HEPPT

ATTORNEY AT LAW

521 FIFTH AVENUE

SUITE 1805

NEW YORK, NEW YORK 10175

FACSIMILE: (212) 973-0891

TELEPHONE: (212) 973-0839

EMAIL: JMHEPPT@HEPPTLAW.COM

April 16, 2007

***VIA CERTIFIED MAIL***
***RETURN RECEIPT REQUESTED***

VENUSTAS INTERNATIONAL, LLC
405 Lexington Avenue   25th floor
New York, NY 10174

> Re:   Aedes de Venustas, Inc. -- Venustas International, LLC – Infringement
>       Our File No. 0727-008

Dear Sir or Madam:

This firm represents Aedes de Venustas, Inc., which is the owner of U.S. Trademark Registration No. 3082887 for the mark AEDES DE VENUSTAS.

Your company's name constitutes an improper infringement on my client's registered trademark in violation of *United States Code,* Titles 15 and 17, and applicable state laws. Your company's name incorporates our client's trademark and name. Since your use is without permission or consent of the trademark owner, this use is an infringing use of the mark AEDES DE VENUSTAS.

In addition, your improper use of our client's trademark and name creates initial interest confusion as it misleads the consumer as to the source or affiliation. Your use is also a dilution of AEDES DE VENUSTAS, which has become famous in the fragrance and skin care industry through years of advertising and usage by our client.

In view of your infringement of our client's rights, we must demand that you provide written assurances within 7days that you will immediately:

1. Permanently refrain from any use of the term AEDES DE VENUSTAS or any variation thereof that is likely to cause confusion or dilution;

2. Distribute a press release clarifying that your company is not related to AEDES DE VENUSTAS in any way; and

3. Request that a clarification be published by Women's Wear Daily stating that your company is not related to AEDES DE VENUSTAS in any way.

VENUSTAS INTERNATIONAL, LLC

April 16, 2007
Page 2

Be assured, our client intends to take whatever steps are necessary to protect its interests and to enforce its rights, including, without limitation, the commencement of appropriate legal action to enjoin infringing use, to recover monetary damages as well as attorney's fees.

The foregoing is not intended to be an exhaustive recital of the factual and legal bases with respect to this matter. Nothing contained in this letter is intended, nor should it be deemed to constitute, as an admission or a complete statement of the relevant facts or to waive, limit, prejudice or otherwise affect any of our client's rights or remedies, all of which are expressly reserved.

Very truly yours,

Joseph M. Heppt

JMH/wrk

Copy to:     Robert Gerstner

# EXHIBIT F
# TO THE DECLARATION
# OF JOSEPH M. HEPPT

1

77DGAEDH                              HEARING

1  UNITED  STATES  DISTRICT  COURT
   SOUTHERN  DISTRICT  OF  NEW  YORK
2  ------------------------------x

3  AEDES  DE  VENUSTAS,  INC.,

4                  Plaintiff,

5           v.                                  07  CV  4530  (LTS)

6  VENUSTAS  INTERNATIONAL,  LLC,

7                  Defendant.

8  ------------------------------x
                                            New  York,  N.Y.
9                                           July  13,  2007
                                            9:55  a.m.
10
   Before:
11
                        HON.  LAURA  TAYLOR  SWAIN,
12
                                            District  Judge
13
                        APPEARANCES
14
   JOSEPH  MICHAEL  HEPPT
15      Attorney  for  Plaintiff

16  MATHEWS,  SHEPHERD,  MCKAY  &  BRUNEAU,  P.A.
        Attorneys  for  Defendant
17  BY:   ROBERT  GEORGE  SHEPHERD

18  TAYLOR,  COLICCHIO  &  SILVERMAN,  LLP
        Attorneys  for  Defendant
19  BY:   PHILIP  M.  COLICCHIO

20  ALSO  PRESENT:   KARL  BRADL
                     ROBERT  GERSTNER
21                   SAM  GHUSSON

22

23

24

25

77DGAEDH                          Ghusson - cross

1    International to the lawyers, did you bother to Google the name

2    Venustas International?

3    A.   No, sir.

4    Q.   And if you had Googled Venustas International, you would

5    have found that there was another company called Aedes De

6    Venustas that was already out there in the beauty industry.

7    Isn't that true?

8    A.   I would have found that there was an Aedes De Venustas

9    store that sells perfume product in Christopher Street in the

10   Village, and that's not in the business that I'm In.

11   Q.   Wouldn't that indicate to you that there was a potential

12   problem with using the name Venustas International?

13   A.   No, sir.

14   Q.   It would not have indicated to you in any way that there

15   might have been a problem?

16   A.   Absolutely not.

17   Q.   And you sent the name Venustas International to your

18   lawyer.   Correct?

19   A.   Yes, sir.

20   Q.   Mr. Allen Silk, I believe you told us?

21   A.   Allen Silk from Stark & Stark.

22   Q.   And he checked the name out, and he said that it was clear?

23   A.   He sent me an invoice that says that he cleared the name

24   for our corporate name as well as a trademark, and you have a

25   copy of that.